# 24-2949

*To Be Argued By*:
ADAM AMIR

# United States Court of Appeals
## For the Second Circuit

◆◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

LUIS CARDENAS PALOMINO, RAMON PEQUENO GARCIA,

*Defendants,*

GENARO GARCIA LUNA,

*Defendant-Appellant.*

_____

**On Appeal From The United States District Court
For The Eastern District of New York**

**BRIEF AND APPENDIX FOR THE UNITED STATES**

JOSEPH NOCELLA, JR.,
*United States Attorney*,
*Eastern District of New York*
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

SUSAN CORKERY,
RYAN C. HARRIS,
ERIN M. REID,
ADAM AMIR,
*Assistant United States Attorneys*,
    *Of Counsel*.

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................iv

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF FACTS ................................................................ 4

    I.     Garcia Luna's Indictment and Arrest .................................... 4

    II.    Pretrial Disclosures..................................................... 5

    III.   Classified Information Procedures Act
          Proceedings................................................................ 6

    IV.   The Trial .................................................................... 7

          A.    Senior Cartel Members Testified That Garcia
                Luna Assisted the Cartel for Bribes ........................... 8

          B.    Cartel Importers, Exporters and Cartel
                Affiliates Corroborated Senior Cartel
                Leaders' Testimony...................................................... 12

          C.    Testimony From Corrupt Government
                Officials..................................................................... 14

          D.    Testimony from Other Government Officials.............. 16

          E.    The Defense Case....................................................... 20

    V.    New Trial Motion ...................................................... 21

    VI.   Court's Opinion ......................................................... 21

SUMMARY OF ARGUMENT .......................................................... 26

ARGUMENT................................................................................. 28

ii

POINT ONE - THE NEW TRIAL MOTION WAS
CORRCTLY DENIED..................................................28

    I.    The Court Did Not Abuse Its Discretion in
    Denying Garcia Luna's Perjury Claims ...............28

        A.    Applicable Law...............................................28

        B.    Discussion......................................................30

            1.    Zavaleta...............................................30

            2.    Villarreal .............................................34

            3.    The Complaints Are Immaterial........38

    II.    The Court Did Not Abuse Its Discretion in
    Denying Garcia Luna's *Brady* Claims ...............39

        A.    Applicable Law...............................................40

        B.    Discussion......................................................43

            1.    Vetting Documents .............................43

            2.    Impeachment Material.......................46

POINT TWO - THE DISTRICT COURT'S EVIDENTIARY
RULINGS WERE NOT AN ABUSE OF
DISCRETION ...............................................51

    I.    Applicable Law ......................................................51

    II.    Discussion...............................................................51

        A.    Wealth-Related Evidence .............................51

        B.    Limiting Cross-Examination........................54

POINT THREE - GARCIA LUNA WAS NOT WRONGFULLY
DENIED ACCESS TO CLASSIFIED
INFORMATION ........................................57

iii

I.    Applicable Law ........................................................... 57

II.   Discussion .................................................................. 60

POINT FOUR - THE PURPORTED EVIDENTIARY AND
            CIPA ERRORS ARE, AT MOST, HARMLESS ........... 62

POINT FIVE - THE DISTRICT COURT DID NOT ERR
            AT SENTENCING ........................................................ 63

I.    Applicable Law ........................................................... 63

II.   Discussion .................................................................. 64

    A.    The District Court Did Not Plainly Err in
          Crediting Evidence of Garcia Luna's
          Obstruction .................................................... 64

        1.    The Government's Investigation ........................ 65

        2.    The Court's Findings Were Not
             Plainly Erroneous ............................................... 68

    B.    The District Court Did Not Procedurally Err
          by Relying Upon the Evidence Presented at
          Trial in Imposing a $2 Million Fine ............................ 71

    C.    The Sentence Imposed Was Substantively
          Reasonable ................................................................. 74

CONCLUSION ....................................................................... 79

iv

## TABLE OF AUTHORITIES

Page

CASES

*Brady v. Maryland,*
373 U.S. 83 (1963) .................................................................. 40

*Brinson v. Walker,*
547 F.3d 387 (2d Cir. 2008) .................................................. 51

*Garrett v. United States,*
471 U.S. 773 (1985) .............................................................. 75

*Giglio v. United States,*
405 U.S. 150 (1972) ................................................................ 5

*In re Terrorist Bombings of E. Afr.,*
552 F.3d 93 (2d Cir. 2008) .................................................... 57

*United States v. Abu-Jihaad,*
630 F.3d 102 (2d Cir. 2010) ...................................... 58, 59, 60

*United States v. Aquart,*
912 F.3d 1 (2d Cir. 2018) ............................................. passim

*United States v. Aref,*
533 F.3d 72 (2d Cir. 2008) .................................... 58-59 n.12

*United States v. Avellino,*
136 F.3d 249 (2d Cir. 1998) .................................... 41, 45, 48

*United States v. Avenatti,*
No. 19-CR-374 (JMF),
2022 WL 457315 (S.D.N.Y. Feb. 15, 2022).................... 42, 43

*United States v. Berger,*
224 F.3d 107 (2d Cir. 2000) .................................................. 53

v

*United States v. Bout,*
  666 F. App'x 34 (2d Cir. 2016) ..............................................................32

*United States v. Broxmeyer,*
  699 F.3d 265 (2d Cir. 2012) .....................................................75, 77, 78

*United States v. Canniff,*
  521 F.2d 565 (2d Cir. 1975) ..........................................................41, 47

*United States v. Coppa,*
  267 F.3d 132 (2d Cir. 2001) .................................................................40

*United States v. Dhinsa,*
  243 F.3d 635 (2d Cir. 2001) .................................................................61

*United States v. Dussard,*
  967 F.3d 149 (2d Cir. 2020) .................................................................64

*United States v. Eppolito,*
  543 F.3d 25 (2d Cir. 2008) ...................................................................53

*United States v. Flaharty,*
  295 F.3d 182 (2d Cir. 2002) ..........................................................55, 56

*United States v. Fletcher,*
  134 F.4th 708 (2d Cir. 2025)................................................................64

*United States v. Gil,*
  297 F.3d 93 (2d Cir. 2002) ...................................................................46

*United States v. Glover,*
  588 F.2d 876 (2d Cir. 1978) .................................................................37

*United States v. Guldi,*
  141 F.4th 435 (2d Cir. 2025)................................................................68

*United States v. Hayes,*
  811 F. App'x 30 (2d Cir. 2020) ...........................................................54

*United States v. Hunter,*
  32 F.4th 22 (2d Cir. 2022)....................................................................42

vi

*United States v. Hutcher,*
622 F.2d 1083 (2d Cir. 1980) ...........................................................41

*United States v. James,*
712 F.3d 79 (2d Cir. 2013) .........................................................28, 29

*United States v. Karlov,*
534 F. App'x 38 (2d Cir. 2013) ...................................................38, 49

*United States v. Klimavicius-Viloria,*
144 F.3d 1249 (9th Cir. 1998)...........................................................59

*United States v. Litvak,*
889 F.3d 56 (2d Cir. 2018) ...............................................................51

*United States v. Locascio,*
6 F.3d 924 (2d Cir. 1993) ...........................................................45, 48

*United States v. Loften,*
518 F. Supp. 839 (S.D.N.Y. 1981)...............................................45 n.9

*United States v. McCourty,*
562 F.3d 458 (2d Cir. 2009) .......................................................39, 50

*United States v. Meregildo,*
920 F. Supp. 2d 434 (S.D.N.Y. 2013)......................................42, 48, 49

*United States v. Messina,*
806 F.3d 55 (2d Cir. 2015) ...............................................................78

*United States v. Monteleone,*
257 F.3d 210 (2d Cir. 2001) .............................................29, 30, 37, 38

*United States v. Moore,*
975 F.3d 84 (2d Cir. 2020) .....................................................64, 70, 71

*United States v. Muja,*
365 F. App'x 245 (2d Cir. 2010)...................................................36, 37

*United States v. Ojeda,*
412 F. App'x 410 (2d Cir. 2011).........................................................52

*United States v. Ortiz,*
   100 F.4th 112 (2d Cir. 2024)................................................................75

*United States v. Owen,*
   500 F.3d 83 (2d Cir. 2007) ......................................................... passim

*United States v. Paulino,*
   445 F.3d 211 (2d Cir. 2006) ...............................................................44

*United States v. Perez-Frias,*
   636 F.3d 39 (2d Cir. 2011) ..................................................................75

*United States v. Persico,*
   No. 04-CR-911 (JS),
   2008 WL 11497841 (E.D.N.Y. Aug. 28, 2008).....................................37

*United States v. Polouizzi,*
   564 F.3d 142 (2d Cir. 2009) ...............................................................51

*United States v. Quinn,*
   445 F.2d 940 (2d Cir. 1971) ...............................................................42

*United States v. Rea,*
   958 F.2d 1206 (2d Cir. 1992) ..............................................................62

*United States v. Reed,*
   570 F. App'x 104 (2d Cir. 2014).........................................................55

*United States v. Robinson,*
   702 F.3d 22 (2d Cir. 2012) ...........................................................68, 70

*United States v. Rodriguez,*
   648 F. App'x 9 (2d Cir. 2016).............................................................55

*United States v. Smith,*
   949 F.3d 60 (2d Cir. 2020) .................................................................63

*United States v. Snype,*
   441 F.3d 119 (2d Cir. 2006) ..........................................................28-29

*United States v. Spinelli*,
　551 F.3d 159 (2d Cir. 2008) ........................................................ 40, 41

*United States v. Sternquist*,
　No. 24-2135-CR,
　2025 WL 1822512 (2d Cir. July, 2, 2025) ..................................... 75, 77

*United States v. Stewart*,
　433 F.3d 273 (2d Cir. 2006) ............................................................. 49

*United States v. Stewart*,
　590 F.3d 93 (2d Cir. 2009) ........................................................ 58, 59

*United States v. Teman*,
　465 F. Supp. 3d 277 (S.D.N.Y. 2020) ............................................. 35

*United States v. Thompson*,
　No. 24-1513,
　2025 WL 843296 (2d Cir. Mar. 18, 2025) ........................ 65 n.13, 66, 67

*United States v. Villafuerte*,
　502 F.3d 204 (2d Cir. 2007) ............................................................ 64

*United States v. Watson*,
　No. 21-1562-CR,
　2022 WL 17660546 (2d Cir. Dec. 14, 2022) ..................................... 70

*United States v. White*,
　972 F.2d 16 (2d Cir. 1992) .............................................................. 56

*United States v. Wong*,
　78 F.3d 73 (2d Cir. 1996) ......................................................... 41, 50

*United States v. Yannotti*,
　541 F.3d 112 (2d Cir. 2008) ............................................................ 68

*United States v. Young*,
　745 F.2d 733 (2d Cir. 1984) ............................................................ 52

*Watson v. Greene*,
　640 F.3d 501 (2d Cir. 2011) ............................................................ 51

ix

## STATUTES

18. U.S.C. app. III, § 1(a)...........................................................................57

18. U.S.C. app. III, § 4 ........................................................................58, 57

## RULES

Fed. R. Crim. P. 16(d)(1) .........................................................................56

Fed. R. Evid. 403.....................................................................................54

Fed. R. Evid. 608(b) ...........................................................................54, 55

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 24-2949

UNITED STATES OF AMERICA,

*Appellee*,

-against-

LUIS CARDENAS PALOMINO, RAMON PEQUENO GARCIA,

*Defendants*,

GENARO GARCIA LUNA,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

PRELIMINARY STATEMENT

Defendant-Appellant Genaro Garcia Luna ("Garcia Luna") appeals from a judgment entered on October 18, 2024 in the United States District Court for the Eastern District of New York (Cogan, J.) convicting him, after a jury trial, of all counts charged in a superseding indictment, including engaging in a continuing criminal enterprise

2

("CCE") (Count One), in violation of Title 21, United States Code, Section 848, and all six charged CCE violations; international cocaine distribution conspiracy (Count Two), in violation of Title 21, United States Code, Sections 959 and 963; and making false statements on his naturalization application (Count Five), in violation of Title 18, United States Code, Section 1001. (See PSR ¶¶ 1-12, 18; DE:47).[1] He was sentenced principally to a total of 460 months' imprisonment and a $2 million fine. (SPA:3-7).

Garcia Luna argues that the district court abused its discretion in (1) denying his new trial motion asserting perjury and disclosure issues, (2) admitting limited wealth evidence and restricting certain inflammatory cross-examination, and (3) depriving him access to classified discovery. He also argues that his sentence was procedurally and substantively unreasonable.

---

[1] "Br.," "A," "SA," "SPA," "GA," "GSA," "PSR," and "DE" refer to Garcia Luna's brief, Garcia Luna's appendix, Garcia Luna's sealed appendix, Garcia Luna's special appendix, the government's appendix, the government's sealed appendix, the Presentence Investigation Report, and entries on the district court's docket, respectively. A copy of the PSR has been filed with the Court under seal.

3

As shown below, these arguments are without merit. Garcia Luna's conviction should be affirmed.

4

## STATEMENT OF FACTS

### I.   Garcia Luna's Indictment and Arrest

On December 4, 2019, a grand jury in the Eastern District of New York returned a four-count indictment charging Garcia Luna with: (i) international cocaine distribution conspiracy, in violation of Title 21, United States Code, Sections 959 and 963; (ii) conspiracy to distribute and possess with intent to distribute cocaine, in violation of Title 21, United States Code, Sections 841 and 846; (iii) cocaine importation conspiracy, in violation of Title 21, United States Code, Sections 952 and 963; and (iv) making false statements, in violation of Title 18, United States Code, Section 1001. (A:6; DE:1). Garcia Luna was arrested on December 9, 2019. (A:47). On July 30, 2020, a grand jury in the Eastern District of New York returned a five-count superseding indictment, which added a charge against Garcia Luna for participating in a continuing criminal enterprise ("CCE") in violation of Title 21, United States Code, Section 848. (A:212-23). The charges arose from Garcia Luna's assistance to the Sinaloa Cartel (the "Cartel") in exchange for bribes. (A:212-14).

5

## II.   Pretrial Disclosures

Before trial, the government made robust disclosures far beyond what is legally required.  It produced more than one million pages of documents in discovery, including substantial financial records that the government did not intend to use in its case-in-chief and were not exculpatory.  (A:4285; *see* A:246-47).  In addition, the government made early disclosures of arguably exculpatory information: on March 1, 2021, the government produced interview reports for 25 individuals (A:269; GSA:1-2), and, in 2022, it made additional disclosures on May 1, August 12, October 26, November 2, November 28, and December 27 (GSA:3-11, 14-15).

On December 9, 2022, the government made disclosures pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), with potential impeachment information for 12 potential trial witnesses.  (SA:1-41). Significantly, the government's submissions contained numerous allegations made by confidential sources that were uncorroborated but nonetheless disclosed in an abundance of caution.  At the same time, the government moved to preclude cross examination on certain irrelevant or inflammatory topics, including uncorroborated allegations of sexual

6

misconduct.  (GSA:16-32; SA:56, 58).  The district court granted the motion.  (SA:60 63).

The government also made four *Giglio* disclosures on December 15, 2022, January 5, 2023, and February 1, 2023.  (GSA:12-13, 33-39).  In addition, the government disclosed more than 26,000 pages of 18 U.S.C. § 3500 material, which included *Giglio* material, for its cooperating witnesses well in advance of trial.  (A:4086).  Specifically, on July 5, 2022, more than six months before trial, the government produced Jencks Act materials for two potential cooperating witnesses.  (A:22-23, 285).  On October 26, 2022, more than two months before the trial, the government produced Jencks Act materials for four more potential cooperating witnesses.  (*Id.*).  The government continued its production of Jencks Act materials in December 2022 and January 2023.  (A:20-22).

III.   Classified Information Procedures Act Proceedings

On May 20, 2022, the government filed an *ex parte*, classified motion for a protective order pursuant to Section 4 of the Classified Information Procedures Act ("CIPA") and Federal Rule of Criminal Procedure 16(d)(1).  (GA:1).  On June 2, 2022, the district court held an *ex parte*, in camera proceeding with defense counsel, so that defense

7

counsel had "the opportunity to present to the [district court] potential trial defenses that w[ould] assist the [district court] in its review of the Section 4 Motion and its related materials." (GA:8; A:16). On June 25, 2022, the government filed an *ex parte* classified supplemental submission in support of its motion for a protective order pursuant to Section 4 of CIPA. (GA:10). On July 7, 2022, the district court held an *ex parte*, in camera classified proceeding with the government concerning its motion for a CIPA Section 4 protective order. (A:16). On August 3, 2022, the government filed an *ex parte* classified supplemental submission in support of its motion for a CIPA Section 4 protective order. (GA:11). On August 4, 2022, the district court issued the CIPA Section 4 protective order. (DE:115).

IV.  The Trial

On February 21, 2023, following a five-week trial, a jury convicted Garcia Luna of all counts against him. (A:23-28). The trial evidence included more than 25 government witnesses, nine of which were cooperating witnesses. (DE:253 at 50).

8

A.  Senior Cartel Members Testified That
     <u>Garcia Luna Assisted the Cartel for Bribes</u>

Multiple high-level Cartel leaders—Sergio Villarreal Barragán (a.k.a. El Grande), Oscar Nava Valencia (a.k.a. El Lobo), and Jesus Zambada Garcia (a.k.a. Rey)—testified that Garcia Luna provided intelligence and safe passage of drugs and equipment, among other benefits, to the Cartel in exchange for bribes. (*Id.* at 4).

Barragán was "[o]ne of the main leaders" of the Cartel, serving as the right-hand man of Cartel leader Arturo Beltrán Leyva. (A:1279-80, 1285). Barragán designed Cartel operations and campaigns against Cartel enemies, and he expanded drug-trafficking routes. (A:1280).

"[T]o make sure it was successful in trafficking cocaine to the United States," Barragán testified, the Cartel paid "authorities in Mexico" "at different levels" of the government, including Garcia Luna. (A:1280, 1287, 1293-94). As Barragán testified:

> A:  There were two types of corruption in the Government. One of them is when you pay an officer and they look the other way and let something through. And the other type is when the officers take part in the activities of the organization.

> Q: Did the Sinaloa cartel pay the defendant Genaro Garcia Luna?
>
> A: Yes.
>
> Q: What level of participation did the defendant Genaro Garcia Luna have with the Sinaloa cartel's activities?
>
> A: A very important one.
>
> Q: Of the two kinds of participation that you just described for us, how would you characterize the defendant's participation with the Sinaloa cartel?
>
> A: As the second description that I mentioned.

(A:1288).

During Garcia Luna's tenure as head of the Agencia Federal de Investigación (AFI), Mexico's federal investigative agency, Beltrán Leyva paid him through an AFI commander. (A:1290, 1308-09). A few years later, Barragán and Beltrán Leyva began paying Garcia Luna directly. (A:1332-34). Barragán identified where the payments were made and described the hiding place of the bribe money. (A:1335, 1341-42).

Barragán explained that, for those bribes, the Cartel received federal police uniforms (A:1302-03), automobiles bearing federal police insignia (*id*.), and police bodyguard protection (A:1305). Barragán

10

personally received an AFI badge bearing a false name. (A:1303-04). The Cartel also received intelligence about investigations against it and rival cartels. (A:1291). In addition, Barragán vividly recounted AFI officers guarding the Cartel while it murdered rivals. (A:1307-08, 1317-18).

Barragán, among other witnesses, testified how, in approximately 2008, a civil war broke out within the Cartel between those loyal to Beltrán Leyva and those loyal to Ismael Zambada García (a.k.a Mayo) and Joaquín Archivaldo Guzmán Loera (a.k.a. El Chapo). (A:1417-25, 4089). Barragán explained that Beltrán Leyva eventually kidnapped Garcia Luna because he was unhappy that police "operations were constant against the Beltr[á]ns and…minimal against Chapo and Mayo." (A:1424-25).

Echoing Barragán, Nava Valencia testified that he paid bribes to Mexican government officials, including Garcia Luna. (A:1796, 1814). Nava Valencia provided Garcia Luna with "money and cash" totaling "more than $10 million," in exchange for assistance with Cartel operations and the airports, as well as receipt of information regarding rival groups. (A:1790, 1806-07, 1813). Nava Valencia also testified that, around 2006, he contributed $2.5 million to a pooled bribe payment going

11

to Garcia Luna.  (A:1814).  Nava Valencia met Garcia Luna twice, first at Beltrán Leyva's house and then at a carwash in Guadalajara, where Cartel members paid Garcia Luna $3 million.  (A:1790, 1826-27, 1837, 1840).  Nava Valencia also recounted other senior Cartel members discussing their relationships with Garcia Luna, including Beltrán Leyva.  (A:1812-13).

Zambada Garcia led the Cartel's operations in Mexico City, including overseeing its airport.  (A:2869-70).  Zambada Garcia explained the "importance of the connections with the government" for the Cartel's growth.  (A:2874).  To that end, Zambada Garcia recounted to the jury Cartel discussions about Garcia Luna, his involvement in payments to Garcia Luna, and benefits the Cartel received from the federal police. Around 2003, Beltrán Leyva offered Zambada Garcia a position leading government relations for the Cartel.  (A:2874-75).  When Zambada Garcia replied that he only had low level government contacts, Beltrán Leyva told him, "[D]on't worry, I already have connections in the highest levels and with all governmental entities" including "Genaro Garcia Luna." (A:2875).  Zambada Garcia described meeting Garcia Luna at a French restaurant in Mexico City where he took bribes from the Cartel.  (A:2886-

12

92, 2897). Zambada Garcia recalled packing millions of dollars into bags, which another person brought to the restaurant. (A:2888). Corroborating Barragán, Zambada Garcia explained that, for the bribes, the Cartel received "protection" and "AFI uniforms." (A:2880, 2900).

B. Cartel Importers, Exporters and Cartel Affiliates
Corroborated Senior Cartel Leaders' Testimony

The jury also heard from other Cartel members, like importers and exporters Harold Poveda Ortega (a.k.a. Conejo), and Tirso Martinez Sanchez (a.k.a. Futbolista), who relied on the Cartel leaders' relationships with Garcia Luna to move massive quantities of cocaine through Mexico. (A:1512, 1580, 1582-83, 2197-98, 2208-09, 2214).

Poveda Ortega testified that he moved "more than one million kilos" of cocaine in partnership with Beltrán Leyva and the Cartel. (SA:922, 924). Beltrán Leyva "paid government officials" (SA:928-29), including the "federal police" (A:2208). Others who worked for Beltrán Leyva, including "Grande" (a.k.a. Barragán), made payments also. (A:2197-98, 2315). Owing to those payments, Poveda Ortega viewed himself as "protected," allowing him to travel "with extreme peace of mind." (A:2197-98).

13

Poveda Ortega described and narrated a video showing federal police raiding his home during the Cartel's civil war. (A:2204-08). After the raid, Beltrán Leyva became enraged with the "federal police" because he had "given them a lot of money." (*Id*.). In retaliation, Poveda Ortega testified, "Arturo Beltran and his security team" kidnapped Garcia Luna in Cuernavaca. (A:2212).

Martinez Sanchez testified that he was "responsible for the train route" in which traffickers moved "between 50 to 60 tons" of cocaine to the United States in train cars with hidden compartments. (A:1511-12, 1532-33). Martinez Sanchez knew that other Cartel members paid bribes to government officials to protect this train route, including the "high command at the federal police." (SA:379).

In addition, multiple witnesses testified about the tons of cocaine the Cartel trafficked to the United States, including in the Eastern District of New York. (*See* SA:408-36, 444-71, 473-83, 511-14, 522-25, 1081-93).

The jury also heard from Cartel accountant Israel Avila. He oversaw "ledgers [that] documented payments to public officials." (SA:810). Echoing Barragán and Nava Valencia, Avila testified that the

14

Cartel paid bribes at all levels of the Mexican government. (SA:811 ("Federal, state and municipal.")). Corroborating Barragán, Nava Valencia, and Zambada Garcia, Avila explained that the Cartel "pa[id] Genaro Garcia Luna." (SA:811). Such million-dollar payments were recorded in Avila's ledgers using Garcia Luna's nicknames. (SA:811-12).

C. Testimony From Corrupt Government Officials

The jury also heard testimony from convicted, corrupt, former Mexican government officials, including Edgar Veytia, the former attorney general of the state of Nayarit (SA:1299), and Hector Villarreal Hernandez, the former finance secretary from the state of Coahuila (SA:1194).

Veytia described how Cartel members paid Garcia Luna and how Garcia Luna had made clear that the government should "not…intervene" in the Cartel's operations. (SA:1303-06, 1318-22, 1326-33, 1344-45). For example, Veytia described an instance when the Cartel attacked him for siding with Beltrán Leyva (and not El Chapo) during the Cartel civil war. (SA:1324, 1326-27). During this attack, the federal police failed to aid Veytia even though he called for assistance. (SA:1329). After Veytia survived the attack, the governor of Nayarit

15

asked for a meeting with Garcia Luna in Mexico City. During the meeting, one of Garcia Luna's senior commanders, Luis Cardenas Palomino, told Veytia that his government was "doing things wrong in Nayarit, that [they] were on the wrong side, and that [they] should be on El Chapo's side." (SA:1332).

Villarreal explained his involvement in a kickback scheme, and how he and his co-conspirator spent the proceeds on homes, planes, better media coverage, and gifts to politicians in Mexico in exchange for their support. (SA:1199-1201). Villarreal further explained how assets are concealed in Mexico, including that politicians' public financial statements were not actually verified. (SA:1204-07). Villarreal also explained that, in Mexico, the federal government funds almost all of states' budgets. (SA:1197).

Villarreal described meeting with Garcia Luna and receiving a tour of the federal police's bunker and surveillance technology. (SA:1212-13). Villarreal also described how Garcia Luna wanted to speak with the Mexican newspaper El Universal to improve his press coverage following reports of his kidnapping. (SA:1216-17). Garcia Luna arranged to pay El Universal. (SA:1217-20, 1223-25).

16

Last, Villarreal described Garcia Luna's homes, including his luxury penthouse apartment in a tony neighborhood in Mexico City (SA:1226), as well as his "really big house" in Cuernavaca from which a helicopter took off (SA:1230-31).

### D. Testimony from Other Government Officials

The jury also heard testimony from police officers Raul Arellano Aguilera and Francisco Cañedo Zavaleta. These witnesses saw the corruption in Mexico and explained Garcia Luna's role in it.

Arellano Aguilera described the corruption he saw as a federal police officer at the Mexico City Airport (SA:714-15), where a "special group" of police officers helped transfer drugs arriving by plane in exchange for financial gain (SA:720-22 (recalling the "order by radio" from higher-ups at the airport that caused officers to cease investigative and enforcement activity), 728). He also testified that these officers brought suitcases of money from the Cartel to the airport, that members of the special unit received "their share [of the funds] when the suitcases went through," and that he saw firsthand a briefcase full of cash delivered to the head of airport security. (SA:728, 730, 733-34, 739).

Case: 24-2949, 03/19/2026, DktEntry: 86.1, Page 27 of 130

17

Zavaleta served as a federal police officer in Mexico between approximately 1993 to 2022, including as an officer at AFI, the agency that Garcia Luna led until 2006. (SA:1095, 1104-05, 1111). From March 2007 to May 2008, Zavaleta was assigned, as part of the Armed Guard for the Federal Police, to stand guard at the federal police office in Constituyentes in Mexico City. (SA:1111-12, 1115). During that time, he saw Garcia Luna frequently, inside the complex, when Garcia Luna was entering or leaving the building. (SA:1112-13). Once, Zavaleta saw Garcia Luna inside the building, at reception. (SA:1113-14).

On October 19, 2008, Zavaleta observed Garcia Luna meeting with senior Cartel members Beltrán Leyva and Edgar Valdez Villarreal (a.k.a. La Barbie). (SA:1118-21). Zavaleta was driving along Highway 115-D when he made that observation. (*Id.*). The government admitted three maps through Zavaleta, which showed his approximate location during his observation. (SA:1121-22; GA:12-13, 38). Concerned by the sight of Mexico's foremost law enforcement official with "cartel bosses" (SA:1160), in 2008, Zavaleta wrote a letter to a member of Congress in Mexico, who in turn passed the information to a Mexican magazine that reported the story (SA:1125-27; GA:32; *see* GA:14-37).

18

Finally, the jury heard from U.S. law enforcement and public officials working in Mexico. They testified that they attempted to work with their Mexican partners to catch Cartel leaders, only to see Garcia Luna's federal police sabotage those efforts.

Miguel Madrigal served as a Special Agent for the Drug Enforcement Administration ("DEA") in Mexico from 2008 to 2015. (SA:1010-11). He testified about the DEA's failed efforts to apprehend senior Cartel leadership during that time. Specifically, he reviewed surveillance video which showed the vehicle of "a high-ranking official within the Mexican Federal Police" at the home of Zambada Garcia, "a high-ranking member of the…Cartel." (SA:1043). Despite the DEA reporting this information to Mexican government officials, Zambada Garcia was not captured at the location. (SA:1051-52).[2]

---

[2] Madrigal also testified about the Sensitive Investigation Unit ("SIU"), which was a unit in the Mexican federal police with officers "trained and vetted by [the U.S.] and polygraphed, and [the U.S.] work[ed] exclusively with them as far as investigations." (SA:1021). Madrigal explained that, notwithstanding that vetting, he had "to be careful [with] what information [he] shared." (*Id.*).

19

Jose Moreno served as a Special Agent with the Federal Bureau of Investigation ("FBI") in Mexico between 2009 and 2014. (SA:1394). He described the failed attempt to capture Guzmán Loera (a.k.a. El Chapo). (SA:1396-1409). Moreno recounted that the U.S. government obtained intelligence about Guzmán Loera's phone number, which allowed law enforcement agents to determine his location. (SA:1396). On the day of the operation to arrest Guzmán Loera, however, the federal police appeared to sabotage the arrest. Most of the officers showed up an hour late. (SA:1402-04). When the operation finally did begin, the federal police went first to several wrong locations. (SA:1406-07). When the officers finally went to the home where Guzmán Loera was most likely located, they failed to create a perimeter, and upon entering the house, they found that Guzmán Loera was not inside. (SA:1408-09).

U.S. Immigration Officer Marlene Tarantino testified about Garcia Luna's naturalization application. She explained that, "under penalty of perjury," Garcia Luna had denied prior criminal conduct. (SA:1422-23).

20

Former U.S. Ambassador to Mexico Earl Anthony Wayne related that in 2011 and 2012, he and his staff knew that they could not rely on Garcia Luna's Federal Police "to work against...the Sinaloa Cartels." (SA:1295).

Finally, Special Agent George Dietz of the U.S. Attorney's Office for the Eastern District of New York introduced photographs of Garcia Luna's house. (SA:1477-85). He also testified about the government's efforts to keep witnesses in the case separate from one another. (SA:1489-91).

E.     The Defense Case

The defense called Linda Cristina Pereyra, Garcia Luna's wife, who sat in the courtroom during trial. (SA:1710, 1761). She testified about his earnings and real estate purchases during his time in office (SA:1718-25) and the couple's ownership of certain cash businesses (SA:1724-25, 1751). On cross examination, she acknowledged that they failed to report earnings as required by the Mexican government. (SA:1754-58).

21

## V. New Trial Motion

On December 15, 2023, ten months after his conviction, Garcia Luna moved under Federal Rule of Criminal Procedure 33 for a new trial (the "Motion"). (A:3650). The Motion argued, among other things, that: (1) the government improperly failed to turn over *Brady* material; (2) the government improperly withheld information that Garcia Luna had been vetted by the U.S. government; (3) the government improperly failed to disclose impeachment material for Villarreal; (3) newly discovered evidence established Villarreal and Zavaleta testified falsely; and (4) newly discovered evidence established that certain government witnesses coordinated their testimony while incarcerated via contraband phones. (SA:1896-1956).

On March 1, 2024, the government opposed the Motion. (A:4078-4170). In its opposition, the government submitted evidence that Garcia Luna procured a false affidavit through the bribery of inmates at the Metropolitan Detention Center ("MDC"). (A:4109-20).

## VI. Court's Opinion

On August 6, 2024, the district court denied the Motion. (A:4351 66). The court found that Garcia Luna schemed to "bribe inmates

22

at the Metropolitan Detention Center [] after his trial to create false evidence" in support of the Motion. (A:4351). That conclusion was based on interview reports of four inmate witnesses, a witness's contemporaneous notes from his conversation with Garcia Luna, and a recording of that witness's conversation with Garcia Luna. (A:4353-55 ("This was a clear scheme by [the] defendant to obstruct justice through bribery")). The court noted that these facts were "virtually concede[d]" by the defense. (A:4351).

In addition, the court rejected Garcia Luna's claim that the government withheld *Brady* material related to Garcia Luna being "vett[ed]" by the U.S. government. (A:4355-56). First, the court noted, the vetting document did not say that Garcia Luna was among those vetted or polygraphed, and thus it could not be exculpatory. (A:4356). Second, the evidence was not "newly discovered," since it involved a document that Garcia Luna, "himself, signed years before his trial began" and would have been found in the exercise of "minimal diligence." (A:4357). Nor was the document *Brady* material because "the documents were not in the possession of the prosecution team." (A:4358). Most fundamentally, the court rejected the notion that it would have resulted

23

in an acquittal, particularly because the court limited the amount of "laudatory evidence on how various U.S. officials regarded" Garcia Luna. (Id.).

Finally, the court rejected Garcia Luna's claim that the government withheld *Giglio* material related to Villarreal. (A:4358-60). First, the court found that the supposed *Giglio* information was "barely comprehensible," was "based on nothing but multiple layers of hearsay, innuendo, and speculation," and would not provide "a sufficient basis to ask" questions from it. (A:4360). Second, the court decided that the information was not in the possession of the Prosecution Team, as it had been delivered to U.S. Attorney's Offices in Texas. (A:4361). Third, the court found that any impeachment value "would not have had any impact on the outcome of this trial" because the jury already heard ample impeachment evidence related to Villarreal's crimes and frauds, making the additional information cumulative. (A:4362). Last, the court noted that Villarreal "did not supply any direct evidence on the central issue in this case — whether the defendant accepted bribes from the cartel[.]" (Id.).

24

The court also rejected the claim that Villarreal committed perjury. (A:4363-65). The court noted that Garcia Luna claimed that "newly discovered evidence" disputed Villarreal's testimony that Villarreal had introduced Garcia Luna to Juan Francisco Ealy Ortiz, the owner of media company El Universal, and that Garcia Luna had bribed El Universal for more favorable news coverage. *(Id.).* Garcia Luna had submitted schedules "purporting to show numerous meetings between defendant and…the publisher of El Universal" prior to Villarreal's claimed introduction, which were purportedly "authenticated" by Garcia Luna's former secretary. (A:4363). The court found that any records— even if genuine—showing Garcia Luna had a prior acquaintance with Ealy Ortiz were "not the same as [him] trusting [Garcia Luna] to engage in a corrupt transaction." (A:4364). The court also gave little weight to an "argumentative affidavit" of an attorney for El Universal, which was "mere…opinion and contains triple layers of hearsay," and contained statements that "cannot be taken seriously." (A:4364-65). Moreover, the court found that, "as with all of [Garcia Luna's] other 'newly discovered evidence,'" the evidence related to Villarreal should have been known to the defense before trial. (A:4365).

25

The court rejected Garcia Luna's remaining arguments as lacking merit and denied them for "the reasons stated in the government's opposition." (A:4352).

26

## SUMMARY OF ARGUMENT

The evidence at this five-week trial established beyond a reasonable doubt that Garcia Luna was a corrupt law enforcement official who took millions of dollars in bribes from Mexico's largest and most sophisticated drug trafficking organization. Garcia Luna accepted those bribes while he met with senior U.S. leadership and broadcasted his purported commitment to fighting the cartels. In exchange for bribes, Garcia Luna and his allies assisted the Cartel. They facilitated drug distribution for the Cartel, helped arrest and kill Cartel rivals, provided armed bodyguards to Cartel leaders, and supplied the Cartel with intelligence and police equipment.

Garcia Luna cannot demonstrate any error—much less an abuse of discretion—in the district court's rejection of the Motion. Neither of the supposed perjurious witnesses provided material testimony, and evidence of Garcia Luna's guilt was overwhelmingly established by multiple unchallenged witnesses who testified about bribes made to and benefits provided by Garcia Luna. Considering Garcia Luna's proven efforts to pay for false affidavits, any "new" evidence he submitted should be viewed with extreme skepticism. Garcia

27

Luna's "newly discovered evidence" contained many exhibits of dubious authenticity that, even if credited, were known to Garcia Luna prior to trial or could have been with the exercise of diligence. Nor did the court err in denying Garcia Luna's *Brady* claims, since it found that the evidence was either known to the defense, immaterial, or not in the possession of the Prosecution Team.

Furthermore, Garcia Luna has not shown any abuse of discretion in the trial court's evidentiary decisions, including its careful Rule 403 balancing of wealth evidence and limitations on inflammatory cross-examination. Garcia Luna has also not identified any error in the court's conscientious classified discovery ruling.

Last, the court's below-Guidelines sentence was both procedurally and substantively reasonable.

28

<u>ARGUMENT</u>

<u>POINT ONE</u>

<u>THE NEW TRIAL MOTION WAS CORRCTLY DENIED</u>

I.  The Court Did Not Abuse Its Discretion
<u>in Denying Garcia Luna's Perjury Claims</u>

Garcia Luna argues based on supposedly newly discovered evidence that Zavaleta and Villarreal committed perjury at trial.

A.  <u>Applicable Law</u>

To prevail on a Rule 33 motion based on "newly discovered evidence," the defendant bears "the burden…to satisfy five elements." *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013). He must demonstrate

> (1) that the evidence is newly discovered after trial; (2) that facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) that the evidence is material; (4) that the evidence is not merely cumulative or impeaching; and (5) that the evidence would likely result in an acquittal.

*Id*. This Court "review[s] a district court's denial of a Rule 33 motion deferentially and will reverse only for abuse of discretion." *United States*

29

*v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006).[3]

"A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001). "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *Id.*

Once perjury is established, "a new trial is not foreordained." Id. at 219. Rather, "the court must strike a fair balance between the need for both integrity and finality in criminal prosecutions." *United States v. Aquart*, 912 F.3d 1, 20 (2d Cir. 2018). "Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." *Monteleone*, 257 F.3d at 219. "If the prosecution knew, or should have known, of the false testimony prior to the conclusion of trial, the conviction must be set aside if there is any reasonable

---

[3] When quoting cases, unless otherwise noted, citations, internal quotation marks, and footnotes are omitted, and all alterations are adopted.

likelihood that the testimony could have affected the jury's judgment." *Aquart*, 912 F.3d at 20. "Where the government was unaware of a witness'[s] perjury, however, a new trial is warranted only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Monteleone*, 257 F.3d at 219.

B.   Discussion

1.   Zavaleta

In the Motion, Garcia Luna argued that "new evidence" demonstrated that Zavaleta could not have observed Garcia Luna along Highway 115-D with Cartel leaders on October 19, 2008, because Garcia Luna was at a hospital with his wife that day. (Br.32-34, 40). In support, Garcia Luna submitted an unauthenticated document that purported to show his wife's hospital discharge on October 19, 2008. (A:3940-48). Garcia Luna also included affidavits from a former bodyguard and his former secretary, who disputed various aspects of Zavaleta's testimony. (A:3949-51; SA:1819-29). The district court did not abuse its discretion in denying Garcia Luna's request for a new trial on this basis.

31

First, as the district court ruled, none of this evidence was "newly discovered" because the purported facts were already known to Garcia Luna. (A:4352 ("much of the 'newly discovered' evidence consists of facts that were known or accessible to [the] defendant prior to trial")). For example, Garcia Luna would certainly have known if he was at the hospital with his wife on October 19, 2008. Garcia Luna's wife testified at trial, and she could have testified to this very claim, though she did not do so.

The affidavit of Garcia Luna's bodyguard—which attempted to contradict the driving route described by Zavaleta—was similarly not "newly discovered." (A:3949-51). Prior to trial, Garcia Luna was obviously best positioned to know his whereabouts on the day in question, to know the identities of his bodyguards, and to be aware of any purported discrepancy in the driving route Zavaleta described.

Nor was the affidavit of Garcia Luna's secretary, who claimed to have never heard of Zavaleta, "newly discovered." (*See* Br.33-34; SA1827). As his secretary stated in her affidavit, no member of Garcia Luna's defense team contacted her prior to trial (SA:1825), which defeats any argument that Garcia Luna was diligent in securing her testimony.

32

As the district court correctly found, there was "no explanation offered as to why [his secretary] wasn't contacted prior to the jury verdict." (A:4363).

And, notwithstanding Garcia Luna's conclusory claim that one witness was "too scared to come forward pre-trial" (Br.21), the defense did not identify any pretrial effort to locate or depose either the bodyguard or secretary before trial, *see United States v. Bout*, 666 F. App'x 34, 38 (2d Cir. 2016) (rejecting new trial motion absent "evidence that he attempted to call or depose [the witness]" and concluding "he has thus failed to exercise due diligence in obtaining [the witness's] testimony"); *United States v. Owen*, 500 F.3d 83, 84 (2d Cir. 2007) (evidence that the defendant "should have been…aware of" cannot support a Rule 33 motion); *id.* at 89 (evidence is not "newly discovered" merely because it is "newly available").

Accordingly, the trial court neither committed error nor abused its discretion in denying the Motion, because none of the evidence was "newly discovered" for purposes of a Rule 33 motion.[4]

---

[4] The district court also expressed skepticism about the authenticity of certain records produced by Garcia Luna's secretary

33

Furthermore, even if the court had considered and credited the affidavits, they did not establish that Zavaleta's testimony was false, much less perjurious. For example, the bodyguard's affidavit does not actually contradict Zavaleta's testimony. Although he claims that "Mr. Francisco Cañedo Zabaleta [sic] was never…a member of the Federal Police's Security Department" (A:3951), the bodyguard was not even working for the defendant in 2008, the relevant time period about which Zavaleta testified (*compare id.* with SA:1111-12, 1115, 1118-21) and, accordingly, he lacked personal knowledge.

Finally, the secretary's affidavit, even if credited, did not establish that Zavaleta's testimony was false or perjurious. Zavaleta described working outside the Federal Police building, but "within the complex," and seeing Garcia Luna once inside the building, while Garcia Luna's "secretary was out to lunch." (SA:1113-14). That the secretary does not remember Zavaleta (SA:1827) is, thus, not surprising and does

---

because she did not explain how she obtained them more than a decade after she and Garcia Luna left government office. (A:4363 ("no explanation offered as to…where she got the documents; or how they were created")).

not render Zavaleta's testimony false. Indeed, though the secretary claims that "it would be *highly unusual*" for a visitor "to have been permitted access to the…area outside Mr. Garcia Luna's office" (*id*.), that does not foreclose the possibility that Zavaleta could have been directly outside the defendant's office while she was not present. Similarly, the secretary claims that "[o]nly SSP and Federal Police officers played a security role at the SSP facilities" and that Garcia Luna entered the building via "a private entrance guarded and controlled by [the defendant]'s security detail." (SA:1826). These assertions also do not contradict Zavaleta's testimony that he guarded the building in his capacity as a Federal Police officer and that he saw Garcia Luna "in the outside area but still within the complex." (SA:1112-13).

### 2. Villarreal

Garcia Luna argues that the district court abused its discretion in not crediting "new evidence" purportedly showing that Villarreal committed perjury because (1) Villarreal could not have received a tour of a federal police facility (the "bunker") and a demonstration of certain technology in 2009, and (2) Villarreal's testimony about Garcia Luna's payments and introduction to Ealy Ortiz

35

is contradicted by other evidence that suggests Garcia Luna separately knew Ealy Ortiz. (Br.35-38).

As an initial matter, the evidence was not "newly discovered" for purposes of Rule 33. Garcia Luna was a featured speaker at the inauguration of the bunker and thus clearly knew prior to trial when it first opened. (A:3811-15). The creation date of the technology shown in the bunker or the date the company was founded similarly cannot be "newly discovered," since it was publicly available at the time of trial. (E.g., A:3828 (company founded in 2010)). As discussed, evidence is not newly discovered where it is already known to a defendant or could be known with reasonable diligence. *Owen*, 500 F.3d at 89; *United States v. Teman*, 465 F. Supp. 3d 277, 343 & n.38 (S.D.N.Y. 2020) (evidence cannot support new trial motion where it is "a matter of public record, which [defendant] himself had the ability to, and ultimately did, locate"), *aff'd*, 2023 WL 3882974 (2d Cir. June 8, 2023) (summary order).[5]

---

[5] Garcia Luna wrongly asserts that the defense could not have been aware because "little to no 3500 material was produced." (Br.35). This is false. Jencks Act material produced before Villarreal's testimony covered these very topics. (*See, e.g.*, GA:46-47 ("around 2009 or 2010 Garcia Luna tried to get them [] to buy Pegasus"); GA:48 (discussing cash

36

Nor can Garcia Luna legitimately cite as "newly discovered" agendas or other evidence establishing his prior acquaintance with Ealy Ortiz. As the district court found, if Garcia Luna had already met or known Ealy Ortiz, the defense knew that fact prior to trial. (A:4365); *see United States v. Muja*, 365 F. App'x 245, 246 (2d Cir. 2010) ("[O]ne does not 'discover' evidence after trial that one was aware of prior to trial.").

Moreover, even if considered, the "newly discovered" affidavit and schedules do not establish falsity. Garcia Luna submitted schedules which, he claimed, show he already knew Ealy Ortiz during the relevant period. (*See* A:3701-31). As the district court found, even assuming the agendas' authenticity, "any acquaintance [the] defendant…might have had with Ealy Ortiz was not the same as Ealy Ortiz trusting [the] defendant to engage in a corrupt transaction." (A:4364). In other words, there was nothing inconsistent between the documents and Villarreal's trial testimony. And the trial court appropriately gave minimal weight to the affidavit on this issue, which was signed by a lawyer in Mexico, not

payments by a Garcia Luna associate to El Universal); GSA:43-44 (discussing payments to El Universal to improve media coverage)).

37

Ealy Ortiz. (*Id.*) (describing it as essentially "a brief from a lawyer [for Ealy Ortiz]" that contains "mere argument and opinion and contains triple layers of hearsay"). The court's factfinding was not clearly erroneous. *Aquart*, 912 F.3d at 24.

Finally, even if such evidence did establish falsity, such inaccuracies would fall well short of perjury. Misremembering the date of a meeting or the name of a technology used more than a decade prior—particularly where, as here, the date or name are immaterial—is the kind of "[s]imple inaccurac[y] [that]…do[es] not rise to the level of perjury." *Monteleone*, 257 F.3d at 219; *United States v. Glover*, 588 F.2d 876, 879 (2d Cir. 1978) (per curiam) (rejecting perjury claim where witness testified about events "four years distant" and noting that while witness was mistaken as to dates, testimony's substance could still be accurate); *United States v. Persico*, No. 04-CR-911 (JS), 2008 WL 11497841, at *4 (E.D.N.Y. Aug. 28, 2008) (denying perjury claim because incorrect testimony resulting from mistake or inaccuracy about a date does not constitute perjury).

38

### 3. The Complaints Are Immaterial

In any event, none of the purportedly perjurious testimony was material. Because Garcia Luna adduced no evidence that the government was aware of any supposed inaccurate testimony,[6] "a new trial is warranted only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Monteleone*, 257 F.3d at 219.

Zavaleta's entire testimony was cumulative; at its core were his observations of Garcia Luna with a senior Cartel member on the side of a road—an event about which multiple other witnesses testified. (See SA:239, 821, 965).

Likewise, as the district court correctly held, Villarreal "did not supply any direct evidence on the central issue in this case—whether [Garcia Luna] accepted bribes from the cartel." (A:4362); *see United States v. Karlov*, 534 F. App'x 38, 40 (2d Cir. 2013) (no perjury if "collateral to the core issues in the trial").

---

[6] Garcia Luna asserts that knowledge can be imputed to the government via a newspaper article. (Br.38-39). Unsurprisingly, he identifies no decision where knowledge is so imputed to the government, for purposes of the perjury analysis.

Nor can Garcia Luna establish an effect on the verdict under any standard. *Aquart*, 912 F.3d at 20. Evidence of Garcia Luna's guilt in this five-week trial was overwhelming, and the testimony of multiple witnesses amply established his conspiracy with the Cartel. (*E.g.*, SA:169-71, 603, 811-12, A:2869, 2886-92, 2901-03). Accordingly, even without Zavaleta's and Villarreal's testimony, there is no "real concern that an innocent person may have been convicted," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009), nor a concern that any supposed false testimony affected the verdict, *Aquart*, 912 F.3d at 20.[7]

II.  The Court Did Not Abuse Its Discretion in Denying Garcia Luna's *Brady* Claims

Garcia Luna wrongly argues that (1) "newly discovered" evidence of his supposed vetting was suppressed and is materially exculpatory, and (2) purported impeachment material submitted to different U.S. Attorney's Offices should have been disclosed to the defense. The trial court appropriately rejected both arguments because

---

[7] Garcia Luna claims that the new evidence demonstrates that Zavaleta's testimony was "a political stunt" and reflected his animus towards Garcia Luna. (Br.34). But the defense already pursued this line of cross-examination at trial. (SA:1166-70, 1183).

40

the defense misreads the relevant documents, which are not materials pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), were not "newly discovered" evidence, and were not in the possession of the Prosecution Team. (A:4356-58).

A. Applicable Law

Under *Brady* and its progeny, "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *Id*.

"[U]ndisclosed information is deemed material so as to justify a retrial only if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different." *United States v. Spinelli*, 551 F.3d 159, 164 (2d Cir. 2008). "A reasonable probability of a different result is shown when the government's failure to disclose undermines confidence in the outcome of the trial." *Id*. at 165.

41

Where the suppressed evidence is *Giglio* information as opposed to exculpatory evidence, this "[e]vidence of impeachment is material if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996). "However, new impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Id.*

The government's disclosure obligations "extend[] only to material evidence…that is known to the prosecutor." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). The government "cannot be required to produce that which it does not control and never possessed or inspected." *United States v. Canniff*, 521 F.2d 565, 573 (2d Cir. 1975); *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) ("We reject…a notion of 'possession' which is so elastic as to embrace materials that the prosecution never had in its files, never inspected, and never knew about.").

A prosecutor is not deemed to control or possess documents of "every agency and individual within the federal government." *United States v. Meregildo*, 920 F. Supp. 2d 434, 440 (S.D.N.Y. 2013); *see also United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting argument "that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor'" as "completely untenable"); *United States v. Hunter*, 32 F.4th 22, 36 (2d Cir. 2022) (same). In analyzing whether an office or individual is a member of a prosecution team,

> courts in this Circuit consider five primary factors: "whether the other entity (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings."

*United States v. Avenatti*, No. 19-CR-374 (JMF), 2022 WL 457315, at *10 (S.D.N.Y. Feb. 15, 2022).

43

B.     Discussion

1.     Vetting Documents

None of the vetting documents cited by Garcia Luna constitutes *Brady* or requires a new trial, and the district court did not err in so holding, for four independent reasons.

First, Garcia Luna is wrong that a 2011 letter of understanding ("LOU") between the U.S. and Mexico shows that "he was thoroughly vetted by the U.S." (Br.41; A:3670-78). The LOU "concerns a Mexican federal police unit called the Sensitive Investigation Unit…a selected group of Mexican police officers who were trained and polygraphed by the DEA." (A:4356). Garcia Luna argues that he must have undergone the same vetting and polygraphing as members of that unit. (*Id*.; Br.21, 41). However, as the trial court correctly found, the vetting document does not say that Garcia Luna himself was vetted. (A:4356 ("But the [LOU] doesn't say that at all (and neither does [the] defendant aver that he actually took a polygraph test, except as theoretical argument in his brief"); A:4356-57 (discovery showed that, as "a cabinet-level official," Garcia Luna "was not required to be polygraphed")).

44

Second, because Garcia Luna, "himself, signed [the LOU] years before his trial began" and the LOU would have been found in the exercise of "minimal diligence," as the district court concluded (A:4357), it does not qualify as *Brady* material or "newly discovered" evidence. Evidence is not "suppressed" under *Brady* "if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States v. Paulino*, 445 F.3d 211, 225 (2d Cir. 2006). For the same reason, such evidence is not newly discovered. *Owen*, 500 F.3d at 84 (evidence about which the defendant knew or "should have been…aware of" cannot sustain a Rule 33 motion).

Third, the vetting documents are not *Brady* material because, as the trial court found, "the documents were not in the possession of the prosecution team." (A:4358).[8] Citing no applicable law, Garcia Luna

---

[8] To be sure, the government construed its disclosure obligations broadly and solicited impeachment and other material helpful to the defense. (*See supra*, pp. 5-6). It also produced records in its possession regarding DEA vetting programs, which noted that Garcia Luna and other senior officials who supervised the Mexican SIU unit "were not required to be polygraphed." (GSA:50).

45

argues that the entire DEA should be considered part of the Prosecution Team because these documents were in that agency's possession. (Br.42 43). Such an argument contravenes well-established precedent. *Avellino*, 136 F.3d at 255; *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993).[9]

Most fundamentally, the court rejected the notion that vetting evidence would have resulted in an acquittal, particularly considering the court's decision to limit the evidence of the U.S. government's commendations of Garcia Luna. (A:4358 ("it is beyond a stretch to argue that had the prosecution team known about and turned over these documents to [the] defendant, they would have 'likely resulted in an acquittal.'")). Even assuming he was vetted—a premise Garcia Luna's proffered evidence does not establish—the leap from vetting to innocence

---

[9] Garcia Luna's reliance on the Justice Manual is misplaced. The Manual is "not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal." Justice Manual § 1-1.200 (2024). It therefore does not create any enforceable rights. *United States v. Loften*, 518 F. Supp. 839, 857 (S.D.N.Y. 1981) (holding, in the context of government's alleged non-compliance with the Manual, that "internal Government policies do not create rights in private citizens"), *aff'd*, 819 F.2d 1130 (2d Cir. 1987).

46

is speculative and "highly attenuated." (*Id*.). At bottom, multiple witnesses testified at trial that they bribed Garcia Luna on behalf of the Cartel. Such testimony was firsthand, corroborated, and compelling. Measured against that evidence, Garcia Luna's supposed vetting is immaterial. *United States v. Gil*, 297 F.3d 93, 103 (2d Cir. 2002) ("Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material.").

### 2. Impeachment Material

Garcia Luna also erroneously claims that the government suppressed impeachment evidence concerning Villarreal that "was hand[-]delivered to an AUSA in the Western District of Texas" (the "Texas Letter"). (Br.43). The district court neither erred nor abused its discretion in denying this claim on four independent grounds. (A:4360-63).

First, as the district court found, the supposed *Giglio* information was "barely comprehensible" and based on "multiple layers of hearsay, innuendo, and speculation." (A:4360 (finding it "very hard to comprehend"); *see* A:3682-98). The Texas Letter speculates that "investigators and prosecutors *believe* that the deposits made in the

account of another person…that Mr. Villarreal uses to complement his lifestyle and to try to invest in new businesses in San Antonio, Texas, may derive from [] criminal activities." (A:3684) (emphasis added). The Texas Letter includes quotations of unknown documents, statements of what its author "believe[s]," supposed quotations from investigations in Spain and Mexico and accusations against Villarreal's family members. (A:3682-98). Because the Texas Letter contains uncorroborated (and arguably incomprehensible) allegations, the court concluded it would have likely precluded questions about it under Rule 403. (A:4360).

Second, the district court correctly concluded that the Texas Letter was not in the Prosecution Team's possession because the "U.S. Attorney's Office for the Western District of Texas was not a part of the prosecution team[.]" (A:4361).[10] The government "cannot be required to produce that which it does not control and never possessed or inspected." *Canniff*, 521 F.2d at 573. Because the Prosecution Team is not deemed

---

[10] To be sure, before trial, the government requested witness materials from the relevant Texas U.S. Attorney's Offices, and the government then produced these materials to the defense. (A:4128). Those offices did not produce the Texas Letter to the Prosecution Team or disclose the allegations contained therein. (*Id.*).

48

to control or possess documents of "every agency and individual within the federal government," the government did not violate its disclosure obligations, and a new trial is not warranted. *Meregildo*, 920 F. Supp. 2d at 440; *see Avellino*, 136 F.3d at 255 (rejecting "the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require…a monolithic view of government"); *Locascio*, 6 F.3d at 948-49 (reports made by FBI agents in the course of unrelated investigations should not be imputed to prosecution team).

Garcia Luna also argues that the existence of certain unspecified "information" about Villarreal (but not the Texas Letter itself) was provided before trial to Madrigal, a trial witness. (Br.43; SA:1814 (defense claim that a government witness learned of unspecified "deceit" of Villarreal)).[11] But information known to a government witness is not automatically imputed to the Prosecution Team. None of the

---

[11] Garcia Luna has not alleged, much less established, what specific information was purportedly provided to Madrigal, which is a separate ground to deny this claim. The argument nevertheless fails for the other reasons articulated here.

49

relevant factors suggest that Madrigal was part of the Prosecution Team, as opposed to a witness who testified about historical facts. Madrigal did not "perform investigative duties and make strategic decisions about the prosecution of the case," he was not involved in the Prosecution Team's investigation of Garcia Luna in any way, and Garcia Luna does not argue otherwise. *Meregildo*, 920 F. Supp. 2d at 441; *United States v. Stewart*, 433 F.3d 273, 299 (2d Cir. 2006) (government agent witness was not a member of the prosecution team because he was not "involved with the investigation or presentation of the case...[and] did not interview witnesses or gather facts").

Third, as the district court found, the impeachment value "would not have had any impact on the outcome of the trial." (A:4362 ("The jury was made well aware that [Villarreal] was a serious fraudster")). The jury already heard ample impeachment evidence related to Villarreal's crimes and frauds; the additional information would be, at best, cumulative. *See Karlov*, 534 F. App'x at 40 (holding that in "cases involving cooperating witnesses who lied at trial about the scope of their criminal activities...the perjury was nevertheless not

50

material to the jury verdict where, as here, the conduct falsely denied or not disclosed was similar to crimes already known to the jury").

Last, as described above, Villarreal "did not supply any direct evidence on the central issue in this case—whether [the] defendant accepted bribes from the cartel." (A:4362). While Villarreal's testimony "supplied some circumstantial evidence that [the] defendant was corrupt," the district court observed, "it was hardly a smoking gun" and was "far from the only evidence linking the defendant to the crime." (A:4363). Accordingly, even if the Prosecution Team had possessed the evidence, there is no *Giglio* violation and certainly no real concern that an innocent person was convicted. *Wong*, 78 F.3d at 79 ("new impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness"); *McCourty*, 562 F.3d at 475.

51

## POINT TWO

## THE DISTRICT COURT'S EVIDENTIARY RULINGS WERE NOT AN ABUSE OF DISCRETION

### I.    Applicable Law

Where an evidentiary challenge is preserved, this Court reviews it "under a deferential abuse of discretion standard, and [it] will disturb an evidentiary ruling only where the decision to admit or exclude evidence was manifestly erroneous." *United States v. Litvak*, 889 F.3d 56, 67 (2d Cir. 2018). "To determine the propriety of cross-examination, as with other determinations of admissibility of evidence, courts balance prejudice versus probative value." *Watson v. Greene*, 640 F.3d 501, 510 (2d Cir. 2011); *Brinson v. Walker*, 547 F.3d 387, 394 (2d Cir. 2008) ("trial judges enjoy broad discretion with respect to...cross-examination"). "The decision to admit or exclude evidence will not be overturned unless we conclude that the court acted arbitrarily or irrationally." *United States v. Polouizzi*, 564 F.3d 142, 152 (2d Cir. 2009).

### II.    Discussion

#### A.    Wealth-Related Evidence

The district court did not act arbitrarily or irrationally in admitting limited evidence of Garcia Luna's wealth. Rather, it struck a

52

careful balance, granting the defense's motion to limit evidence of the defendant's wealth acquired after 2012 (the year he left public office), while allowing the government "to introduce evidence of opportunity during the relevant period." (A:3611). The court noted that "[s]ome of the defendant's post-2012 activity will necessarily come in…if [the defense] argue[s] that defendant withdrew from any conspiracy." (*Id.*; *see also* A:2802-03 ("[E]vidence of 2012 wealth and prior to 2012 is okay if it's not cumulative…houses, cars, things owned by [a] person on a public salary, I understand the inference that the Government is asking the jury to draw, and I think those documents are relevant to those inferences…. [I]f something was owned and enjoyed pre-2012 and it continued to be owned and enjoyed afterwards, [it is relevant]…both for the statute of limitations purpose and also to reinforce the point about the pre-2012 inferences…. I'd allow a little of that.")).

Unexplained wealth is generally relevant in showing illicit gain. *See, e.g.*, *United States v. Ojeda*, 412 F. App'x 410, 412 (2d Cir. 2011) ("[E]vidence of unexplained wealth is generally probative in narcotics crimes[.]"); *United States v. Young*, 745 F.2d 733, 762-63 (2d Cir. 1984) (the defendant's "large amount of unexplained and unreported

53

wealth was…highly probative of [his] involvement in narcotics trafficking"). To the extent such evidence was "prejudicial" at all (Br.30), it was introduced for a proper purpose: so the jury could draw reasonable inferences about Garcia Luna's unexplained wealth while he was a public official.

Wealth evidence, including Garcia Luna's continued use of homes and other assets he acquired while conspiring with the Cartel, was also probative to rebut a withdrawal defense. (A:3333-36, 3478-80 (giving withdrawal instruction)). *See United States v. Eppolito*, 543 F.3d 25, 48-49 (2d Cir. 2008) (no withdrawal if the defendant "receive[s] any additional benefits from the conspiracy"); *United States v. Berger*, 224 F.3d 107, 119 (2d Cir. 2000) ("the defendant still may remain a part of the conspiracy if he or she…continues to receive benefits from the conspiracy's operations").

The court's nuanced ruling was also justified because Garcia Luna made his wealth a central defense. He asked the jury in opening statements: "where is the money?" (A:1265 ("So what exactly do you do with hundreds of millions of dollars in suitcases? We know what the cartel leaders did. They bought ranches, houses, yachts, airplanes… But

54

where is the money supposedly paid to Mr. Garcia Luna?")).  That theme repeated in cross-examinations of cooperating witnesses, whom defense counsel asked about homes, cars, and other valuable possessions.  (See A:1455, 1476-86, 2129-32, 2222-26, 2247-50, 2553-54).  As here, "evidence" can be "made all the more relevant by defense counsel's cross-examination."  *United States v. Hayes*, 811 F. App'x 30, 35-36 (2d Cir. 2020).  The court's measured decision to admit some limited wealth evidence cannot be characterized as irrational or arbitrary.

B.  Limiting Cross-Examination

Nor can Garcia Luna demonstrate error in the district court's decision to limit impeachment of Barragán and Poveda Ortega about unsubstantiated allegations of sexual misconduct.  (Br.44-49).

As background, the government disclosed allegations of prior bad acts by witnesses, including Barragán and Poveda Ortega, relating to murder and violence, narcotics trafficking, sexual misconduct, bribery, and other serious crimes.  (*See* SA:1-41; A:1445-66, 2216, 2222-24, 2248, 2263).  The government moved *in limine* under Federal Rules of Evidence 403 and 608 to limit questions relating to unsubstantiated instances of sexual misconduct, but not the vast majority of those prior bad acts.

55

(GSA:16-32; SA:55-59). The district court granted the government's motion to preclude cross-examination on sexual misconduct. (SA:62).

The district court's decision to preclude cross-examination on a limited set of uncorroborated allegations against Barragán and Poveda Ortega fell well within the court's "wide discretion" in setting limits on cross-examination. *United States v. Flaharty*, 295 F.3d 182, 190 (2d Cir. 2002). The district court carefully conducted a Rule 403 balancing test before limiting cross-examination because, even if the conduct was "marginally probative" of the witnesses' credibility (itself a questionable premise) (SA:56), "the shock value and resulting prejudice from these incidents far outweigh[ed] any probative value" (SA:62). *See United States v. Rodriguez*, 648 F. App'x 9, 11 (2d Cir. 2016) ("[I]t is not an abuse of discretion to preclude questioning of prosecution witnesses regarding sex crimes because such evidence has insufficient bearing on the witness's credibility"); *United States v. Reed*, 570 F. App'x 104, 109 (2d Cir. 2014) (district court properly excluded evidence of a witness's sexual abuses under Rule 403 because it would likely distract the jury); Fed. R. Evid. 608(b) (limiting cross-examination of prior acts if "probative of the character for truthfulness").

56

The court's decision was also appropriate because the defense was armed with, and made use of, ample additional impeachment evidence. At trial, defense counsel extensively cross-examined these witnesses about other serious crimes. (A:1445-66 (cross-examining Barragán about involvement in murder, kidnapping, and torture), 2216, 2222-24, 2248, 2263 (cross-examining Poveda Ortega about narcotics trafficking, money laundering, bribery, and other criminal acts)). There is no reversible error in excluding prior bad acts where the jury had sufficient evidence to evaluate the witness's credibility. *Flaharty*, 295 F.3d at 191; *United States v. White*, 972 F.2d 16, 21-22 (2d Cir. 1992) (new trial not warranted where the witness had already been "aggressively cross-examined" and newly discovered impeachment evidence went to a "collateral fact" and "general credibility," making it the "sort of cumulative impeachment material that is routinely held insufficient to warrant a new trial.").

57

POINT THREE

GARCIA LUNA WAS NOT WRONGFULLY
DENIED ACCESS TO CLASSIFIED INFORMATION

Garcia Luna alleges—without any basis—that he believes he was deprived of "access to classified discovery and the right to present a defense." (Br.51). This argument is entirely without merit.

I.    Applicable Law

CIPA, 18 U.S.C. app. III, § 1-16, establishes procedures for handling classified information in criminal cases. "Its animating purpose is to harmonize a criminal defendant's right to obtain and present exculpatory material with the government's need to withhold information from discovery when disclosure would be inimical to national security." *In re Terrorist Bombings of E. Afr.*, 552 F.3d 93, 115-16 (2d Cir. 2008). CIPA defines "[c]lassified information" as "any information or material that has been determined by the United States Government pursuant to an Executive order, statute, or regulation, to require protection against unauthorized disclosure for reasons of national security." 18 U.S.C. app. III, § 1(a).

In regulating the discovery of such information, Section 4 of

CIPA instructs that:

> The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove.

18 U.S.C. app. III, § 4;[12] *United States v. Abu-Jihaad*, 630 F.3d 102, 140 (2d Cir. 2010).

To determine whether the privilege against disclosure applies, the district court must first "determine whether the material in dispute is discoverable, and if so, whether the state-secrets privilege applies." *United States v. Stewart*, 590 F.3d 93, 131 (2d Cir. 2009). "It applies if (1) there is a reasonable danger that compulsion of the evidence

---

[12] "In a case involving classified documents, *ex parte*, in camera hearings in which government counsel participates to the exclusion of defense counsel are part of the process that the district court may use in order to decide the relevancy of the information. When the government is seeking to withhold classified information from the defendant, an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules." *United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008).

59

will expose matters which, in the interest of national security, should not be divulged, and (2) the privilege is lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *Id.* "If the information is discoverable but the privilege applies, then the district court must determine whether the information is helpful or material to the defense, *i.e.*, useful to counter the government's case or to bolster a defense." *Id.*

Section 4 also requires that, when a district court enters an order granting the government's requested relief, "the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal." 18 U.S.C. app. III, § 4; *see* also Fed. R. Crim. P. 16(d)(1) ("If relief is granted, the court must preserve the entire text of the party's statement under seal."). Under this framework, this Court may review district courts' *ex parte* decisions, including in the CIPA context. *See, e.g., Abu-Jihaad*, 630 F.3d at 139-42; *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1261-62 (9th Cir. 1998).

This Court reviews "for abuse of discretion a district court's decision to issue a protective order pursuant to Section 4 of CIPA,

60

including its determination whether evidence is helpful or material to the defense and whether unclassified summaries or admissions are properly substituted for classified information." *Abu-Jihaad*, 630 F.3d at 140.

## II.    Discussion

In urging that the district court abused its discretion, Garcia Luna essentially concedes that his argument rests entirely on speculation. (*See* Br.52 ("[B]ecause the defense has not had access to the government's submissions or transcripts of the *ex-parte* conferences with the court, it can only make a general request that the Court determine the propriety of the district court's analysis.")). Garcia Luna also asserts that "[n]o classified materials were produced to the defense despite the substantial classified materials in the government's possession," while ignoring that Section 4 of CIPA permits disclosure of classified information through other means, such as substitution. (Br.53).

In this case, the government continued to disclose *Brady* and *Giglio* material to defense counsel after the issuance of the CIPA Section 4 protective order in this matter. (*See* GSA:5-7, 11-15, 33-39; SA:1-41). Garcia Luna simply assumes that none of these materials were disclosed pursuant to the CIPA Section 4 protective order.

61

Garcia Luna has identified no reason why this Court should second-guess the district court's conscientious discovery rulings. If the Court wishes to review the underlying classified materials and decision, the Classified Information Security Officer can provide the Court with these materials.

62

## POINT FOUR

### THE PURPORTED EVIDENTIARY AND CIPA ERRORS ARE, AT MOST, HARMLESS

"The test for determining whether nonconstitutional error is harmless is what effect the error had or reasonably may be taken to have had upon the jury's decision." *United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir. 1992). "An erroneous ruling on the admissibility of evidence is harmless if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury." *Id.* "The strength of the government's case against the defendant is probably the most critical factor in determining whether an error affected the verdict." *United States v. Dhinsa*, 243 F.3d 635, 650 (2d Cir. 2001).

Here, any error related to the evidentiary rulings and CIPA matter is harmless, because the evidence against Garcia Luna was overwhelming. Nine cooperating witnesses testified, and multiple witnesses—including witnesses not challenged in this appeal—testified that Garcia Luna received bribes from the Cartel and offered benefits in return. (*See* SA:811 (Avila); A:2869, 2886-92, 2901-03 (Zambada Garcia); *see also* SA:169-71, 603). Thus, no error affected the verdict.

POINT FIVE

THE DISTRICT COURT DID NOT ERR AT SENTENCING

Garcia Luna contends that the district court imposed a sentence that was procedurally unreasonable, because it relied on (a) evidence of Garcia Luna's efforts to obstruct justice by bribing inmates to file false affidavits with the court and by commenting on the defense's failure to rebut this evidence (Br.54), and (b) supposed "speculation" regarding Garcia Luna's finances in imposing a fine of $2 million (Br.57). Because these challenges were not preserved, they are reviewed for plain error. Garcia Luna also argues that the Court's below-Guidelines sentence of 38 years' imprisonment and a $2 million fine were substantively unreasonable. These claims are meritless.

I.    Applicable Law

"A sentence is procedurally unreasonable if the district court fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the [18 U.S.C.] § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence." *United States v. Smith*, 949 F.3d 60, 66 (2d Cir. 2020). "However, if a

64

defendant does not raise an objection on these procedural grounds at the time of sentencing, [this Court's] review is confined to plain error." *United States v. Fletcher*, 134 F.4th 708, 711 (2d Cir. 2025) (per curiam).

To establish plain error, a defendant must show "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the [defendant's] substantial rights; and (4) the error seriously affects the fairness, integrity[,] or public reputation of judicial proceedings." *United States v. Moore*, 975 F.3d 84, 90 (2d Cir. 2020). The defendant bears the burden of establishing each of these elements. *See United States v. Dussard*, 967 F.3d 149, 156 (2d Cir. 2020). This Court has warned that "reversal for plain error should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007).

II.   Discussion

A.   The District Court Did Not Plainly Err in
     Crediting Evidence of Garcia Luna's Obstruction

First, the district court did not commit any error, much less plain error, in finding that Garcia Luna had obstructed justice by bribing

65

inmates at the MDC to file false affidavits with the court. [13] As part of the Motion, Garcia Luna submitted an affidavit from an inmate at the MDC ("Inmate 3"), who alleged that Nava Valencia and Veytia, both government witnesses, communicated prior to trial through Nava Valencia's brother, Juan Carlos Nava Valencia, and through contraband phones. (SA:1892-95, 1949-50).

    1.    <u>The Government's Investigation</u>

The government's investigation revealed that Inmate 3's affidavit was the product of Garcia Luna's corrupt scheme to bribe inmates at the MDC to submit false affidavits with the court. The government submitted evidence recovered during this investigation, including interview reports and an audio recording, to the court (A:4145-70).

First, the government interviewed each alleged participant (Veytia and the Nava Valencia brothers), and each denied the allegations

---

[13] Garcia Luna did not object to the district court's purported procedural errors at the sentencing proceeding. (*See* A:4556-4557). Accordingly, this Court should review these claims for plain error. *See United States v. Thompson*, No. 24-1513, 2025 WL 843296, at *2 (2d Cir. Mar. 18, 2025).

66

categorically. (A:4109-10, 4145-52). Juan Carlos Nava Valencia also advised the government that Garcia Luna was seeking to convince another MDC inmate ("Inmate 1") to make false allegations in support of the Motion, and that Garcia Luna conveyed his offer to Inmate 1 via another MDC inmate ("Inmate 2"). (A:4149-50). At Inmate 1's request, Inmate 2 provided Inmate 1 with a document of the false claims that Garcia Luna wanted Inmate 1 to make, including a false claim about the Nava Valencia brothers' pretrial collusion and communication. (*Id*.). The investigation revealed that Juan Carlos Nava Valencia's attorney had advised another member of the U.S. Attorney's Office for the Eastern District of New York of Garcia Luna's corrupt efforts more than two months before Garcia Luna filed the Motion. (A:4111).

The government also interviewed Inmate 2. (A:4150). Inmate 2 provided the government with contemporaneous notes memorializing his conversations with Garcia Luna during which Garcia Luna attempted to generate false testimony for the Motion. (A:4111-12; GSA:60-70). Inmate 2 also provided the government with an audio recording of a conversation between Inmate 2 and Garcia Luna in April 2023, which Inmate 2 had surreptitiously recorded using a contraband phone.

67

(A:4111-12, 4155-66; GSA:71). Inmate 2's testimony, his contemporaneous notes, and his recorded conversation with Garcia Luna all established that, beginning in April 2023, Garcia Luna asked Inmate 2 to persuade Inmate 1 to file a false affidavit. Garcia Luna intended this false affidavit to contain the same allegations set forth by Inmate 3 in his affidavit appended to the Motion. The evidence also established that Garcia Luna similarly asked Inmate 2 to file such an affidavit in exchange for $2 million, that Garcia Luna advised Inmate 2 that Inmate 3 had agreed to file an affidavit in exchange for money, and that Inmate 2 had provided Inmate 1 with a script of what Garcia Luna wanted Inmate 1 to allege. (A:4111-16, 4150-52, 4155-66; GSA:60-71).

Moreover, the government obtained a copy of the document (the "Document") previously described by both Inmate 2 and Juan Carlos Nava Valencia as a script drafted by Inmate 2 on behalf of Garcia Luna for Inmate 1. (A:4116, 4167). The Document, dated April 24, 2023, contained specific instructions regarding the false allegations that Garcia Luna wanted Inmate 1 to make. (*Id.*).

68

### 2. The Court's Findings Were Not Plainly Erroneous

In denying the Motion, the court described the government's evidence as "just as damning as [it] could be. This was a clear scheme by [Garcia Luna] to obstruct justice through bribery." (A:4354). Garcia Luna entirely fails to identify how the district court's reliance upon this extensive, unrebutted evidence was plain error or an abuse of discretion. A "sentencing court may find facts relevant to sentencing by the lower preponderance of the evidence standard," *United States v. Yannotti*, 541 F.3d 112, 129 (2d Cir. 2008), and "a district court has broad discretion as to what types of procedures are needed at a sentencing proceeding for determination of relevant disputed facts," *United States v. Guldi*, 141 F.4th 435, 450 (2d Cir. 2025). Therefore, Garcia Luna has not met his burden to demonstrate that the district court selected its "sentence based on clearly erroneous facts," *United States v. Robinson*, 702 F.3d 22, 38 (2d Cir. 2012), or otherwise committed error.

Nor did the court procedurally err in observing Garcia Luna's failure to persuasively rebut this obstruction evidence. (Br.56). Garcia Luna focuses on the court's observation that Garcia Luna had lived a "double life" and that "nobody on the defense side, not his lawyers, not

69

Mr. Garcia Luna, has contradicted in any way the fact that he attempted to bribe prisoners [] to lie in order to discredit cooperators who testified at his trial. Nobody has denied that." (A:4580; *see* Br.27-28, 56).

While Garcia Luna denied the allegations in his reply brief seeking a new trial and his PSR objections, the defense failed to contradict the evidence of obstruction. (A:4171-4204, 4344-46). At sentencing, the court was clearly aware of Garcia Luna's denial and found it to be entirely unpersuasive. As the court said while resolving the defendant's PSR objections:

> THE COURT: Next, let's talk about some of these objections that have been made and how much the defense really wants to press some of these objections.... I have objections to paragraphs 15 and 18 which basically is the defendant saying he didn't assist the drug cartels.... I have a jury verdict and I have to reject that.
>
> MR. DE CASTRO: We do.... And, Judge, we were filing objections[,] and motions were pending at the time when we were filing objections. So we were just making sure to be careful.
>
> THE COURT: I appreciate that and I think it's probably the same with paragraph 20, which talks about the attempt to bribe inmates at the MDC. I've since

70

> rendered my decision to deny the motion for a new trial which disposes of that as well. Right?

MR. DE CASTRO: Yes, Judge.

(A:4556-57).

Viewed in context, the district court's comments—that neither Garcia Luna nor his counsel had "contradicted in any way the fact that he attempted to bribe prisoners [at the MDC] to lie in order to discredit cooperators who testified at his trial" and that "[n]obody has denied that"—reflected his accurate view that any denial by Garcia Luna was perfunctory and that the compelling evidence presented by the government was uncontradicted. (A:4580).

Such "remarks, taken as a whole," do not amount to plain error. *See United States v. Watson*, No. 21-1562-CR, 2022 WL 17660546, at *8 (2d Cir. Dec. 14, 2022) (rejecting challenge to rhetorical comments by sentencing judge that this Court characterized as "hyperbole," which did not "render a sentence infirm"); *Robinson*, 702 F.3d at 39 (analyzing the "import of the District Court's remarks…as a whole" and rejecting claim of procedural error). The court did not misconstrue Garcia Luna's position or otherwise err.

71

Nor has Garcia Luna met his burden to demonstrate that the error affected his "substantial rights" or the "fairness, integrity or public reputation" of the proceedings. *Moore*, 975 F.3d at 90, 93 n.37 ("[W]hen plain error review applies, it is the defendant rather than the Government who bears the burden[.]"). This issue—whether Garcia Luna had contradicted or denied the government's obstruction evidence —exaggerates a minor procedural observation by the court that had no apparent effect on the Guidelines. And, even if the court did commit an error, which it did not, Garcia Luna received a below-Guidelines sentence. *Id*. at 93 (affirming sentence on plain error review where court committed minor factual error because "the thrust of the court's observation remain[ed] valid" and there was no reason to believe the error was "material to the court's otherwise careful analysis").

B. The District Court Did Not Procedurally Err by Relying Upon the Evidence Presented at Trial in Imposing a $2 Million Fine

Garcia Luna next argues that the district court procedurally erred in "speculat[ing]" that Garcia Luna "had hidden money out there." (Br.57 (quoting A:4580-81)). Not so. The district court relied on trial evidence of Garcia Luna's receipt of millions of dollars in bribes. (A:4580-

81) ("I have no confidence in the financial statement that I've seen. I don't think Probation did either, based on the way it summed up the statement. I think there's, in all likelihood, hidden money out there especially *based on what I heard at trial.* I am, therefore, imposing a $2 million fine as to Count One which is due immediately." (emphasis added)).

The trial evidence on this point was compelling: multiple Cartel leaders testified that Garcia Luna accepted bribes. Specifically, Barragán testified about the payments delivered to Garcia Luna, stating that "[t]he payments grew as the cartel grew." (A:1279, 1288, 1290, 1293). For years, the leaders of the Cartel pooled millions of dollars each month and delivered the funds to either Garcia Luna directly or a subordinate commander. (A:1315-16, 1332-33, 1342-43, 1399-1401, 1420-21). In particular, Barragán described Beltrán Leyva delivering regular bribe payments of between $1 million and $1.5 million to Garcia Luna through a subordinate commander. (A:1308-10). Barragán even recalled one occasion when the Cartel delivered a bribe payment of between $14 million and $16 million in exchange for Garcia Luna authorizing the release of a ton of cocaine. (A:1323-27).

73

Oscar Nava Valencia similarly testified that he paid Garcia Luna more than $10 million in bribes, (A:1790-91), that he pooled bribe payments with members of the Cartel, including Beltrán Leyva, (A:1813-14), and that he had personal knowledge of a $3 million bribe payment delivered to Garcia Luna. (A:1837, 1840-41). Israel Avila described the Cartel's accounting ledgers, which documented millions of dollars in bribe payments by the Cartel to Garcia Luna. (A:2058-61). In addition, Jesus Zambada Garcia testified about delivering bribe payments in the amounts of $3 million, $2 million, and $5 million to Garcia Luna, either directly or through Garcia Luna's associates on behalf of the Cartel. (A:2869, 2886-92, 2901-03). Zambada Garcia also relayed conversations he had with other members of the Cartel regarding the delivery of pooled monthly $1.5 million bribe payments for Garcia Luna. (A:2877, 2899). Finally, as previously discussed, the district court credited the government's evidence that, in advance of sentencing, Garcia Luna offered millions of dollars to MDC inmates in exchange for false testimony. (A:4354).

Garcia Luna argues that the imposed fine was improper because, at the outset of the case and before evidence was presented, the

74

district court appointed counsel based upon a financial affidavit.[14] (*See* Br.57). But financial affidavits are self-serving and unverified, as the court acknowledged at trial. (A:3425 ("[Y]ou've heard…that defendant's lawyers had been appointed by the [c]ourt…. The process for appointment of counsel doesn't involve any vetting or checking or financial investigation about the information that the defendant discloses in that affidavit. So you shouldn't infer, one way or the other, from the fact that counsel has been appointed that the defendant does or does not have access to money."")).

C.    The Sentence Imposed Was Substantively Reasonable

Garcia Luna wrongly argues that his below-Guidelines sentence of 460 months in prison and a $2 million fine is substantively unreasonable. (Br.58; A:4586, 4590).

---

[14]    As addressed in the PSR, Garcia Luna's financial affidavit appeared to be particularly unreliable in light of his documented history of using "various techniques to disguise the size of his true financial holdings, including by using shell companies and straw purchasers to acquire assets," and the fact that Garcia Luna had acquired a $3 million Florida property and a private yacht through a shell company and used a separate shell company to pay for private school tuition for his children. (*See* PSR ¶ 77).

75

This Court will "vacate a sentence as substantively unreasonable only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions, that is, when sentences are so shockingly high, shockingly low, or otherwise unsupportable as a matter of law that allowing them to stand would damage the administration of justice." *United States v. Ortiz*, 100 F.4th 112, 122 (2d Cir. 2024). A defendant bears "a heavy burden because [this Court's] review of a sentence for substantive unreasonableness is particularly deferential." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012). "While [this Court] do[es] not presume that a Guidelines sentence is necessarily substantively reasonable, that conclusion is warranted in the overwhelming majority of cases," *United States v. Sternquist*, No. 24-2135-CR, 2025 WL 1822512, at *3 (2d Cir. July, 2, 2025) (summary order), and "[i]t is therefore difficult to find that a below-Guidelines sentence is unreasonable," *United States v. Perez-Frias*, 636 F.3d 39, 43 (2d Cir. 2011) (per curiam).

Garcia Luna was convicted at trial of one of the most serious federal crimes: a continuing criminal enterprise. *Garrett v. United States*, 471 U.S. 773, 781 (1985) (describing a continuing criminal

76

enterprise prosecution as "designed to reach the top brass" in drug trafficking organizations). Garcia Luna was Mexico's chief law enforcement officer, and he is the highest-ranking official in Mexico to be prosecuted in the United States. For over a decade, he breached his public duty and received millions of dollars in bribes from the Cartel in exchange for facilitating its massive drug trafficking operation. The court remarked that Garcia Luna's role as a leader and enabler of the Cartel was "horrible conduct" and the "seriousness of the crime" could not be overstated. (A:4576; *see* A:4574 ("I understand that Mr. Garcia Luna is not the direct trigger puller, but I also understand that he bears a large responsibility as a major facilitator" of the Cartel's endemic violence)).

The district court also emphasized the importance of "general deterrence" (A:4569), as well as Garcia Luna's obstruction of justice (see A:4572). After reviewing the relevant sentencing factors, including certain mitigating factors, such as his length of time in pretrial custody (A:4579), the court imposed a sentence that, while substantial, still fell below the Guidelines of life imprisonment. (A:4571, 4580). As the district court further elaborated:

77

> [T]he offense here is so overwhelming that it does suggest a real need to send a message to public officials, particularly enablers of this level of criminal activity that you just can't—you might not get tagged directly with every single murder, but you also cannot shirk responsibility by saying well there were others that were just as bad or even worse.

(A:4576).

Garcia Luna's history and characteristics also justified a lengthy prison sentence, including his corrupt efforts "to undo the verdict through more corruption and deceit" by bribing MDC inmates to file false affidavits with the district court. (A:4370). Garcia Luna's obstruction while incarcerated refutes his argument that he had "been a model inmate" at the MDC. (Br. 58).

The $2 million fine was also appropriate, since it fell within the Guidelines range and reflected the defendant's corrupt gains, as trial evidence established. (PSR ¶ 105); *Sternquist*, 2025 WL 1822512, at *3.

While Garcia Luna disagrees with the court's consideration of certain mitigating factors (Br.58), his "disagreement with how the district court weighed those circumstances does not provide a basis for disturbing [the] sentence," *Sternquist*, 2025 WL 1822512, at *3 (citing

78

*Broxmeyer*, 699 F.3d at 289 ("[W]e are mindful that facts may frequently point in different directions so that even experienced district judges may reasonably differ, not only in their findings of fact, but in the relative weight they accord competing circumstances.")).

In sum, Garcia Luna cannot meet his "heavy burden" to show that the below Guidelines sentence was "shockingly high," in light of the breadth and brazenness of the defendant's crimes and the "particularly deferential" standard of review. *Broxmeyer*, 699 F.3d at 289; *United States v. Messina*, 806 F.3d 55, 66 (2d Cir. 2015).

79

## CONCLUSION

For the foregoing reasons, the judgment should be affirmed.

Dated:     Brooklyn, New York
           March 19, 2026

                         Respectfully submitted,

                         JOSEPH NOCELLA, JR.,
                         *United States Attorney*,
                         *Eastern District of New York.*

           By:   /s/ ADAM AMIR
                 ADAM AMIR
                 Assistant U.S. Attorney


SUSAN CORKERY,
RYAN C. HARRIS,
ERIN M. REID,
ADAM AMIR,
*Assistant United States Attorneys*,
     (*Of Counsel*).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 13,635 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:   Brooklyn, New York
         March 19, 2026

/s/ SUSAN CORKERY
SUSAN CORKERY
Assistant U.S. Attorney

APPENDIX

TABLE OF CONTENTS

Page

Government Letter,
*United States v. Garcia Luna*, No. 19-CR-576 (BMC)
May 20, 2022 ..................................................................................... GA1

Government Letter,
*United States v. Garcia Luna*, No. 19-CR-576 (BMC)
May 24, 2022 ..................................................................................... GA7

Government Letter,
*United States v. Garcia Luna*, No. 19-CR-576 (BMC)
June 25, 2022 .................................................................................. GA10

Government Letter,
*United States v. Garcia Luna*, No. 19-CR-576 (BMC)
August 3, 2022 ................................................................................ GA11

Government Exhibits,
*United States v. Garcia Luna*, No. 19-CR-576 (BMC)
GX726 ...................................................................................... GA12
GX727 ...................................................................................... GA13
GX738A..................................................................................... GA14
GX738AT .................................................................................. GA26
GX741 ...................................................................................... GA38



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RCH                                         *271 Cadman Plaza East*
F. #2019R00927                              *Brooklyn, New York 11201*


May 20, 2022


<u>By ECF</u>


The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Genaro Garcia Luna, et al.
>           <u>Criminal Docket No. 19-576 (S-1) (BMC)</u>

Dear Judge Cogan:

      The government hereby notifies the Court of its filing earlier today—via the Classified Information Security Officer—of an <u>ex</u> <u>parte</u>, classified motion for a protective order pursuant to the Classified Information Procedures Act, Title 18, United States Code, Appendix III, Section 4, and Federal Rule of Criminal Procedure 16(d)(1), with related material. A copy of the motion's cover page, with markings redacted, and a proposed order on the motion are enclosed.


                        Respectfully submitted,

                        BREON PEACE
                        United States Attorney

By:      /s/
                        Ryan C. Harris
                        Saritha Komatireddy
                        Erin M. Reid
                        Phillip Pilmar
                        Marietou Diouf
                        Assistant U.S. Attorneys
                        (718) 254-7000


cc:    Counsel for Defendants (by ECF)
       Clerk of Court (BMC) (by ECF)

RCH/SK/EMR/PP
F.#2019R00927

CISO: _____
Date: 5/20/22

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

v.

GENARO GARCIA LUNA,

                                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**FILED EX PARTE,
IN CAMERA AND UNDER SEAL**

19-CR-576 (S-1) (BMC)

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS CLASSIFIED
EX PARTE, IN CAMERA MOTION FOR A PROTECTIVE ORDER PURSUANT TO
SECTION 4 OF THE CLASSIFIED INFORMATION PROCEDURES ACT AND
RULE 16(d)(1) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

BREON PEACE
United States Attorney
Eastern District of New York

Saritha Komatireddy
Ryan Harris
Erin Reid
Philip Pilmar
Marietou Diouf
Assistant U.S. Attorneys
Eastern District of New York

RCH
F.#2019R00927

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

GENARO GARCIA LUNA,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

[PROPOSED] ORDER

19 CR 576 (S-1) (BMC)

### [PROPOSED] PROTECTIVE ORDER PURSTANT TO SECTION 4
### OF THE CLASSIFIED INFORMATION PROCEDURES ACT AND
### RULE 16(d)(1) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

This action is before the Court on the government's ex parte application for a protective order pursuant to Section 4 of the Classified Information Procedures Act, 18 U.S.C. App. III ("CIPA"), and Rule 16(d)(1) of the Federal Rules of Criminal Procedure, seeking to withhold from discovery certain classified materials ("the materials"), filed on May 20, 2022 ("the application"). After ex parte, in camera inspection and consideration of the application and the accompanying exhibits, the Court finds, pursuant to Section 4 of CIPA and Rule 16(d)(1), that the government's application contains classified information that requires protection against unauthorized disclosure for reasons of national security. Specifically, the Court finds that disclosure of the classified materials to the defense, or to the public, reasonably could be expected to cause serious damage to the national security of the United States. See United States v. Farekh, 956 F.3d 99, 106-09 (2d Cir. 2020) ("the District Court properly exercised its authority under CIPA when it reviewed and adjudicated the Government's CIPA motions ex parte and in camera" even where defense counsel has requisite security clearance).

1

The First Amendment right of access to court documents may be curtailed in favor of a compelling government interest provided that the limitation on access is "narrowly tailored to serve that interest." Globe Newspaper Co. v. Superior Ct., 457 U.S. 596, 606-07 (1982); see also Press-Enterprise Co. v. Superior Ct., 464 U.S. 501, 510 (1984) ("The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."); Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 598 (1978) (common law right of access may be outweighed by an important competing interest). Here, the Court finds that the government's interest in protecting the national security and preventing the unnecessary dissemination of classified information outweighs the defendants' and/or public's right of access to these materials. See Haig v. Agee, 453 U.S. 280, 307 (1981) ("[N]o governmental interest is more compelling than the security of the Nation."); Snepp v. United States, 444 U.S. 507, 509 n.3 (1980) ("The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.").

WHEREAS the government, in its motion and application, seeks a protective order against disclosure of certain classified information to the defense because that information is not discoverable under applicable law or is not helpful or material to the defense;

WHEREAS the Court finds that disclosure of the motion or accompanying materials to the defense or the public would defeat the government's purpose in seeking a protective order;

WHEREAS the Court further finds that the government's application is so interrelated with classified information as to make impracticable the filing of meaningful redacted

2

materials that do not divulge classified information, and that no reasonable alternative to closure and sealing exists that will protect the government's interest in preventing the unauthorized dissemination of this information;

WHEREAS this sealing order is drawn as narrowly as possible under the circumstances;

WHEREAS the government has properly invoked the state secrets privilege with respect to the materials pursuant to United States v. Aref, 533 F.3d 72, 80 (2d Cir. 2008) (holding that the privilege must be "lodged by the head of the department which has control over the matter, after actual personal consideration by that officer" (internal quotation marks omitted));

WHEREAS the Court has determined that the classified materials to be withheld are not "helpful or material to the defense," see United States v. Stewart, 590 F.3d 93, 131 (2d Cir. 2009);

WHEREAS the Court finds that the classified information sought to be excluded from discovery is either not discoverable under Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and their progeny, or Federal Rule of Criminal Procedure 16; or that such discovery value is outweighed by the potential danger to national security that might ensure after disclosure;.and

WHEREAS the Court finds that the government's proposed summary substitutions of certain classified material adequately inform the defense of information that arguably may be helpful or material to their defense, in satisfaction of the government's discovery obligations; it is hereby

ORDERED that the government's application for a protective order to withhold certain classified materials from discovery is granted; and

IT IS FURTHER ORDERED that the government's proposed summary substitutions of certain classified materials that were made available to the Court are sufficient to comply with the government's discovery obligations; and

IT IS FURTHER ORDERED that the government's request to file its application ex parte and under seal is granted because disclosure of the contents of the application to the defendant or the public would compromise the government's compelling interest in protecting national security and would defeat the purpose of the protective order.  See also United States v. Abu-Jihaad, 630 F.3d 102, 143 (2d Cir. 2010).


Brooklyn, New York
_____, 2022

                                      SO ORDERED.


                                     _____
                                     HONORABLE BRIAN M. COGAN
                                     UNITED STATES DISTRICT JUDGE
                                     EASTERN DISTRICT OF NEW YORK

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SK/RCH/EMR/PP/MD                    *271 Cadman Plaza East*
F. #2019R00927                         *Brooklyn, New York 11201*

May 24, 2022

By ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Genaro Garcia Luna
>        Criminal Dkt. No. 19-576 (BMC)

Dear Judge Cogan:

The parties respectfully submit this written status update to the Court in the above-captioned matter, in advance of the upcoming status conference scheduled for May 25, 2022. The parties agree that an order of excludable delay following the upcoming status conference is appropriate based on the Court's previous complex case designation in this matter.

In addition, the parties respectfully write to update the Court on the following issue:

- <u>Discovery and Early Production of Certain Jencks Act Material</u>

  o The government continues the process of collecting and reviewing discovery for production to the defendant on a rolling basis. To facilitate the defendant's preparation for trial, the government has agreed to review Jencks Act material and identify materials that can be produced well in advance of trial on a rolling basis for early disclosure. The government anticipates making an initial production of such material this week.

  o To date, the government has produced more than one million pages of documents and voluminous intercepted communications. The government has produced the vast majority of the discoverable material in its possession. It expects to make smaller productions on a rolling basis as it receives additional discoverable materials and/or identifies such material in its possession.

- <u>Request for Particulars</u>

  o By letter dated April 15, 2022, defense counsel requested particulars regarding the charges alleged in the indictment and materials pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  On May 1, 2022, the government responded by letter and provided the defendant with certain particulars and certain information provided, in an abundance of caution, pursuant to Federal Rule of Criminal Procedure 16, 18 U.S.C. § 3500, <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>Giglio v. United States</u>, 405 U.S. 150 (1972).  The government further advised defense counsel that, in order to facilitate trial preparation, the government would review its Jencks Act material and identify those materials that could be produced to defense counsel well in advance of trial on a rolling basis.

- <u>CIPA Proceedings</u>

  o On May 20, 2022, the government filed an <u>ex</u> <u>parte</u>, classified motion for a protective order pursuant to the Classified Information Procedures Act, Title 18, United States Code, Appendix III, Section 4, and Federal Rule of Criminal Procedure 16(d)(1), with related material (the "Section 4 Motion").  <u>See</u> Dkt. No. 90.  The Court had previously scheduled an <u>ex</u> <u>parte</u> hearing on the Section 4 Motion for June 2, 2022 at 10:00 a.m., when the due date for the Section 4 Motion was originally May 3, 2022.  In light of the subsequent adjournment of the due date of the Section 4 Motion to May 20, 2022, the government respectfully requests that the Court adjourn the date of the <u>ex</u> <u>parte</u> hearing on the Section 4 Motion to a date at the end of June 2022.  In addition, defense counsel also respectfully requests that the Court schedule an <u>ex</u> <u>parte</u>, in camera appearance, at which defense counsel will have the opportunity to present to the Court potential trial defenses that will assist the Court in its review of the Section 4 Motion and its related materials.

                              Respectfully submitted,

                              BREON PEACE
                              United States Attorney

                    By:    ___/s/_____
                              Saritha Komatireddy
                              Ryan C. Harris
                              Erin M. Reid
                              Philip Pilmar
                              Marietou Diouf
                              Assistant U.S. Attorneys
                              (718) 254-7000

2

cc:    Cesar de Castro, Esq. and Valerie Gotlib, Esq. (by ECF)
        Clerk of the Court (BMC) (by ECF)



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SK
F. #2019R00927

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 25, 2022

By ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Genaro Garcia Luna, et al.
> Criminal Docket No. 19-576 (S-1) (BMC)

Dear Judge Cogan:

The government hereby provides notice that earlier this week it filed—via the Classified Information Security Officer—a supplemental submission in support of its previously filed ex parte, classified motion for a protective order pursuant to the Classified Information Procedures Act, Title 18, United States Code, Appendix III, Section 4, and Federal Rule of Criminal Procedure 16(d)(1).

Respectfully submitted,

BREON PEACE
United States Attorney

By:    __/s/_____
Saritha Komatireddy
Ryan C. Harris
Erin M. Reid
Phillip Pilmar
Marietou Diouf
Assistant U.S. Attorneys
(718) 254-7000

cc:    Counsel for Defendants (by ECF)
Clerk of Court (BMC) (by ECF)

Case 1:19-cr-00576-BMC    Document 114    Filed 08/03/22    Page 1 of 1 PageID #: 1421



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SK
F. #2019R00927

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 3, 2022

By ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Genaro Garcia Luna, et al.
               Criminal Docket No. 19-576 (S-1) (BMC)

Dear Judge Cogan:

      The government hereby provides notice that earlier today it filed—via the Classified Information Security Officer—a supplemental submission in support of its previously filed ex parte, classified motion for a protective order pursuant to the Classified Information Procedures Act, Title 18, United States Code, Appendix III, Section 4, and Federal Rule of Criminal Procedure 16(d)(1).

                          Respectfully submitted,

                          BREON PEACE
                          United States Attorney

          By:       /s/
                          Saritha Komatireddy
                          Ryan C. Harris
                          Erin M. Reid
                          Phillip Pilmar
                          Marietou Diouf
                          Assistant U.S. Attorneys
                          (718) 254-7000

cc:    Counsel for Defendants (by ECF)
       Clerk of Court (BMC) (by ECF)



GOVERNMENT
EXHIBIT
**726**
19-CR-576 (BMC)



**GOVERNMENT EXHIBIT**

**727**

**19-CR-576 (BMC)**

GOVERNMENT
EXHIBIT
**738A**
19-CR-576 (BMC)

C. **OSCAR GRANADOS SALERO** Y OTROS, EN NUESTRA CALIDAD DE AGENTES DE LA POLICÍA FEDERAL INVESTIGADORA DE LA AGENCIA FEDERAL DE INVESTIGACIÓN DE LA PROCURADURÍA GENERAL DE LA REPÚBLICA; CON DISTINTAS CATEGORIAS. SEÑALANDO COMO DIRECCIÓN PARTICULAR EL UBICADO EN:

TLALPAN, DISTRITO FEDERAL, CP-14650. Z.P.-22 TELÉFONOS: (CASA) Y (CELULAR).

**H. CONGRESO DE LA UNION EN SUS DOS CAMARAS DE SENADORES Y DE DIPUTADOS.**
P R E S E N T E S.

Los suscritos, integrante de la sociedad mexicana, educados y acostumbrados, por nuestros padres, a conducirnos en la vida y trabajo, con honestidad y probidad, mismos principios hemos inculcado a nuestros hijos, con diversos años de experiencia y trabajo honesto, leal, eficiente, profesional, imparcial y transparente en el servio público federal, además, de siempre habernos conducido en base a los principios de obediencia y alto concepto de honor, justicia y ética, preparados en el área del combate al narcotráfico, delincuencia organizada y delito diversos federales, con categorías diversas en la Policía Federal Investigadora de la Agencia Federal de Investigación dependiente de la Procuraduría General de la República; nos dirigimos ante Ustedes con el debido respeto y con los siguientes propósitos:

**PRIMERO.-** Ponernos a su disposición en el sentido más amplio en que podamos servirles.

**SEGUNDO.-** Solicitándoles y rogándoles en la forma más humilde, su valiosa intervención, para no ser despedido de nuestra única fuente de trabajo, en forma ilegal, arbitraria e injustificada, por lo menos supervisando los exámenes y cursos, que en puerta preparan nuestros superiores jerárquicos, con el objetivo del despido ilegal, arbitrario e injustificado pretenden, y que por ende, no suframos, nuevamente varios de nosotros y en definitiva, nuestras familia y suscritos, condena a la miseria con la consecuente perdida del poco patrimonio, social y cultural que nos queda y poseemos.

**TERCERO.-** Los suscritos, enterados por los medios de comunicación y experiencias propias, de las diversas inquietudes y realidades que aquejan a nuestra sociedad y país, por la magnitud violenta y desbordante del crimen organizado, los diversos delitos e impunidad, les manifestamos y demandamos a continuación, repetimos, respetuosa y humildemente, su respuesta e intervención a lo siguiente:

**A).-** Los suscritos, nos dolemos de la perspectiva que la sociedad tiene del servidor público, textualmente, al haber manifestado, en la marcha blanca denominada "Iluminemos México", mediante pancartas, entre otras cosas lo siguiente: "¡QUE NOS GOBIERNEN, JUZGUEN Y CUIDEN LAS PUTAS PORQUE SUS HIJOS NOS HAN FALLADO!", aunque con justa razón, ya que por el mal ejemplo y actuar de unos, pagamos todos, pero no todos somos y actuamos igual y los suscritos nos consideramos y aseguramos ser esa excepción demostrándolo de la siguiente manera:

**B).-** Los suscritos, al igual que toda la sociedad, fuimos engañado por nuestros malos gobernantes, pues creídos de la convocatoria, emitida por la Procuraduría General de la República, en diversos años, en el sentido, que quien ingresara a ella, se formaría profesionalmente en la Procuración de Justicia Federal, ingresamos a laborar para la misma.

**C).-** Si bien es cierto, como personas humanas, cometimos diversos errores pero no graves, también cierto es, como servidores públicos, corregimos el camino destacando profesionalmente en la Procuración de Justicia Federal, dando resultados en diversos rubros como son:

2

**a). INVESTIGACIONES** (Que culminaron con detenidos y aseguramientos de dinero, armamento, vehículos, inmuebles y droga):

**b). ASEGURAMIENTOS** (De personas, droga, vehículos, armamento, etc.)**:**

**c). VALORACION DEL DESEMPEÑO:**
**- ÚNICA** en el que se precisa el desempeño **como investigadores y aseguramientos de dinero, heroína, cocaína, marihuana, cristal, laboratorios, vehículos y armas, siempre con detenidos.**

Lo anterior, los suscritos, lo podemos demostrar individual y documentalmente en el momento que se nos requiera (no anexando dichos documentos, en este momento, para no atiborrar de información innecesaria distinta a los fines que ahora se persiguen), pues siempre hemos desarrollado nuestro trabajo con alto grado profesional y con un primordial interés en servir a los intereses de nuestro pueblo, sociedad y país, colaborando y contribuyendo para una mejor estadía de la colectividad.

**D).-** Contamos también, con un amplio reconocimiento de autoridades extranjeras y de nuestro país, que profesionalmente nos prepararon para el desempeño de nuestro trabajo, sin que hasta la fecha, se nos haya reconocido por nuestra institución patrona.

**E).-** Actualmente, contrario a lo anterior, tenemos el temor fundado de un despido ilegal, injustificado y arbitrario (como anteriormente, en contra de diversos de los suscritos se intento en perjuicio propio y trascendentalmente de nuestras familias), por parte de los altos mandos que actualmente presiden la titularidad y puestos claves de nuestra institución patrona, así como de la Secretaria de Seguridad Publica Federal, de la PFP o PF, que son indistintamente los mismos funcionarios que laboran en ambas corporaciones (Genaro García Luna; Edgar Eusebio Millán Gómez, finado; Armando Espinosa de Benito; Ramón Pequeño García; Francisco Javier Garza Palacios, destituido y actual agregado en Colombia; Luís Enrique Cárdenas Palomino; Facundo Rosas Rosas; Patricio Patiño Arias; Oswaldo Luna Valderrabano, Igor Labastida Calderón, finado; entre otros finados, ejecutados y otros que actualmente laboran. ¿No será en realidad, por sus siglas, en verdad denominada, Policía Familiar García y Asociados?), los cuales, siempre han sido los mismos, que se van rotando, por tiempos determinados o indeterminados, los cargos más importantes y relevantes, sin dar oportunidad a nadie más (¿Ésto no será monopolio del poder y control total de las policías federales, por un interés común ajeno al de la sociedad u orden público, aun sin existir la aprobación por parte del Congreso de la Unión, respecto a la unificación de dichas instituciones policiacas?), y que al parecer cobran nomina por parte de ambas instituciones.  Aunado que la propia ley interna de la institución en que laboramos lo prohíbe:

Artículo 55 de la Ley Orgánica de la Procuraduría General de la República.

Lo anteriormente manifestado respecto al despido ilegal, injustificado y arbitrario, se sustenta en la realidad ya que bajo protesta de decir verdad, trascendió a la familia de diversos de los suscritos (y puede trascender a los, suscritos, que no lo han sufrido), por largos años, en que se les condenó a la miseria y a la pérdida de su patrimonio material (al tener que hacer gastos, pagar abogado defensor y contraer deudas para nuestra manutención y defensa), social (al poner en entredicho, la dignidad de los suscritos, ante la propia sociedad y nuestra familia) y cultural (al haber perdido años de estudio propios y de nuestros hijos, por falta del salario del que dependíamos), que casi culmina con la desintegración de sus familias, por la falta de trabajo y salario del que fueron privados, conllevando consecuencias como que en ocasiones tuvieran la necesidad de desperdigase para conseguir un poco de alimento (aclarando que por lo ultimo expuesto, NO es nuestra intención manipular su intervención solicitada, sino hacer ver a lo que como parte de la sociedad a la que pertenecemos, tenemos temor fundado junto con nuestras familias); pues bajo el engaño, de nuestros gobernantes, como ya es costumbre, sexenio con sexenio, respecto a la depuración de las instituciones policiacas, respecto a malos elementos, entre los suscritos, nos encontramos quienes fuimos removidos como una cifra mas, más no por la realidad de la supuesta depuración, sino por medio de remoción ilegal, injustificada y arbitraria, años atrás, bajo argucias falsas (simplemente por considerar, que los exámenes a los que fuimos sometidos, eran inconstitucionales y trasgresores de garantías) ilegales y arbitrarias (al no considerar las constancias que

3

integraron los expedientes de remoción, referentes y a las evaluaciones que aplica dicha institución denominadas como "poligrafía", "entorno social o situación patrimonial" y "psicología") acreditando finalmente, los suscritos, no sólo una cuestión ilegal, injustificada y arbitraria, sino la legal permanencia en nuestros cargos que actualmente ocupamos, al llenar los requisitos para tal propósito (se presentaran copias de las sentencias para constancia y veracidad de lo antes expresado si se nos requiere), acorde a las leyes vigentes emanadas por la exigente necesidad de la sociedad a la cuál servimos.

**F).-** Nuestro propósito, ante Ustedes, es que bajo su supervisión, además de no ser despedidos en forma ilegal, arbitraria e injustificada, como antes se explico se pretendió, que es nuestro temor fundado y miedo de nuestras familias a sufrir nuevamente los embates que ello conlleva, y que de esta forma se cerque la forma honesta de vivir, de los suscritos y familias; todo esto, es también el motivo, de unirnos a la lucha común de nuestra sociedad, a la que pertenecemos contra el delito y la impunidad, aun anteponiendo de ser necesario nuestra propia vida (como lo manifestamos y consentimos al formar parte de las filas de la corporación a la que pertenecemos), con el objetivo de armonizar la convivencia de la sociedad a la que servimos, sin que sea obstáculo señalarles que actualmente, nos vemos impedidos por fuerzas ajenas a nuestra voluntad, es decir, por voluntad de los dirigentes de la institución en la que trabajamos, pues, desde nuestro ingreso y reingreso, a pesar de nuestros antecedentes record y a pesar de que varios de nosotros, hemos solicitado nuestra reintegración en las áreas que son nuestra fuerte, por la profesión, actitud, aptitud, preparación y vocación que son, combatir la delincuencia organizada, narcotráfico y diversos delitos federales, se ha hecho caso omiso a nuestras peticiones a las cuales no ha habido respuesta alguna y en ningún sentido (se presentaran dichas solicitudes si se requieren).

**G).-** En lugar de dejar que los policías, como los suscritos, trabajen, se nos ha confinado a las guardias armadas generales (en realidad desarmadas) con el único propósito de cuidar que a las instalaciones de la PGR y de la actual Policía Federal, no se ingrese comida o con vestuario impropio de los que ahí laboran, así como que en las afueras de las instalaciones no circulen o se estacionen impropiamente vehículos de compañeros o personas ajenas a las instituciones, lo cual es absurdo, tomando en cuenta la preparación en el área de investigaciones que tenemos para combatir la delincuencia, lo que ha propiciado a su vez, el aumento de esta, al separarnos y ocuparnos en cuestiones ajenas a la misma.

No debe pasar desapercibido, que a varios de los elementos que, como a los suscritos, tienen la suficiente aptitud y capacidad para combatir el crimen organizado y la delincuencia, por la viciada legislación a la que estamos expensos, solo se nos cambia de área dentro de las mismas guardias mencionadas (denominada guardia armada, donde regularmente, se hace que los elementos poliacos, portemos armas sin licencia para ello) y a gustillo de nuestros superiores.

**H).-** Aunado a lo anterior, entre las instituciones policiacas (AFI) dependientes de la PGR y (PFP o PF) dependiente de la Secretaria de Seguridad Pública Federal, solo existe un acuerdo de coordinación (el 05/2007), publicado en el Diario Oficial de la Federación fechado 25 de abril del año 2007 (ANEXO 1), derivado del convenio (ANEXO 2) firmando en fecha 30 de enero del año 2007, entre el Procurador de nuestra dependencia y el Secretario de Seguridad Pública Federal, esto es, de no subordinación, ni dependencia entre los recursos materiales y humanos de una y otra institución, sino de colaboración para combatir a la delincuencia en un frente común, sin embargo, el C. Secretario de Seguridad Pública Federal, antes Titular de la AFI, al través de sus inferiores, que dejo laborando en dicha AFI, con el propósito de tener el poder y control total de ambas dependencias policiacas, contradice el acuerdo en comento (con avenencia del Procurador General de la República), pues ha dispuesto de la totalidad del parque vehicular (sin que los mandos hagan nada al respecto), quitando el rotulado de la AFI y poniéndole el de la SSPF, con el propósito, al parecer, de acreditar el desmesurado gasto publico en cuanto a la adquisición de vehículos en la Secretaría que actualmente preside (ANEXO 3 fotos de tal anomalía; no debe quedar desapercibido, el antecedente que tiene, en cuanto a la anómala adquisición de helicópteros, cuando pertenció a la extinta PFP).

Tampoco, debe pasar desapercibido, que la realidad de lo que esta sucediendo actualmente y que es del conocimiento publico, por los medios masivos de comunicación, en cuanto que el 24 de septiembre del año en curso, 500 elementos de las Fuerzas

4

Federales de Apoyo de la Secretaria de Seguridad Publica Federal, tomaron por asalto y sin oficio alguno, la sede de la AFI, bajo el mando del C. Luís Cárdenas Palomino, quién con abuso de poder y autoridad, saqueo diversos archivos que estaban bajo el resguardo de esta AFI y lo destruyó, lo que conlleva, por acción de éste y por omisión del Señor Procurador General de la República, el rompimiento del acuerdo de colaboración antes mencionado (el 05/2007), con los objetivos: Uno, de adjudicarse ilegal, arbitraria e injustificadamente los recursos materiales de la AFI; y Dos, de unificar por medio de la fuerza de forma ilegal y mediante amedrentamiento hacia los suscritos, a ambas corporaciones policiacas (lo que contradice incluso, el decreto, ANEXO 4, de fecha 20 de agosto del año en curso, que refrenda la existencia de la AFI en la PGR, al reformar, adicionar y derogar diversas disposiciones del Reglamento de dicha institución), tomando de esta forma directa e indirectamente, el poder y control total de ambas instituciones el Secretario de Seguridad Pública Federal, mediante hostigamiento y amenaza laboral, se hizo a todos los elementos de dicha institución, mediante desplegado hizo, el Señor José Patricio Patiño Arias, en las oficinas de la AFI, dando autoritariamente 3 opciones para los que integramos las filas de la AFI, 1) Que optemos por el retiro voluntario (el cual es ridículo incluso para poder poner un negocio cualquiera, para poder sobrevivir nuestras familias) o 2) Para que entreguemos armamento y credenciales quedando como oficinistas o 3) Qué para darnos una plaza en la PF y firmemos el cambio a la misma, se nos someterá a un curso de 2 meses y exámenes, en la sede de la PF denominada CONTEL, ubicada en Iztapalapa, y que dependiendo de su aprobación se nos aceptaría en las filas de la PF, con el real objetivo de reprobarnos, lo que conlleva no solo acoso laboral, sino, abuso de autoridad y poder, contrariando nuestros derechos laborales.

Cabe afirmar rotundamente, que si bien es cierto, los sucritos, nos hemos manifestado mediante marchas, dirigidas a las sedes del H. Congreso de la Unión, como ante la propia PGR, para intentar hacer valer nuestros pocos derechos que creemos tener, también cierto es, que esto lo hemos hecho, durante nuestras francas o supuestos descansos, es decir, sin distraernos o separarnos de nuestras funciones injustificadamente, así como que tampoco, los suscritos, nos neguemos (como falsamente afirmó el Secretario de Seguridad Pública Federal en días pasados, ante el Señor Joaquín López Dóriga, del grupo Televisa, entrevistador favorito de su grupo, de quien opinamos, debe sacarse de la boca lo que éstos le han dado de propina, y se conduzca con veracidad, sin transgiversar la información ante la sociedad) a que se nos aplique ningún examen que conlleve a la mejora de nuestras funciones, ni tampoco en caso que sea necesario a la compilación de nuestros datos signalécticos, de voz, de ADN o de cualquier otra que sea necesaria, siempre y cuando sea conforme a derecho.

**CUARTO.-** Los suscritos, estamos enterados de la Iniciativa de Ley presentada por el C. Presidente constitucional, publicada e a Gaceta Parlamentaria de la Camara de Diputados, refiere a suprimir o desaparecer a la Agencia Federal de Investigaciones (de la que actualmente engrosamos las filas) del Órgano Administrativo de la Procuraduría General de la República, es decir de la Ley Orgánica de dicha institución, dándonos un tiempo fatal de 30 días, para decidir si nos incorporamos a su nueva policía o se nos retira con liquidación de ley.

Con la supuesta salvedad, que en caso, de querer sumarnos, a la nueva corporación tendremos que sujetarnos a diversos filtros de confianza establecidos, que de no ser acreditados, impediría nuestro acceso a esa nueva policía, por lo que reitera, seríamos liquidados económicamente conforme a la ley

**QUINTO.-** También, estamos enterados, que uno de los objetivos de dicha Iniciativa de Ley, es imponer sobre un solo individuo, el poder y control total sobre las instituciones policiacas federales e incluso de los Estados o Locales.

**SEXTO.-** Al respecto, los suscritos, por principio de cuentas, consideramos que es injusta la referida iniciativa, en el sentido, que si es aceptada por el Congreso de la Unión, como lo propone nuestro C. Presidente, suprimir o desaparecer a la Agencia Federal de Investigaciones del Órgano Administrativo de la Procuraduría General de la República, como antes referimos conocer, esto conllevaría agravios a los suscritos, pues cuando nosotros ingresamos a trabajar para dicha institución, se nos prometió falsamente, se nos formaría profesionalmente en la Procuración de Justicia Federal, es decir, sería una Carrera Profesional en forma y esto conllevaría a perder los distintos años de servicio que

cada uno de nosotros llevamos dentro de la Procuraduría General de la República, para comenzar de ceros a prestar nuestros servicios en la nueva policía pretendida.

**1.-** Aunado, si nosotros comenzamos a laborar para la Procuraduría mencionada, ésta al no desaparecer, sería injusto se nos apartara de su seno mediante la Iniciativa aducida y se nos forcé, mediante ésta, a decidir entre comillas a incorporarnos a la nueva policía, amenazándonos con retirarnos con liquidación de ley.

**2.-** Al respecto, de antemano presentamos, por este medio, nuestra categórica y rotunda inconformidad a tal Iniciativa, pues no es justo se nos quiera forzar a aceptar tal liquidación.

**3.-** Por lo que solicitamos a ustedes, aceptar nuestra contrapropuesta, al respecto, es decir, aceptamos la propuesta inmersa en la Iniciaiva referida, pero sólo en caso de ser aceptada por el H. Congreso de la Unión; pero en el sentido de que, primero, se nos liquide mediante prestación o retiro voluntario y, segundo, por derecho de igualdad, se nos otorgue una plaza presupuestal operativa, es decir, como policías investigadores de delitos federales diversos y del combate al narcotráfico y delincuencia organizada, por la preparación que tenemos, ya que a varios de nuestros compañeros, que con antelación a la Iniciativa ocupa, se les invitó y aceptaron engrosar las filas de la actualmente denominada en Policía Federal, se les otorgó una categoría similar o superior a la que ocupaban dentro de la Agencia Federal de Investigaciones, y así nosotros aceptaremos ingresar a las filas de la nueva policía propuesta por el C. Presidente.

**4.-** Igualmente, por derecho de igualdad, solicitamos acepten nuestra contrapropuesta, al respecto, es decir, aceptamos la propuesta inmersa en la iniciativa de Ley referida, pero sólo en caso de ser aceptada por el H. Congreso de la Unión, que refiere en el sentido de que se nos aceptaría o sumaria en las filas de la nueva policía si nos sujetamos a los diversos filtros de confianza establecidos, y nuestra contrapropuesta es en el sentido de que, como muchos de nuestros ex-compañeros (los mas allegados al Secretario de Seguridad Pública Federal) que aceptaron engrosar las filas de la actualmente denominada Policía Federal, sabemos, reprobaron diversos exámenes de confianza, ahora denominados filtros, y aún así siguen trabajando para ella, por lo que nosotros solicitamos dicha igualdad aceptando así ingresar a las filas de la nueva policía propuesta por el C. Presidente.

Respecto a esta última contrapropuesta, de los suscritos, respecto a ser aceptados y trabajar en la nueva policía se refiere en la iniciativa mencionada, aún reprobando exámenes o filtros de confianza que en ella misma se menciona, cabe aclarar y señalar, que no tiene nada de descabellado, por 2 razones:

**a).-** Porque, sí como se supone, dicha iniciativa, refiere a la conformación de una nueva policía, esta conllevaría no sólo que a los, suscritos, elementos de la Agencia Federal de Investigaciones, se les someta a exámenes o filtros para su aceptación en dicha nueva policía, sino que también debe incluirse a la aplicación de dichos exámenes y filtros, a los integrantes de la Policía Federal Preventiva y de la actual Policía Federal, de lo contrario se entiende que los elementos que conforman dicha nueva policía, ya esta conformada por estas ultimas corporaciones policiacas mencionadas, siendo inmutables e inamovibles sin que sus elementos concursen para ocupar las plazas o cargos poliacos en la misma; y no sería justo acorde al derecho de igualdad que en realidad obedece a un cierto interés particular por dicho Secretario de Seguridad Pública Federal, que solo a nosotros, se nos someta a tales exámenes y filtros, que por tales motivos, nos resulte injusto; aunado que ya aprobamos con antelación, al igual que los elementos que conforman aquellas otras instituciones policiacas, los exámenes y filtros que aplica nuestro Centro de Evaluación y Desarrollo Humano, a quien también se le conoce como Centro de Control y Confianza, que incluso afirmamos, es la misma institución que aplica los exámenes y filtros a todos y cada uno de los elementos policiacos que conformamos las distintas instituciones policiacas federales mencionadas en este párrafo.

**b).-** Porque, el propio actual Secretario de Seguridad Pública Federal, cuando fungió como Titular de la Agencia Federal de Investigaciones en contubernio con el Consejo de Profesionalización de la Procuraduría General de la República, del cual por sus facultades y funciones formaba parte, lo acostumbraban, y para muestra un botón, pues emitieron el acuerdo número CP/03/12/06, por duplicado, es decir, en dos fechas distintas, al parecer

6

para satisfacer sus intereses personales de nepotismo, mismos fueron publicados en los diarios oficiales de la federación de fechas 7 de julio (ANEXO 5) y 4 de agosto (ANEXO 6), ambos del año 2006, refieren a Convocatoria para el proceso de ingreso al Servicio de Carrera de Procuración de Justicia Federal (artículo tercero fracción II y bases de la convocatoria) para los agentes de la policía federal investigadora "de designación especial", es decir, dicho actual Secretario de Seguridad Pública Federal, Ex-titular de la Agencia Federal de Investigaciones en contubernio con **el Consejo de Profesionalización,** de la procuraduría mencionada, les **concedió (**esto es, poco antes de que dejara la titularidad en la AFI; puede verificarse la veracidad de esto, solicitándose al propio Consejo de Profesionalización de esta H. Procuraduría la lista de las personas que ingresaron y tomaron los cargos mediante dicha convocatoria**)**, incluso **a quienes tienen la categoría de Comandantes en Jefe, ahora** denominado como, **Supervisor Investigador General,** que es la **categoría policial de mayor rango en ambas instituciones**; sin que pasen desapercibidas 3 cuestiones en dicha convocatoria: Primera, que el personal que no fuera aceptado (es decir que repruebe su examen) continuaría en el cargo de designación especial (artículo sexto); Segunda, que tuvieran como requisito la enseñanza preparatoria o equivalente (base segunda fracción II numeral 2 inciso a.); y Tercera, que para ocupar tal cargo sólo necesitaban una antigüedad en el mismo de 4 años (base tercera fracción II inciso f.). **Anomalía que conlleva** no solo nepotismo ni abuso de autoridad y poder, sino a **una falta y cuestión mas grave, que es la imperante necesidad, por ende, de otorgar a la sociedad la seguridad pública efectiva y necesaria, al través de personal con verdadera aptitud, actitud y vocación para ello, que se ha reflejado en los actuales acontecimientos de inseguridad y auge de la delincuencia y narcoterrorismo**.

c).- Por lo aducido en el inciso anterior, los suscritos, consideramos injusto, que acorde a los antecedentes (experiencia) extraordinarios de los mismo, y por la antigüedad que tenemos dentro de la institución, no se nos de oportunidad desde hace años mediante convocatoria, de aumentar el cargo o rango al que tenemos, trasgrediéndose en nuestro agravio el derecho de igualdad y los principios de progresividad y de no regresión.

d).- Por tal cuestión, es de nuestro conocimiento, que **dicho personal a quien se dirigió la convocatoria descrita**, en el inciso b) antecede, con toda seguridad no **tenían o tenían exactamente 4 años en los cargos** policiacos referidos (antigüedad en la categoría y supuesta experiencia, y lo mas importante ser familiares del actual Secretario de Seguridad Pública Federal, como muestra un botón, su hermana Esperanza García Luna, Nepotismo, que es muy difícil se le compruebe ya que su apellido "GARCIA" es muy común y pasan desapercibidos), amistades (propias del mismo y de sus inferiores mas allegados) o amantes (de altos funcionarios de dicha H. Institución, como Lorena González Hernández de la PF, con cargo de subinspector, bajo ordenes de Facundo Rosas Rosas, involucrada en el secuestro del joven Fernando Martí); **y que en el peor de los casos, de no aprobar el examen de oposición, seguirían laborando en el mismo cargo para el que concursaron**, sin mayor requisito académico que la enseñanza media superior. **Razón** suficiente **por el que se debe aplicar del mismo modo el derecho de igualdad en relación directa con los principios de progresividad y de no regresión antesaducidos, a los suscritos, considerando que aquellos,** a quien describe la convocatoria referida **son supuestos policias, de designación especial, que sin pasar por categorías inferiores llegaron directamente al cargo** de comandantes en jefe o de **Supervisor Investigador General,** que repetimos, es la mas alta jerarquía policiaca, **por lo que incluso,** por el propio derecho de igualdad, **a los suscrito, se les puede otorgar un cargo mayor, pues** no debe pasar desapercibido que varios de los suscritos **tienen** no menos de cinco años aproximadamente **de experiencia, con** una **enseñanza académica mínima de preparatoria o licenciatura trunca** o licenciatura concluida en derecho u otras profesiones.

5.- En relación a todo lo antes expuesto, y relacionadamente, respecto a la propuesta de Iniciativa de Ley, de **imponer sobre un solo individuo, el poder y control total sobre las instituciones policiacas federales**, ya no digamos también la de los diversos Estados o locales, los suscritos, no tenemos ni proponemos ninguna contrapropuesta que no sea la de coordinación, advirtiendo a Ustedes, que **es muy peligroso** acepten aquélla, **en primer lugar, porque por nepotismo ubicaría** a sus familiares, amistades y amantes en áreas y **cargos estratégicos,** como es la Dirección en el área de inteligencia policial e informática, esta última que fue sustraída de nuestra base de datos por el actual Secretario de Seguridad Pública Federal, **teniendo así control y poder total sobre**

7

**personal e información relevante, sobre el cual pretenda o tenga intereses personales, como esta sucediendo, directa o indirectamente, al través de sus subordinados** de dicho Secretario, que como antes explicamos en el **inciso "TERCERO" "E", todavía forman parte del alto mando en la AFI** (con el único propósito de mantener y tener el control y poder total sobre las policías federales), **que además se pasan o laboran indistintamente tanto en la AFI como en la PFP o PF o SSPF, en perfecta ilegalidad de nuestros ordenamientos** (artículo 55 de la Ley Orgánica de la PGR), por lo que sólo nos queda hacérselos ver mediante un ejemplo y un supuesto hecho real, siguientes:

Ejemplo:
**a).-** Si quiere dicho mando único, por su control y poder total, físicamente a su gusto, mover personal policiaco, que en un reten de relevante importancia se encuentre ubicado estratégicamente, por ordenes propias en forma directa o indirectamente, a través de sus subordinados (familiares o amistades), lo puede hacer con el propósito de distracción, dejando pasar vehículos con droga o personas fugitivas de la ley, que convengan a sus intereses; o bien, al tener ubicada a sus familiares o amistades en las áreas de inteligencia policial, permita el desvanecimiento u ocultamiento de información por la misma cuestión.

Supuesto hecho real:
**b).-** El pasado día sabado 19 de octubre del año en curso 2008, el actual Secretario de Seguridad Pública Federal, Genaro García Luna y su escolta integrada por aproximadamente 27 elementos, según se sabe por comentarios de diversos de ellos, en los pasillos de sus diversas instalaciones, después de las 12 horas del día en mención, en la carretera Cuernavaca a Tepoztlán, fue interceptado o citado por un alto capo de las drogas que se acompañaba por un indeterminado número de pistoleros o sicarios en aproximadamente 10 vehículos suburban blindados, sin que la escolta del funcionario en mención hiciera nada por protegerlo, al parecer, por una orden verbal de éste, teniendo como efectos que la escolta de dicho funcionario fuera sometida, vendada de los ojos durante aproximadamente cuatro horas, así como que dicha escolta, fue desposeída de sus armas largas y cortas a su cargo, escuchando, según versiones de dicha escolta, de una voz desconocida, pero según refieren, al parecer, del alto capo de las drogas, textualmente:

"Este es el primero y último aviso para que sepas que sí podemos llegar a ti si no cumples con lo pactado"

Sin haber oído dicha escolta, más al respecto, pues el funcionario en comento después de esas palabras, de dicho alto capo de las drogas, se retiró al parecer sólo, abandonando a sus escoltas a su suerte, sin saber la dirección que tomó y lo que hizo durante esas cuatro largas horas, tiempo en que pudo entrevistarse en un lugar mas cómodo y distinto al que fueron los supuestos hechos.

No debe pasar desapercibido, que el Secretario funcionario en cuestión, es un experto actor acostumbrado al engaño, pues debe recordarse, que en fechas pasadas, elaboro un circo en torno a un secuestro en el que estuvo supuestamente involucrada una mujer francesa en el pueblo de Ajusco, D.F., donde cito a un medio televisivo de comunicación masivo, y en el caso concreto ocupa, pudo manipular a toda su escolta, haciéndoles creer que lo sucedido fue un amedrentamiento (levantón) por parte de algún capo de la droga y lo que en realidad sucedió fue una cita concertada con ese supuesto capo.

Al respecto, de este supuesto hecho real, cabe solicitar a ustedes, su valiosa intervención, de manera urgente, para verificar la veracidad del mismo, dándose vista a la Secretaría de la Defensa Nacional, para que le solicite al través del funcionario en comento, a la totalidad de su escolta, exhiban sus portaciones y documentos de asignación de armas cortas y largas, que deben contener el quintado o marcado hecho por dicha Secretaría de la Defensa Naciona,l así como deben concatenarse las ojivas de cada arma de dichas escoltas, con de las ojivas en cuanto el rayado o testigo que deben obrar en los archivos de la misma Secretaría de la Defensa Nacional, armamento que se supone, proporcionó a dicha escolta el recurso material referido, al través de la Secretaría de Seguridad Pública Federal y Procuraduría General de la República, pues según se sabe, por los comentarios surgidos en los pasillos de las diversas instalaciones, el funcionario secretario en comento, le indicó a su escolta, les reintegraría las armas, sin saberse si dicha

8

reintegración se hará adquiriendo armas de dudosa procedencia o al hacer el supuesto cambio por abastecimiento de nuevo armamento, ante la propia Secretaría de la Defensa Nacional o bien recibir armamento que esté bajo resguardo de la propia Secretaría de Seguridad Pública Federal o Procuraduría General  de la República sin devolver las anteriores.

Para mejor proveer, al supuesto hecho real antes expuesto, sabemos que las escoltas de dicho funcionario, tenían o tienen bajo su resguardo el siguiente armamento:

1.- ALONSO OLVERA MIGUEL ANGEL, Pistola Pietro Beretta, Calibre 9mm, Matrícula H99095Z y Carabina Colt AR-15 Calibre .223, Matricula LGC022359

2.- ALONSO TORRES REY, Pistola Pietro Beretta, Calibre 9mm, Matrícula H97904Z y Fusil Marca Galil Calibre .223 Matricula 2089677

3.- ALVIZ MONDRAGON ROBERTO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98581Z y Carabina Colt AR-15 Calibre .223, Matricula LGC022120

4.- ARREOLA ROBLES CESAR ALEJANDRO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98312Z y Carabina Colt AR-15 Calibre .223, Matricula LGC026764

5.- ALVAREZ ALQUICIRA ALAN, Pistola Pietro Beretta, Calibre 9mm, Matrícula H99139Z y Carabina Bush Master Calibre .223 Matricula BFI542668

6.- ARTEAGA URIBE OSCAR, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98491Z y Carabina Colt AR-15. Calibre .223, Matrícula LGC024222.

7- BENITEZ PUEBLA EDGAR, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98834Z y Carabina Colt AR-15. Calibre .223, Matrícula LGC022486.

8.- BLANCO HERNANDEZ GRISELDA EDITH, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98519Z

9.- CAMPILLO DIAZ GUSTAVO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H991836Z y Fusil Calibre .223 Matricula FN017585

10.- CARDENAS ACUÑA ELLIUT, Pistola Pietro Beretta, Calibre 9mm, Matrícula P19522Z y Fusil Calibre .223 Matricula FN018127

11.- CASTAÑEDA ORTEGA JOSE JUAN, Pistola Pietro Beretta, Calibre 9mm, Matrícula H06599Z y Carabina Colt AR-15 Calibre .223, Matricula LGC024405

12.- CAVAZOS MEDINA ALVARO OVIDIO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P20396Z y Fusil Calibre .223 Matricula FN017585

13.- CERVANTES MOJICA LIBIO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P19864Z y Fusil Galil Calibre .223 Matricula FN017732

14.- CHAVEZ GARCIA DANIEL, Pistola Pietro Beretta, Calibre 9mm, Matrícula P19796Z y Carabina Colt AR-15 Calibre .223 Matricula LGC024417.

15.- CHAVEZ HERNANDEZ JOSE LUIS, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98264Z y Carabina Colt AR-15 Calibre .223, Matricula LGC027786

16.- CLAUDIO CARRILLO ANGEL MAURICIO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H97916Z y Fusil Galil Calibre .223 Matricula FN017079

17.- COALLA PULIDO LUIS ALBERTO

18.- CORTES DE LA ROSA OSCAR, Pistola Pietro Beretta, Calibre 9mm, Matrícula P19579Z y Fusil Calibre .223 Matricula FN017359

19.- DE LA CRUZ JIMENEZ ROBERTO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P19076Z y Fusil Galil Calibre .223 Matricula FN018191

20- DE LUIS REYES JAVIER, Pistola Pietro Beretta, Calibre 9mm, Matrícula H99081Z y Carabina Colt AR-15. Calibre .223, Matrícula LGC014258.

21.- ESTRADA ARMENTA CLAUDIA, Pistola Pietro Beretta, Calibre 9mm, Matrícula P19912Z y Fusil Calibre .223 Matricula FN017873

22.- GALICIA BLANCO RAFAEL, Pistola Pietro Beretta, Calibre 9mm, Matrícula P20524Z y Carabina Colt AR-15 Calibre .223 Matricula LGC024679

23.- GALVAN SANCHEZ ANDRES, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98551Z y Carabina Colt AR-15 Calibre .223 Matricula LGC028100

24.- GARCIA ARZATE GUSTAVO ADOLFO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98108Z y Carabina Colt AR-15 Calibre .223, Matricula LGC025269

25.- GARCIA CUEVAS NESTOR, Pistola Pietro Beretta, Calibre 9mm, Matrícula H06609Z y Carabina Bush Master Calibre .223 Matricula BFI542402.

26.- GARCIA PEREZ OSWALDO MISAEL, Pistola Pietro Beretta, Calibre 9mm, Matrícula P19188Z y Carabina Colt AR-15 Calibre .223 Matricula LGC014005

27.- GAYTAN GONZALEZ SANDRA, Pistola Pietro Beretta, Calibre 9mm, Matrícula H06571Z y Carabina Colt AR-15 Calibre .223 Matricula LGC022081.

28.- GOMEZ SANCHEZ LUÍS GERARDO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98980Z y Carabina Colt AR-15 Calibre .223, Matricula LGC022144

29.- GONZALEZ ESPARZA DELFINO HUMBERTO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98809Z y Carabina Colt AR-15. Calibre .223, Matrícula LGC022423

30.- GUZMAN GONZALEZ JOEL, Pistola Pietro Beretta, Calibre 9mm, Matrícula P17381Z y Carabina Colt AR-15 Calibre .223 Matricula LGC024324

31.- HERNANDEZ CASTILLO JOSE LUIS, Pistola Pietro Beretta, Calibre 9mm, Matrícula P19080Z y Fusil Calibre .223 Matricula FN017099

32.- HERNANDEZ LICONA MARIO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P19533Z y Fusil Calibre .223 Matricula FN018293

33.- HERNANDEZ GONZALEZ JOSE RAMON, Pistola Pietro Beretta, Calibre 9mm, Matrícula H99072Z y Carabina Colt AR-15 Calibre .223, Matricula LGC022562

34.- JUAREZ ROSAS RODRIGO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P20250Z y Fusil Galil Calibre .223 Matricula FN017239

35.- LONA ROMERO EDGAR, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98760Z y Carabina Colt AR-15 Calibre .223, Matricula LGC024251

36.- LOPEZ DIAZ JULIO ALEJANDRO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98309Z y Carabina Colt AR-15 Calibre .223, Matricula LGC014544

37.- LOPEZ SANCHEZ GERONIMO ARMANDO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P20007Z y Fusil Calibre .223 Matricula LGC024747

38.- LOPEZ VELASCO CINTYA FABIOLA, Pistola Pietro Beretta, Calibre 9mm, Matrícula P20249Z y Carabina Colt AR-15 Calibre .223 Matricula LGC024244

39.- LINARES DE ANDA CARLOS EMILIO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98736Z y Carabina Colt AR-15 Calibre .223, Matricula LGC013814

40.- MARIN GARDUÑO LEOPOLDO AUDIEL, Pistola Pietro Beretta, Calibre 9mm, Matrícula P20477Z y Carabina Colt AR-15 Calibre .223 Matricula LGC024287

*41.- MARTINEZ GARCIA BERNABE, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98488Z

*42.- MARTINEZ GARCIA ALICIA, Pistola Pietro Beretta, Calibre 9mm, Matrícula P19726Z y Carabina Bush Master Calibre .223 Matricula BFI473054

43.- MARTINEZ GODOY DITHER FEDERICO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H97825Z y Carabina Colt AR15 Calibre .223 Matricula LGC024849

44.- MARTINEZ ORDUÑA JAVIER, Pistola Pietro Beretta, Calibre 9mm, Matrícula P20476Z y Carabina Bush Master Calibre .223 Matricula BFI473059

45.- MELGOZA GONZALEZ SAUL, Pistola Pietro Beretta, Calibre 9mm, Matrícula P20520Z y Carabina Colt AR-15 Calibre .223 Matricula LGC028060

46.- MENDOZA HERNANDEZ CESAR ARTURO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H97944Z y Carabina Colt AR-15. Calibre .223, Matrícula LGC024747

47.- MENDOZA MARIN ADONIS ANTONIO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P18442Z y Fusil Galil Calibre .223 Matricula FN017795

48.- MENDOZA SANCHEZ JUAN CARLOS, Pistola Pietro Beretta, Calibre 9mm, Matrícula H68633Z y Subametralladora Bush Master Calibre .223 Matricula BFI540717.

49.- MEZA MALDONADO MARTIN, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98123Z

50.- MIRANDA ESPADAS FERNANDO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P20250Z y Fusil Galil Calibre .223 Matricula FN017239

51.- MONTERO JIMENEZ LEONCIO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H78761Z y Carabina Colt AR-15 Calibre .223, Matricula LGC025335

Pistola Pietro Beretta, Calibre 9mm, Matrícula H99038Z y Carabina Colt AR-15 Calibre .223, Matricula LGC025101

52.- MORENO DE LA PEÑA HANS IVAN, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98066Z y Carabina Colt AR-15 matrícula LGC 025187 Calibre .223

53.- NAVARRETE DUARTE CESAR OBDULIO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98047Z y Carabina Colt AR-15 Calibre .223, Matricula LGC026649

54.- OLIVA CHAVEZ RODOLFO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98506Z y Carabina Colt AR-15. Calibre .223, Matrícula LGC024705

55.- OLVERA SOTO JOSE JUAN, Pistola Pietro Beretta, Calibre 9mm, Matrícula H99152Z y Carabina Colt AR-15 Calibre .223, Matricula LGC022463

56.- PEREZ PACHECO DOMINGO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H06598Z

57.- PIMENTEL MAYA ANA LILIA

58.- PLATA VILLEGAS GUSTAVO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98836Z y Carabina Colt AR-15 Calibre .223 Matricula LGC024705.

59.- POSADAS MEJIA EDUARDO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98959Z y Carabina Colt AR-15. Calibre .223, Matrícula LGC022081

60.- RAMIREZ BERMUDES JAIME, Pistola Pietro Beretta, Calibre 9mm, Matrícula H06567Z y Carabina Colt AR-15 Calibre .223, Matricula LGC027781

61.- RAMIREZ SERRANO EDGAR RICARDO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P18000Z y Carabina Colt AR-15 Calibre .223 Matricula LGC022596

62.- RAMIREZ ZUBIETA CARLOS, Pistola Pietro Beretta, Calibre 9mm, Matrícula H06593Z y Carabina Colt AR-15. Calibre .223, Matrícula LGC022501.

63.- REBOLLAR BENITEZ CARLOS, Pistola Pietro Beretta, Calibre 9mm, Matrícula P99186Z y Carabina Colt AR-15 Calibre .223 Matricula LGC024287

64.- RICARDO MARTINEZ HUGO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P29547Z y Carabina Colt AR-15 Calibre .223 Matricula LGC001436

65.- RIOS VICTORIO HUGO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98829Z y Carabina Colt AR-15 Calibre .223, Matricula LGC024589

66.- RODRIGUEZ RANGEL JORGE ALEJANDRO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H99135Z y Carabina Colt AR-15 Calibre .223 Matricula LGC024878

67.- RUIZ URIOSTEGUI ALFONSO PARIS, Pistola Pietro Beretta, Calibre 9mm, Matrícula P17205Z y Carabina Colt AR-15 Calibre .223 Matricula LGC024679

68.- SALAZAR CORREA EDGAR OSCAR, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98509Z y Carabina Colt AR-15. Calibre .223, Matrícula LGC023843

69.- SAN JUAN MARTINEZ LUIS ALBERTO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98306Z y Carabina Colt AR-15 matrícula LGC 028100

70.- SANCHEZ ALVAREZ ERNESTO, Pistola Pietro Beretta, Calibre 9mm, Matrícula H99040Z y Carabina Colt AR-15 matrícula LGC 022596

71.- SANCHEZ MARTINEZ EDDI, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98501Z y Carabina Colt AR-15 Calibre .223 Matricula LGC023947

72.- SANCHEZ RODRIGUEZ DOLORES, Pistola Pietro Beretta, Calibre 9mm, Matrícula P19197Z

73.- SOLIS JUAREZ MANUEL, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98996Z y Carabina Colt AR-15. Calibre .223, Matrícula LGC024849

74.- SOTO ROBERTO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P20072Z y Carabina Colt AR-15 Calibre .223 Matricula LGC001436

75.- SUAREZ MORALES JOEL, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98670Z y Carabina Colt AR-15 matrícula LGC 024121 Calibre .223

76.- TAMES PINALES CARLOS Pistola Pietro Beretta, Calibre 9mm, Matrícula P20613Z y Carabina Colt AR-15 Calibre .223 Matricula LGC024324

77.- TOLEDO MARTINEZ FABIAN, Pistola Pietro Beretta, Calibre 9mm, Matrícula P20303Z y Fusil Galil Calibre .223 Matricula FN017611

78.- TORRES GUZMAN EMMA, Pistola Pietro Beretta, Calibre 9mm, Matrícula P17893Z y Carabina Colt AR-15 Calibre .223 Matricula LGC024244

79.- ULLOA CORDOVA ESEQUIAS, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98453Z y Carabina Colt AR-15. Calibre .223, Matrícula LGC024550

80.- URIBE DORIA EDUARDO

81.- VALENCIA GARCIA DAVID MIZRRAIN, Pistola Pietro Beretta, Calibre 9mm, Matrícula H99039Z y Carabina Colt AR-15 Calibre .223, Matricula LGC027778

82.- VAZQUEZ BECERRIL GUSTAVO ALBERTO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P28170Z y Carabina Colt AR-15 Calibre .223 Matricula LGC002573

83.- VAZQUEZ DOMINGUEZ GUSTAVO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P19877Z y Carabina Colt AR-15 Calibre .223 Matricula LGC014005

84.- VAZQUEZ RODRIGUEZ GUMER GAMALIEL, Pistola Pietro Beretta, Calibre 9mm, Matrícula P19866Z y Carabina Colt AR-15 Calibre .223 Matricula LGC025138

85.- YAÑEZ TORRES MARCO ANTONIO, Pistola Pietro Beretta, Calibre 9mm, Matrícula P18123Z y Carabina Colt AR-15 Calibre .223Matricula LGC028060

86.- ZARAGOZA GONZALEZ JOSE JESUS, Pistola Pietro Beretta, Calibre 9mm, Matrícula H98560Z y Carabina Colt AR-15 Calibre .223, Matricula LGC027755

**SEPTIMO.-** Tampoco es obstáculo señalar y aclarar a Ustedes, por nuestra experiencia y vivencia dentro de la institución en la que trabajamos, que fue un error gravísimo, se incorporara en años pasados a los integrantes de las instituciones militares a las instituciones policiales federales, pues es mentira, de nuestros gobernantes (Procurador General de la República y Secretario de Seguridad Pública Federal), que los denominados "zetas", integrantes del "cártel del golfo", sólo sean desertores del ejército, pues los mismos, fueron integrados a las filas de la policía judicial federal a partir del año de 1996 (es decir, formaban filas y firmaban listas de asistencia a finlesde dicho año en el extinto INCD y posteriormente en la FEADS, podrá verificarse tal aseveración, solicitándose dichas listas a la PGR, concatenando, los nombres de los iniciadores de los denominados "zetas del Cártel del Golfo") y enviados a las diversas plazas como la de Tamaulipas, donde se desempeñaron como subdelegados y comandantes, desertando a su vez de la institución en la que trabajamos (al ordenárseles su concentración para ser reintegrados a su vez a las filas militares) y que por la rigidez de su adiestramiento, cambiaron las reglas consuetudinarios, entendidas y referidas como el respeto a las familias, personas y sociedad tanto integrantes como no integrantes de instituciones militares, policiacas o de cárteles de las drogas, lo que a su vez permitió que la droga

12

empezará a quedarse en nuestro país como no había sucedido anteriormente, pues es del conocimiento público, que los líderes de los diversos carteles de la droga, como regla entendida consuetudinaria, no permitirían que en nuestro país se quedara dicha droga con el objetivo de no enviciar a nuestra juventud y sociedad.

Actualmente, hemos entrevistado a diversos de nuestros compañeros, que han sido asignados a diversas plazas (Estados de la República), que no tienen la misma experiencia en el combate a la delincuencia organizada y narcotráfico, que los suscritos, manifestándonos que tienen temor, pues han sido amenazados, indirectamente, por diversos líderes de los carteles de las drogas, en el entendido de no intervenir o interferir en sus intereses, e incluso, tienen que solicitar permiso para implementar retenes carreteros u operativos, a los propios líderes de esas organizaciones delictivas al través de nuestros superiores que fueron designados por el actual Titular de la Secretaria de Seguridad Pública Federal.  Aunado, han manifestado, que tienen temor de actuar, los que si tienen dicha capacidad, actitud, preparación y experiencia, ya que por una parte, no tienen el apoyo de sus superiores, y por la otra, los mismos (superiores), les han dado la instrucción de no ir mas haya del cumplimiento de las ordenes o mandamientos judiciales, esto es, ordenes de presentación, de aprehensión o reaprehensión (podrá verificarse tal aseveración solicitándose los record de dichos mandamientos en lo diversos Estados), pues dichos superiores, también están amenazados de muerte en caso contrario al actuar propio y de sus subordinados (amenazas que han sido cumplidas como puede observarse de los propios medios de comunicación); más aún, legalmente tienen temor de actuar y caer por lo mismo en una falta, ya no digamos penal, sino simplemente administrativa, que dé motivo a su baja, remoción o cese y por ende a la pérdida de su única fuente de trabajo y sustento de sus familias, ya que el actual artículo 123 apartado B fracción XIII constitucional, amenaza a cualquier elemento policiaco (aun siendo buen elemento e incorruptible), a la pérdida del mismo, aún siendo despedido injustificadamente y bajo argucias falsas, como en casos concretos y verídicos sucedió, con diversos de los suscritos, anteriormente, pero ahora en forma definitiva, al quedar en total estado de indefensión, por lo estipulado en dicho artículo, que nos ha sumergido en una burbuja de suspensión de garantías (actualmente de policías después de ciudadanos, como se pretendió con la reforma sobre los cateos sin orden judicial), por todo lo anterior, muchos de esos compañeros, nos han manifestado que es mejor seguir aquel proverbio que reza: "si quieres llegar a ser agente viejo, haste pendejo", por lo anterior textualmente indicado, solicitamos y les presentamos nuestras disculpas, pero es la realidad para algunos, no para nosotros, pues no podemos ignorar todo esto y es necesario actuar aun, repetimos, anteponiendo nuestras propias vidas.

Por todo lo expuesto,

A TODOS USTEDES, solicitamos:

UNICO.- Apoyar, a los suscritos (y familias), en todos y cada uno de los motivos, fines y objetivos planteados, en todo lo que sus fuerzas puedan contribuir.

ATENTAY RESPETUOSAMENTE
POR QUE LA JUSTICIA, EL DERECHO Y LA RAZON,
SE ENCUENTREN SIEMPRE POR ENCIMA DE LA
FUERZA, LA ARBITRARIEDAD E IMPUNIDAD.



GOVERNMENT
EXHIBIT
**738AT**
19-CR-576 (BMC)

C. **OSCAR GRANADOS SALERO** AND OTHERS, IN OUR CAPACITY AS AGENTS OF THE FEDERAL POLICE OF THE FEDERAL AGENCY OF INVESTIGATION UNDER THE OFFICE OF THE ATTORNEY GENERAL OF THE REPUBLIC; HOLDING VARIOUS POSITIONS. HOME ADDRESS IS LOCATED AT:

TLALPAN, DISTRITO FEDERAL, CP-14650. Z.P.-22 PHONES: (HOME) AND (CELL PHONE).

**THE HON. CONGRESS OF THE UNION IN ITS TWO CHAMBERS OF SENATORS AND DEPUTIES.**
HAND DELIVERED.

The undersigned persons, as part of Mexican society, educated and brought up by our parents to live and work with honesty and integrity, which are the same principles we have instilled in our children, with many years of experience and honest, loyal, efficient, professional, impartial and transparent work in federal public service, who, in addition, have always acted based on principles of obedience, highly valuing the concepts of honor, justice and ethics, duly prepared to fight against drug trafficking, organized crime and various federal crimes, and holding different positions in the Federal Police of the Federal Agency of Investigation under the Office of the Attorney General of the Republic; we address you with due respect and for the following reasons:

**FIRST. -** We place ourselves at your disposal in the broadest sense in which I can serve you .

**SECOND. -** We request and beseech of you in the humblest manner your valued intervention, so as not to be dismissed from our only source of work, in an illegal, arbitrary and unjustified manner, by at least supervising the exams and courses that our hierarchical superiors have posted notice of, with the aim of the illegal, arbitrary and unjustified dismissal that they intend, so that our families and the undersigned are not doomed to misery with the consequent loss of the little cultural and social patrimony that we have left and possess.

**THIRD. -** We, the undersigned, duly informed through the media and personal experience of the various concerns and realities afflicting our society and country, because of the exceeding violence and magnitude of organized crime, of other various crimes and the impunity involved; we manifest and request below, most respectfully and humbly, your response and intervention regarding the following:

**A). -** We, the undersigned, are hurt by the perspective that society has of the public servant, having manifested textually with banners in the marcha blanca [white march] referred to as "*Iluminemos México*" [Shine a light on Mexico], [that read] the following, among other things: "LET US BE GOVERNED, JUDGED AND TAKEN CARE OF BY WHORES, BECAUSE THEIR CHILDREN HAVE FAILED US!" Although stated with good reason, due to the bad example and behavior of some, all of us suffer. But we are not all the same nor act as they do, for we the undersigned, consider ourselves to be and can assure you that we are that exception, based on the following:

**B). -** We, the undersigned, as well as the entire society, were deceived by our bad rulers because when the Office of the Attorney General of the Republic issued the call, over the years, in the sense that whoever entered it would be professionally trained in the Enforcement of Federal Justice, we began working there because we believed them.

**C). -** Although it is true that we, as human beings, made various but not serious mistakes, it is also true that we, as public servants, corrected our path by standing out professionally in the Enforcement of Federal Justice, producing results in various areas, such as:

2

**a). INVESTIGATIONS** (Culminating in arrests and seizure of money, weapons, vehicles, property, and drugs):

**b). SEIZURES** (Of people, drugs, vehicles, weapons, etc.):

**c). PERFORMANCE EVALUATION:**
   **- SOLE EVALUATION** that specifies the performance **as investigators and seizure of money, heroin, cocaine, marijuana, crystal, laboratories, vehicles, and weapons, always with arrests.**

Regarding the above, we, the undersigned, can prove these cases individually and in writing any time this is required (these documents are not included at this time, so as not to encumber the text with unnecessary information other than the aims now pursued), for we have always developed our work with a high level of professionalism and with the primary goal of serving the interests of our people, society, and country, collaborating, and contributing to the wellbeing of the overall community.

**D). -** We have also received extensive recognition from foreign authorities and from our country, who professionally prepared us for the performance of our duties, without due recognition by our main institution as an employer to this date.

**E). -** At present, contrary to the above, we have a well-founded fear of an illegal, unjustified, and arbitrary dismissal (as previously attempted to the detriment of the undersigned and thus to the detriment of our families also), by high commanders who currently preside over the institution that employs us and the Federal Public Security Secretariat of the Federal Police. These are indistinctly the same officials who work in both corporations, specifically: (Genaro García Luna; Edgar Eusebio Millán Gómez, deceased; Armando Espinosa de Benito; Ramón Pequeño García; Francisco Javier Garza Palacios, dismissed and current attaché in Colombia; Luís Enrique Cardenas Palomino; Facundo Rosas Rosas; Patricio Patiño Arias; Oswaldo Luna Valderrabano, Igor Labastida Calderón, deceased; among other deceased and executed persons, including those who are still working there. In reality, should it not be called by its acronym García and Partners Family Police?), who have always been the same who rotate, for certain or undetermined periods, in the most important and relevant positions, without allowing anyone else (Could this be a monopoly of power and total control of the federal police, for a common interest? Interest other than that of society or public order, even without approval by Congress of the Union regarding the unification of these police institutions?), and they seem to be on the payroll of both institutions. In addition, the internal law of the institution under which we work prohibits this:

Article 55 of the Organic Law of the Office of the Attorney General of the Republic.

The abovementioned concerning the illegal, unjustified and arbitrary dismissal is based on reality, were under oath, to tell the truth, we can say it engulfed the families of the undersigned (and can transcend to the undersigned who have not suffered it), for many years, in which they were doomed to misery and the loss of their material patrimony (having to incur in expenses, pay defense lawyers and incur debts for our support and defense), social standing (by questioning the dignity of the undersigned, before society and our family) and cultural standing (having lost years of our studies and our children, for lack of the salary on which we depended). This situation almost culminated with the disintegration of our families, due to the lack of work and of the salary we were deprived of, leading to consequences such as having to search sometimes far and wide to get a little food (to clarify this last part, it is NOT our intention to manipulate your requested intervention but to make you see to what level of society we have sunk, which gives rise to our well-founded fear and that of our families); for under the deception of our governing class, as is customary, every six years, concerning the purging of the police institutions of bad agents, we the undersigned, found ourselves dismissed as if we were just another number. The foregoing, not because of the reality of the supposed purging, but employing an illegal, unjustified, and arbitrary removal. Years ago, under pretense (by way of example, the examinations to which we were subjected were unconstitutional and contrary to rights) and illegal and arbitrary arguments (by not considering the records that make up the files for removal as references, and the evaluations applied by that institution called "polygraphy," "social environment or financial situation" and "psychology"). In which case, we the undersigned, not only verified that this involved an illegal, unjustified, and arbitrary

3

issue, but that we were legally authorized to remain in our current positions, since we met the requirements for such purpose (copies of the judgments will be submitted for the record and truthfulness of what is expressed above if required), following the laws in force issued by the demanding needs of the society we serve.

**F). -** Our purpose in appealing to You is that, under your supervision, in addition, to avoid being dismissed illegally, arbitrarily and unjustifiably, as previously attempted and explained, which is our well-founded fear and the fear of our families to suffer again the onslaught that this entails, and that if this occurs, this honest way of life of the undersigned and our families to make a living will vanish; all this is the reason for us to also join in the common struggle of our society, to which we belong, against crime and impunity, even at the risk of our own lives if necessary (as we have expressed and agreed to when we became part of the ranks of the corporation to which we belong), to harmonize the coexistence of the society in which we serve. In this case, we can easily point out that currently, we are prevented by forces outside our control, i.e., by the will of the leaders of the institution in which we work. This can be observed from our incorporation and re-incorporation into the same, despite our historical good record and even though several of us have requested our reintegration into the areas that are our strength, because of our profession, attitude, aptitude, preparation, and vocation in combating organized crime, drug trafficking, and various federal crimes; regarding our requests, no response has been given in any way (these requests will be attached if required).

**G). -** Instead of letting police officers, such as the undersigned, work, we have been confined to general armed guard duties (actually disarmed) with the sole purpose of ensuring that those who work in the installations of the Office of the Attorney General (PGR) and the current Federal Police do not enter them with food or inappropriate clothing and that vehicles of colleagues or people outside the agency do not circulate or park improperly on the agency's grounds. All this is absurd, taking into account the preparation we have in the area of investigations to combat crime, which in turn has led to an increase in crime, by separating us from those issues and assigning us to deal with matters other than crime.

It is worth noting that several of the subjects, such as the undersigned persons, have sufficient skill and capacity to combat organized crime and criminal activities, but because of the flawed legislation to which we are exposed, we are only changed from the area within the same guard posts mentioned (called an armed guard, where, as part of the police force, we are regularly required to carry weapons without holding a license for it) and at the will of our superiors.

**H). -** In addition to the above, among the police institutions (AFI) under the Office of the Attorney General (PGR) and the Federal Police (PFP or PF), there is only one coordination agreement (that of 05/2007), published in the Official Gazette of the Federation dated April 25, 2007 (ANNEX 1), derived from the agreement (ANNEX 2) signed on January 30, 2007, between the Attorney General of our unit and the Secretary of Federal Public Security. This involved no subordination or dependence between the material and human resources of one institution and another, but cooperation to combat crime on a common front. Nevertheless, the C. Secretary of Federal Public Security, formerly Head of the AFI, through his subordinates that he left working in this AFI, to have power and total control of both police units, contradicts the agreement in question (with the approval of the Attorney General of the Republic), since he has disposed of the entire vehicle fleet (without the leadership doing anything about it), removing the AFI label and replacing it with that of the SSPF. The purpose, it would seem, is to justify the excessive public spending on the acquisition of vehicles in the Secretariat that he currently presides over (ANNEX 3 contains photos of this anomaly; note the antecedent this has, as regards to the anomalous acquisition of helicopters, when it belonged to the now-defunct PFP).

The reality of what is currently happening should also be noted, which has become public knowledge through the mass media, when a force of 500 subjects of the Federal

4

Support Services of the Secretariat of Federal Public Security took over the AFI headquarters by force and without authorization on September 24 of this year, under the command of C. Luís Cárdenas Palomino, who with abuse of power and authority, plundered various files that were under the custody of this AFI. This entails, by his actions and by the omission of the Attorney General, the breach of the aforementioned collaboration agreement (05/2007), with the following objectives: One, illegally, arbitrarily and unjustifiably appropriating the material resources of the AFI; and two, directly taking power and exerting total control of both police bodies illegally and by intimidating the undersigned (which contradicts even the decree, ANNEX 4, dated August 20 of the current year, endorsing the existence of the AFI in the PGR, by reforming, adding and repealing various provisions of the Regulations of that institute). In this way, the Secretary of Federal Public Security (SSPF) was taking, directly and indirectly, total power and control of both institutions, through harassment and labor threats, which affected all the subjects of that institution through the deployment made by Mr. José Patricio Patiño Arias in the AFI offices, thus authoritatively giving 3 options to those of us in the AFI ranks: 1) That we opt for voluntary retirement (which is ridiculous, even to think about starting a business for our families to survive), or 2) For us to surrender our weapons and credentials and remain as office workers, or 3) That we assume a post in the Federal Police by signing on for this change, on condition that we participate in a 2-month course, as well as examinations in the Federal Police headquarters known as CONTEL, located in Iztapalapa. Depending on such approval, we would be accepted in the ranks of the Federal Police, with the real objective of failing us, which entails not only workplace harassment but abuse of power and authority, contrary to our employment rights.

It must be said emphatically that, although it is true, we the undersigned, have expressed ourselves employing marches, directed at the headquarters of the H. Congress of the Union, as well as before the PGR itself, to try to assert our few rights which we believe we have. It is also true that we have carried out the former during our leaves or supposed breaks, i.e., without becoming distracted or separating ourselves from our functions unjustifiably. In addition, it is not true that we, the undersigned, refuse (as the Secretary of Federal Public Security falsely stated in past days, before Mr. Joaquín López Dóriga of the Televisa Group, the favorite interviewer of his group, who we think should stop taking the bribes they have given him, and act truthfully, without distorting the information before society) to take any examination meant for the improvement of our functions, or object in cases where it is necessary to collect our signaletic data, voice data, DNA or any other required data, provided it is following the law.

**FOURTH. -** We, the undersigned, are aware of the Bill presented by the C. Constitutional President, published in the Parliamentary Gazette of the Chamber of Deputies, which refers to the removal or disappearance of the Federal Agency of Investigation (of which we are currently members) of the Administrative Body of the Office of the Attorney General of the Republic, i.e., of the Organic Law of that institution, giving us the deadline of 30 days to decide whether to join this new police force or be removed with the relevant severance package.

This includes the alleged exception that, if we want to join the new corporation, we will have to subject ourselves to various established trust screenings, which, if we are not approved, would prevent our access to this new police force, and we would, therefore, as stated, receive a severance package under law.

**FIFTH. -** We are also aware that one of the objectives of this Bill is to confer on a single individual the full power and control over the Federal and even State or local police institutions.

**SIXTH. -** In this respect, we, the undersigned, in the first place, consider that the aforementioned Bill is unfair, in the sense that if it is accepted by the Congress of the Union, as proposed by our C. President, by removing or terminating the Federal Agency of Investigations under the Administrative Body of the Office of the Attorney General of the Republic, as we mentioned before, this would entail grievances to the undersigned. The foregoing, because when we began working for that institution, we were falsely promised that we would be trained professionally in the Enforcement of Federal Justice, i.e., it would be a formal professional career. So, if enacted, this would lead to the loss of various years of                                    service                                    that

each of us has within the Office of the Attorney General of the Republic, forcing us to start from zero again by having to render our services in this new police force.

**1. -** In addition, if we began working for the aforementioned Office of the Attorney General, if this institution did not disappear, it would be unfair to remove us from its ranks through the alleged Bill, forcing us thereby to decide carefully whether to join the new police force, threatening to dismiss us subject to the legal settlement.

**2. -** In this regard, we are hereby presenting in advance our categorical and absolute disagreement with this Bill since it is not fair to force us to accept such settlement.

**3. -** Therefore, we ask you to accept our counter-proposal, in this respect, i.e., we accept the proposal contained in the aforementioned Bill, but only if it is accepted by the Hon. Congress of the Union; the foregoing, with the understanding that, first, we receive a due settlement through voluntary withdrawal or severance pay and, secondly, under the right of equality, we are given a post under the operating budget, i.e., as police investigators of various federal crimes and in the fight against drug trafficking and organized crime, based on our qualified training, since several of our colleagues, before this Bill, were invited and agreed to join the ranks of the currently called Federal Police, and were given a similar or higher category than what they had within the Federal Agency of Investigation. Following the above, we will agree to enter the ranks of the new police force proposed by C. President.

**4. -** In addition, under the right of equality, we ask that you accept our counterproposal, in this respect, i.e., we accept the proposal contained in the aforementioned Bill, but only if it is accepted by the H. Congress of the Union. The foregoing, in the sense that we would be accepted or incorporated into the ranks of the new police force if we submit to the various established trust screenings. Our counterproposal is in the sense that, like many of our former colleagues (those close to the Secretary of Federal Public Security) who agreed to join the ranks of the now-called Federal Police, as we know, failed various trust examinations, now called screenings, and even so, they still work there. We, therefore, demand such equality, accepting in this way to enter the ranks of the new police force proposed by the C. President.

Concerning this last counterproposal of the undersigned, concerning being accepted and working in the new police force, referred to in the above Bill, even when failing the examinations or trust screenings mentioned therein, it should be clarified and pointed out that there is nothing unreasonable about it, for 2 reasons:

**a). -** Because, as assumed, such Bill refers to the establishment of a new police force, which would not only mean that those, the undersigned, subjects of the Federal Agency of Investigation, are subjected to examinations or screenings for acceptance in that new police force, but it must also include in the application for such examinations and screenings the members of the Federal Preventive Police and the current Federal Police. Otherwise, it is understood that the subjects that make up this new police force are already included in these last-mentioned police corporations, their post being immutable and immovable without the subjects having to compete to hold a place or position in these police bodies; in addition, it would be unfair, pursuant to the right of equality, which in fact responds to a particular interest of the Secretary of Federal Public Security, that we alone should be subjected to such examinations and screenings, thus placing us on an unequal standing; in addition, we have already passed these tests in advance, like the subjects who make up those other police institutions, the tests and screenings applied by our Center for Human Evaluation and Development, also known as the Center for Control and Trust, which we can fully affirm is the same institution that applies the tests and screenings to each and every police subject that make up the various federal police institutions mentioned in this paragraph.

**b). -** Because, the current Secretary of Federal Public Security, when he served as the Head of the Federal Agency of Investigation, in collusion with the Professionalization Council under the Office of the Attorney General of the Republic, of which he was part of due to his authority and functions, were involved in this practice. Given that, for nothing, they issued agreement number CP/03/12/06, in duplicate, i.e., on two different dates, apparently

6

to satisfy their interests of nepotism. These were published in the Official Gazette of the Federation dated July 7, (ANNEX 5) and August 4 (ANNEX 6), both in the year 2006, and they refer to the Call for the process of entering the Career Service of Enforcement of Federal Justice (Article 3, section II and the terms of the call) for agents under "special designation" of the Federal Police of Investigation. That is to say, the current Secretary of Federal Public Security, former Head of the Federal Agency of Investigation, in collusion with the **Professionalization Council** under the Office of the Attorney General, **granted them** (i.e., shortly before he left the office as head of the AFI; the truthfulness of this can be verified, requesting from the Professionalization Council under this Office of Attorney General the list of persons who entered and took posts by means of this call), even **those who hold the category of Commanders in Chief, now** referred to as, **General Supervisor of Investigation,** which is the **highest ranking police category in both institutions**; likewise, it is important to notice 3 issues in that call: First, that personnel who were not accepted (i.e., who failed the examination) would continue in the special designation post (Article 6); second, that a high school education or its equivalent would be required of them (base 2, section II, point 2, subsection a.); and third, that to occupy such a position they would only need 4-year seniority in the same (base 3, section II, subsection f.). **An anomaly that not only entails** nepotism or abuse of authority and power, but also **a more serious fault and issue, which is the prevailing need, therefore, to give society effective and necessary public security, through personnel with real skill, attitude, and vocation to do so, a fact that has been reflected in the current events of insecurity and the rise of crime and narco-terrorism**.

c). - As stated in the previous subparagraph, we, the undersigned, consider that, according to the extraordinary background (experience) we have, and because of our seniority within the institution, it is unfair that we have not been given the opportunity, years ago, for promotion within our position or rank, thus infringing, to our detriment, the right of equality and the principles of progressiveness and non-regression.

d). - In view thereof, we are aware that **the personnel addressed by the call described in subparagraph (b) above,** in all certainty did not **have or at the most had 4-years seniority in the abovementioned police positions** (seniority in the category and alleged experience and, most importantly, to be a relative of the current Secretary of Federal Public Security, as seen in one case, his sister Esperanza García Luna, example of nepotism, which is very difficult to verify since his surname "GARCIA" is very common and they go unnoticed), friendships (of himself and close ones under him) or lovers (of high officials of that H. Institution, such as Lorena González Hernández of the Federal Police, with the position of deputy inspector, under orders of Facundo Rosas Rosas, involved in the abduction of young Fernando Martí); **and that in the worst case, if they did not pass the entrance examination, they would continue working in the same position for which they competed**, without further academic requirement other than high school education. This is sufficient **reason why the right of equality should be applied on an equal basis in direct relation to the principles of progressiveness and non-regression previously mentioned.** In which case, considering that **those persons**, described by the above call **are supposedly police officers, of special designation, who without rising through the ranks became eligible directly for the office** of Commanders in Chief or **Supervisor General of Investigation**, which, we repeat, is the highest police position**, similarly**, by the right of equality, **the undersigned can be granted a higher office, since,** it is worth noting that several of the undersigned **have no fewer** than approximately five years **of experience, with minimum academic education of high school or an incomplete law degree** or a completed law degree or other professions.

5. - Concerning all the above, it should be noted regarding the proposed Bill, in which it intends **to confer on a single individual total power and control over the federal police institutions**, without mentioning also the various States or local institutions, we, the undersigned, do not have, nor propose, any counter-proposal other than coordination, hereby warning you that **it is very dangerous** to accept the former. **First of all, because of nepotism, it would place** their family, friends, and lovers in **strategic areas and positions,** such as the Directorate in the area of police and computer intelligence. The latter was removed from our database by the current Secretary of Federal Public Security, **thus having total control and power over**

7

personnel and relevant information, over which he claims or has personal interests, **as is happening, directly or indirectly, through the subordinates** of that Secretary. Regarding this fact, as we explained in the **subsection "THIRD" "E"** above, **they are still part of the high command in the AFI** (for the sole purpose of maintaining and having total control and power over the federal police) **and are also involved or work indistinctly in both the AFI and the PFP or PF or SSPF, in perfect illegality of our ordinances** (Article 55 of Organic Law of the PGR). Thus, all we can do now is to help them understand this matter utilizing an example and an alleged real fact, as follows:

Example:
**a). -** If they want to hold this sole command, due to its total control and power, physically at their leisure, capable of moving police personnel, who are strategically located at key checkpoints, by their orders, directly or indirectly, through their subordinates (relatives or friends), they can do so for distraction. Thus, allowing vehicles with drugs or fugitives from the law to pass through, who suit their interests; or, by having their family or friends located in key areas of police intelligence, allowing information to be concealed or vanished for the same reason.

Alleged real fact:
**b). -** Last Saturday, on October 19, 2008, the current Secretary of Federal Public Security, Genaro García Luna, and his escorts, consisting of approximately 27 subjects, and based on comments of several of them in the corridors of the various facilities, the following events occurred. It was afternoon on the abovementioned day, on the road from Cuernavaca to Tepoztlán when [the Secretary] was intercepted or summoned by an important drug lord, who was accompanied by an unspecified number of gunmen or hitmen in approximately 10 fully armored suburban vehicles. This official's escorts did nothing to protect him, apparently by his own verbal order, thus resulting in that the official's escorts were subdued and blindfolded for approximately four hours. In addition, the escorts were stripped of their long guns and light weapons under their charge. At this time, they heard, according to these escorts, an unknown voice, which in their opinion belonged to the drug lord, literally saying as follows:

"This is the first and last warning to let you know that we can reach you if you do not comply with what was agreed."

These escorts did not hear anything more than this, more so, since, after those words from this drug lord, this official withdrew alone, leaving his escorts to their fate. They did not know in what direction he went and what he did during those four long hours, supposing that during this time he could have met with that drug lord in a more comfortable setting, other than where the alleged facts occurred.

It should be pointed out that this official Secretary is an expert pretender or actor accustomed to deceiving. It is worth remembering that in the past, he invented a circus scenario concerning a French woman who was allegedly kidnapped in the village of Ajusco, F.D. At which time he summoned mass media TV coverage, and in this specific case, was able to manipulate all his escorts, making them believe that what happened was an act of intimidation (abduction) by some drug lord. In this case, what happened was an agreed appointment with that alleged drug lord.

Therefore, we urgently request your valuable help to verify the truthfulness of this alleged real fact, serving notice to this Secretariat of National Defense, so that it may request through the above official from all of his escorts, requiring them to display the documents for the assignment and carrying of handguns and long guns, which must contain the stamping, engraving or marking made by the Secretariat of National Defense, as well as comparing the warheads of each weapon of those escorts, with the scoring and marks on the warheads recorded in the archives of the Secretariat of National Defense. These weapons were supposedly provided to the escorts as part of the material resources referred to, through the Federal Public Security Secretariat and the Office of the Attorney General of the Republic. Since, as we know, from the comments made in the corridors of the various facilities, the above Secretary indicated to his escorts that he would return the weapons to them. The foregoing, without knowing whether or not such

8

reintegration will be carried out by acquiring weapons of dubious origin or by making the supposed change for a new supply of weapons before the Secretariat of National Defense, or by receiving weapons that are held in the custody of the Federal Public Security Secretariat or the Office of the Attorney General of the Republic, without returning the previous ones.

For clarification purposes regarding the alleged real fact, we know that the escorts of that official had or have in their custody the following weapons:

1. - ALONSO OLVERA MIGUEL ANGEL, Pietro Beretta pistol, 9mm caliber, Registration H99095Z and Colt rifle AR-15 .223 caliber, Registration LGC022359

2. - ALONSO TORRES REY, Pietro Beretta pistol, 9mm caliber, Registration H97904Z and Galil brand rifle .223 caliber, Registration 2089677

3. - ALVIZ MONDRAGON ROBERTO, Pietro Beretta pistol, 9mm caliber, Registration H98581Z and Colt rifle AR-15 .223 caliber, Registration LGC022120

4. - ARREOLA ROBLES CESAR ALEJANDRO, Pietro Beretta pistol, 9mm caliber, Registration H98312Z and Colt rifle AR-15 .223 caliber, Registration LGC026764

5. - ALVAREZ ALQUICARA ALAN, Pietro Beretta pistol, 9mm caliber, Registration H99139Z and Bush Master rifle .223 caliber, Registration BFI542668

6. - ARTEAGA URIBE OSCAR, Pietro Beretta pistol, 9mm caliber, Registration H98491Z and Colt rifle AR-15 .223 caliber, Registration LGC024222

7. - BENITEZ PUEBLA EDGAR, Pietro Beretta pistol, 9mm caliber, Registration H98834Z and Colt rifle AR-15 .223 caliber, Registration LGC022486

8. - BLANCO HERNANDEZ GRISELDA EDITH, Pietro Beretta pistol, 9mm caliber, Registration H98519Z

9. - CAMPILLO DIAZ GUSTAVO, Pietro Beretta pistol, 9mm caliber, Registration H991836Z and .223 caliber rifle, Registration FN017585

10. - CARDENAS ACUÑA ELLIUT, Pietro Beretta pistol, 9mm caliber, Registration P19522Z and .223 caliber rifle, Registration FN018127

11. - CASTAÑEDA ORTEGA JOSE JUAN, Pietro Beretta pistol, 9mm caliber, Registration H06599Z and Colt rifle AR-15 .223 caliber, Registration LGC024405

12. - CAVAZOS MEDINA ALVARO OVIDIO, Pietro Beretta pistol, 9mm caliber, Registration P20396Z and .223 caliber rifle, Registration FN017585

13. - CERVANTES MOJICA LIBIO, Pietro Beretta pistol, 9mm caliber, Registration P19864Z and Galil .223 caliber rifle, Registration FN017732

14. - CHAVEZ GARCIA DANIEL, Pietro Beretta pistol, 9mm caliber, Registration P19796Z, and Colt rifle AR-15 .223 caliber, Registration LGC024417

15. - CHAVEZ HERNANDEZ JOSE LUIS, Pietro Beretta pistol, 9mm caliber, Registration H98264Z and Colt rifle AR-15 .223 caliber, Registration LGC027786

16. - CLAUDIO CARRILLO ANGEL MAURICIO, Pietro Beretta pistol, 9mm caliber, Registration H97916Z and Galil .223 caliber rifle, Registration FN017079

17. - COALLA PULIDO LUIS ALBERTO

18. - CORTES DE LA ROSA OSCAR, Pietro Beretta pistol, 9mm caliber, Registration P19579Z and .223 caliber rifle, Registration FN017359

19. - DE LA CRUZ JIMENEZ ROBERTO, Pietro Beretta pistol, 9mm caliber, Registration P19076Z and Galil .223 caliber rifle, Registration FN018191

20. - DE LUIS REYES JAVIER, Pietro Beretta pistol, 9mm caliber, Registration H99081Z and Colt rifle AR-15 .223 caliber, Registration LGC014258

21. - ESTRADA ARMENTA CLAUDIA, Pietro Beretta pistol, 9mm caliber, Registration P19912Z and .223 caliber rifle, Registration FN017873

22. - GALICIA BLANCO RAFAEL, Pietro Beretta pistol, 9mm caliber, Registration P20524Z and Colt rifle AR-15 .223 caliber, Registration LGC024679

23. - GALVAN SANCHEZ ANDRES, Pietro Beretta pistol, 9mm caliber, Registration H98551Z and Colt rifle AR-15 .223 caliber, Registration LGC028100

24. - GARCIA ARZATE GUSTAVO ADOLFO, Pietro Beretta pistol, 9mm caliber, Registration H98108Z and Colt rifle AR-15 .223 caliber, Registration LGC025269

25. - GARCIA CUEVAS NESTOR, Petro Beretta pistol, 9mm caliber, Registration H06609Z and Bush Master rifle .223 caliber, Registration BFI542402.

26. - GARCIA PEREZ OSWALDO MISAEL, Pietro Beretta pistol, 9mm caliber, Registration P19188Z and Colt rifle AR-15 .223 caliber, Registration LGC014005

27. - GAYTAN GONZALEZ SANDRA, Pietro Beretta pistol, 9mm caliber, Registration H06571Z and Colt rifle AR-15 .223 caliber, Registration LGC022081

28. - GOMEZ SANCHEZ LUÍS GERARDO, Pietro Beretta pistol, 9mm caliber, Registration H98980Z and Colt rifle AR-15 .223 caliber, Registration LGC022144

29. - GONZALEZ ESPARZA DELFINO HUMBERTO, Pietro Beretta pistol, 9mm caliber, Registration H98809Z and Colt rifle AR-15 .223 caliber, Registration LGC022423

30. - GUZMAN GONZALEZ JOEL, Pietro Beretta pistol, 9mm caliber, Registration P17381Z and Colt rifle AR-15 .223 caliber, Registration LGC024324

31. - HERNANDEZ CASTILLO JOSE LUIS, Pietro Beretta pistol, 9mm caliber, Registration P19080Z and .223 caliber rifle, Registration FN017099

32. - HERNANDEZ LICONA MARIO, Pietro Beretta pistol, 9mm caliber, Registration P19533Z and .223 caliber rifle, Registration FN018293

33. - HERNANDEZ GONZALEZ JOSE RAMON, Pietro Beretta pistol, 9mm caliber, Registration H99072Z and Colt rifle AR-15 .223 caliber, Registration LGC022562

34. - JUAREZ ROSAS RODRIGO, Pietro Beretta pistol, 9mm caliber, Registration P20250Z and Galil rifle .223 caliber, Registration FN017239

35. - LONA ROMERO EDGAR, Pietro Beretta pistol, 9mm caliber, Registration H98760Z and Colt rifle AR-15 .223 caliber, Registration LGC024251

36. - LOPEZ DIAZ JULIO ALEJANDRO, Pietro Beretta pistol, 9mm caliber, Registration H98309Z and Colt rifle AR-15 .223 caliber, Registration LGC014544

37. - LOPEZ SANCHEZ GERONIMO ARMANDO, Pietro Beretta pistol, 9mm caliber, Registration P20007Z and .223 caliber rifle, Registration LGC024747

38. - LOPEZ VELASCO CINTYA FABIOLA, Pietro Beretta pistol, 9mm caliber, Registration P20249Z and Colt rifle AR-15 .223 caliber, Registration LGC024244

39. - LINARES DE ANDA CARLOS EMILIO, Pietro Beretta pistol, 9mm caliber, Registration H98736Z and Colt rifle AR-15 .223 caliber, Registration LGC013814

40. - MARIN GARDUÑO LEOPOLDO AUDIEL, Pietro Beretta pistol, 9mm caliber, Registration P20477Z and Colt rifle AR-15 .223 caliber, Registration LGC024287

*41. - MARTINEZ GARCIA BERNABE, Pietro Beretta pistol, 9mm caliber, Registration H98488Z

*42. - MARTINEZ GARCIA ALICIA, Pietro Beretta pistol, 9mm caliber, Registration P19726Z and Bush Master rifle .223 caliber, Registration BFI473054

43. - MARTINEZ GODOY DITHER FEDERICO, Pietro Beretta pistol, 9mm caliber, Registration H97825Z and Colt rifle AR15 .223 caliber, Registration LGC024849

44. - MARTINEZ ORDUÑA JAVIER, Pietro Beretta pistol, 9mm caliber, Registration P20476Z and Bush Master rifle .223 caliber, Registration BFI473059

45. - MELGOZA GONZALEZ SUL, Pietro Beretta pistol, 9mm caliber, Registration P20520Z and Colt rifle AR-15 .223 caliber, Registration LGC028060

10

46. - MENDOZA HERNANDEZ CESAR ARTURO, Pietro Beretta pistol, 9mm caliber, Registration H97944Z and Colt rifle AR-15 .223 caliber, Registration LGC024747

47. - MENDOZA MARIN ADONIS ANTONIO, Pietro Beretta pistol, 9mm caliber, Registration P18442Z and Galil rifle .223 caliber, Registration FN017795

48. - MENDOZA SANCHEZ JUAN CARLOS, Pietro Beretta pistol, 9mm caliber, Registration H68633Z and Bush Master sub-machine gun, .223 caliber, Registration BFI540717

49. - MEZA MALDONADO MARTIN, Pietro Beretta pistol, 9mm caliber, Registration H98123Z

50. - MIRANDA ESPADAS FERNANDO, Pietro Beretta pistol, 9mm caliber, Registration P20250Z and Galil rifle .223 caliber, Registration FN017239

51. - MONTERO JIMENEZ LEONCIO, Pietro Beretta pistol, 9mm caliber, Registration H78761Z and Colt rifle AR-15 .223 caliber, Registration LGC025335

Pietro Beretta pistol, 9mm caliber, Registration H99038Z and Colt rifle AR-15 .223 caliber, Registration LGC025101

52. - MORENO DE LA PEÑA HANS IVAN, Pietro Beretta pistol, 9mm caliber, Registration H98066Z and Colt rifle AR-15 .223 caliber, Registration LGC 025187

53. - NAVARRETE DUARTE CESAR OBDULIO, Pietro Beretta pistol, 9mm caliber, Registration H98047Z and Colt rifle AR-15 .223 caliber, Registration LGC026649

54. - OLIVA CHAVEZ RODOLFO, Pietro Beretta pistol, 9mm caliber, Registration H98506Z and Colt rifle AR-15 .223 caliber, Registration LGC024705

55. - OLVERA SOTO JOSE JUAN, Pietro Beretta pistol, 9mm caliber, Registration H99152Z and Colt rifle AR-15 .223 caliber, Registration LGC022463

56. - PEREZ PACHECO DOMINGO, Pietro Beretta pistol, 9mm caliber, Registration H06598Z

57. - PIMENTEL MAYA ANA LILIA

58. - PLATA VILLEGAS GUSTAVO, Pietro Beretta pistol, 9mm caliber, Registration H98836Z and Colt rifle AR-15 .223 caliber, Registration LGC024705.

59. - POSADAS MEJIA EDUARDO, Pietro Beretta pistol, 9mm caliber, Registration H98959Z and Colt rifle AR-15 .223 caliber, Registration LGC022081

60. - RAMIREZ BERMUDES JAIME, Pietro Beretta pistol, 9mm caliber, Registration H06567Z and Colt rifle AR-15 .223 caliber, Registration LGC027781

61. - RAMIREZ SERRANO EDGAR RICARDO, Pietro Beretta pistol, 9mm caliber, Registration P18000Z and Colt rifle AR-15 .223 caliber, Registration LGC022596

62. - RAMIREZ ZUBIETA CARLOS, Pietro Beretta pistol, 9mm caliber, Registration H06593Z and Colt rifle AR-15 .223 caliber, Registration LGC022501

63. - REBOLLAR BENITEZ CARLOS, Pietro Beretta pistol, 9mm caliber, Registration P99186Z and Colt rifle AR-15 .223 caliber, Registration LGC024287

64. - RICARDO MARTINEZ HUGO, Pietro Beretta pistol, 9mm caliber, Registration P29547Z and Colt rifle AR-15 .223 caliber, Registration LGC001436

65. - RIOS VICTORIO HUGO, Pietro Beretta pistol, 9mm caliber, Registration H98829Z and Colt rifle AR-15 .223 caliber, Registration LGC024589

66. - RODRIGUEZ RANGEL JORGE ALEJANDRO, Pietro Beretta pistol, 9mm caliber, Registration H99135Z and Colt rifle AR-15 .223 caliber, Registration LGC024878

67. - RUIZ URIOSTEGUI ALFONSO PARIS, Pietro Beretta pistol, 9mm caliber, Registration P17205Z and Colt rifle AR-15 .223 caliber, Registration LGC024679

68. - SALAZAR CORREA EDGAR OSCAR, Pietro Beretta pistol, 9mm caliber, Registration H98509Z and Colt rifle AR-15 .223 caliber, Registration LGC023843

69. - SAN JUAN MARTINEZ LUIS ALBERTO, Pietro Beretta pistol, 9mm caliber, Registration H98306Z and Colt rifle AR-15, Registration LGC 028100

70. - SANCHEZ ALVAREZ ERNESTO, Pietro Beretta pistol, 9mm caliber, Registration H99040Z and Colt rifle AR-15, Registration LGC 022596

71. - SANCHEZ MARTINEZ EDDI, Pietro Beretta pistol, 9mm caliber, Registration H98501Z and Colt rifle AR-15 .223 caliber, Registration LGC023947

72. - SANCHEZ RODRIGUEZ DOLORES, Pietro Beretta pistol, 9mm caliber, Registration P19197Z

73. - SOLIS JUAREZ MANUEL, Pietro Beretta pistol, 9mm caliber, Registration H98996Z and Colt rifle AR-15 .223 caliber, Registration LGC024849

74. - SOTO ROBERTO, Pietro Beretta pistol, 9mm caliber, Registration P20072Z and Colt rifle AR-15 .223 caliber, Registration LGC001436

75. - SUAREZ MORALES JOEL, Pietro Beretta pistol, 9mm caliber, Registration H98670Z and Colt rifle AR-15 .223 caliber, Registration LGC 024121

76. - TAMES PINALES CARLOS, Pietro Beretta pistol, 9mm caliber, Registration P20613Z and Colt rifle AR-15 .223 caliber, Registration LGC024324

77. - TOLEDO MARTINEZ FABIAN, Pietro Beretta pistol, 9mm caliber, Registration P20303Z and Galil rifle .223 caliber, Registration FN017611

78. - TORRES GUZMAN EMMA, Pietro Beretta pistol, 9mm caliber, Registration P17893Z and Colt rifle AR-15 .223 caliber, Registration LGC024244

79. - ULLOA CORDOVA ESEQUIAS, Pietro Beretta pistol, 9mm caliber, Registration H98453Z and Colt rifle AR-15 .223 caliber, Registration LGC024550

80. - URIBE DORIA EDUARDO

81. - VALENCIA GARCIA DAVID MIZRRAIN, Pietro Beretta pistol, 9mm caliber, Registration H99039Z and Colt rifle AR-15 .223 caliber, Registration LGC027778

82. - VAZQUEZ BECERRIL GUSTAVO ALBERTO, Pietro Beretta pistol, 9mm caliber, Registration P28170Z and Colt rifle AR-15 .223 caliber, Registration LGC002573

83. - VAZQUEZ DOMINGUEZ GUSTAVO, Pietro Beretta pistol, 9mm caliber, Registration P19877Z and Colt rifle AR-15 .223 caliber, Registration LGC014005

84. - VAZQUEZ RODRIGUEZ GUMER GAMALIEL, Pietro Beretta pistol, 9mm caliber, Registration P19866Z and Colt rifle AR-15 .223 caliber, Registration LGC025138

85. - YAÑEZ TORRES MARCO ANTONIO, Pietro Beretta pistol, 9mm caliber, Registration P18123Z and Colt rifle AR-15 .223 caliber, Registration LGC028060

86. - ZARAGOZA GONZALEZ JOSE JESUS, Pietro Beretta pistol, 9mm caliber, Registration H98560Z and Colt rifle AR-15 .223 caliber, Registration LGC027755

**SEVENTH. -** It is also important to point out and clarify to you, based on our experience and involvement within the institution in which we work, that a very serious mistake was made in the case where, in past years, our government incorporated members of military institutions into federal police institutions. It is a lie on the part of our rulers (Attorney General of the Republic and Secretary of Federal Public Security), that the so-called "Zetas," members of the Gulf Cartel, are only deserters from the army since they were incorporated into the ranks of the Federal Judicial Police starting from 1996 (i.e., they formed ranks and signed attendance lists at the end of that year in the now-defunct INCD [National Institution on Fighting Drug-Trafficking] and later in the FEADS [Special Prosecutor's Office for Crimes Against Health]. All of this can be verified by requesting these lists from the PGR, comparing the names of the founders of the so-called "Zetas of the Gulf Cartel") and sent to various places such as Tamaulipas, where they served as subdelegates and commanders. They in turn deserted from the institution in which we work (when they were ordered to report for duty to be incorporated again into military ranks) and due to their rigid training, they changed the customary and mutually understood rules that refer to respect for families, people, and society, whether members or non-members of military or police institutions or the drug cartels. This in turn allowed drugs to

12

begin to remain in our country as it had not happened before, since it is public knowledge that the leaders of the various drug cartels, as a customary rule, would not allow drugs to stay in our country to avoid converting our youth and society into addicts.

Currently, we have interviewed several of our colleagues who have been assigned to various places (States of the Republic), who do not have the same experience in the fight against organized crime and drug trafficking as the undersigned. They tell us that they are afraid because they have been threatened indirectly by various leaders of drug cartels, on the understanding that they must not intervene or interfere in their interests. Even to the point where to implement roadblocks or carry out operations, they have to request permission from the very leaders of these criminal organizations through our superiors who were appointed by the current Head of the Federal Public Security Secretariat. In addition, those who have the skill, attitude, preparation, and experience have stated that they are afraid to act, since on the one hand, they do not have the support of their superiors, and on the other hand, the same (superiors) have instructed them not to go beyond the fulfillment of judicial orders or warrants; i.e., presentation, apprehension or re-arrest orders (this can be verified with the records of such orders in the various States), since these same superiors are also threatened with death if they act against themselves and their subordinates (threats which have materialized, as can be verified through the media); furthermore, they are legally afraid of acting and therefore falling into a fault, not criminal, but simply administrative, which would lead to their dismissal, removal or termination and therefore, the loss of their only source of work and support for their families. The foregoing, because current Article 123, paragraph B, section XIII of the Constitution, threatens any police subject (even if they are incorruptible good police agents) with the loss of his or her job, even being dismissed without justification and under pretenses, as it happened specifically and truly with several of the undersigned in the past. But now, definitively, leaving them in a total state of defenselessness, by the stipulations of that article, which has submerged us in a bubble of suspension of rights (currently of police rights after citizens' rights, as it was intended with the reform on searches without a warrant). Given all of the above, many of these colleagues told us that it is better to follow that proverb that says: "If you want to become an old agent, look the other way." For the above-written reasons, we request and present our apologies, but it is the reality for some, not for us, because we cannot ignore all this and it is necessary to act, even if this means risking our own lives.

In witness whereof,

TO ALL OF YOU, we hereby request as follows:

SOLE PARAGRAPH. - Support the undersigned (and families), in each one of the reasons, goals, and objectives raised, to the extent to which you can help.

CORDIALLY AND RESPECTFULLY<br>
BECAUSE JUSTICE, LAW AND REASON,<br>
ARE ALWAYS ABOVE<br>
FORCE, ARBITRARITY AND IMPUNITY.



