# 24-2949-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

LUIS CARDENAS PALOMINO, RAMON PEQUENO GARCIA,

*Defendants,*

GENARO GARCIA LUNA,

*Defendant-Appellant.*

*On Appeal from the United States District Court
for the Eastern District of New York*

## REPLY BRIEF FOR DEFENDANT-APPELLANT

<table>
<tr><td>

Valerie A. Gotlib, AT
GOTLIB LAW, PLLC
20 Vesey Street, Suite 400
New York, New York 10007
917-536-8171

</td><td>

Cesar de Castro
Shannon McManus
THE LAW FIRM
  OF CESAR DECASTRO, P.C.
The District
111 Fulton Street, Suite 602
New York, New York 10038
646-285-2077

</td></tr>
</table>

*Attorneys for Defendant-Appellant*



**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .............................................................................................. 1

ARGUMENT ..................................................................................................... 3

    I.    The Court Should Reject the Government's Attempts to
         Shift the Burden of Discovery to Garcia-Luna Because
         the Government Should Have Known That Villarreal's
         Testimony Was False ............................................................................ 3

    II.   Garcia-Luna's Conviction was Tainted by False Testimony
         from Two of the Government's Most Material Witnesses ......................... 9

         a.    The Government's Trial Arguments Establish That
             Zavaleta's Testimony was Material ...................................... 10

         b.    Villarreal was the Government's Response to
             Garcia Luna's Primary Defense .......................................... 12

    III.  Garcia-Luna Exercised Due Diligence to Discover New
         Evidence .............................................................................................. 14

    IV.  The Court Must Carefully Review Whether the District
         Court Denied the Defense Access to Classified Materials ........................ 19

    V.   The Government Cannot Deny That Garcia-Luna Was
         Vetted by the United States .................................................................. 21

    VI.  Garcia-Luna Possessed No Trappings of Wealth in
         Mexico and the Government's Implications Regarding
         Hidden Wealth Should Not Have Been Permitted
         at Trial ................................................................................................. 27

CONCLUSION .................................................................................................. 29

CERTIFICATE OF COMPLIANCE .................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Global Reinsurance Corp. of Am. V. Century Indem. Co.*,
    22 F.4th 83 (2d Cir. 2021) ..................................................................22

*JA Apparel Corp. v. Abboud*,
    568 F.3d 390 (2d Cir. 2009) .............................................................22

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
    959 F.2d 425 (2d Cir. 1992) .............................................................22

*United States v. Abu Jihaad*,
    630 F.3d 102 (2d Cir. 2010) .............................................................20

*United States v. Aquart*,
    912 F.3d 1 (2d Cir. 2018) ...........................................................4, 5, 14

*United States. v. Avellino*,
    136 F.3d 249 (2d Cir. 1998) .............................................................26

*United States v. Bout*,
    666 App'x 34 (2d Cir. 2016) .........................................................14, 17

*United States v. Cromiti*,
    727 F.3d 194 (2d Cir. 2013) ...............................................................5

*United States v. Gallego*,
    191 F.3d 156 (2d Cir. 1999) ...............................................................4

*United States v. Glover*,
    588 F.2d 876 (2d Cir. 1978) .............................................................5, 6

*United States v. Owen*,
    500 F.3d 83 (2d Cir. 2007) .........................................................14, 16, 17

*United States v. Sedhagaty*,
    728 F.3d 885 (9th Cir. 2013) .............................................................20

*United States v. Stofsky*,
    527 F.2d 237 (2d Cir. 1975) ...............................................................................4

*United States v. Wong*,
    78 F.3d 73 (2d. Cir. 1996) ...............................................................................4

**Statutes**

Classified Information Procedures Act § 4 ............................................................19

**Rules**

Rule 16 ...............................................................................................................24

Rule 33 ...........................................................................................*passim*

**INTRODUCTION**

Garcia-Luna's conviction rests on a fundamentally flawed trial record headlined by false testimony that was not merely inconsistent, but demonstrably impossible. The government fails to examine its own conduct in relation to the false testimony of two of its most important witnesses. It ignores the governing legal standard and instead attempts to place the entire burden on the defense to discover a government witness's false testimony when, with minimum diligence, it would have realized the impossibility of his claims. Applying the proper legal standard, the government should have known of its witnesses' false testimony. The government does not even attempt to explain how it presented testimony that was not merely inconsistent, but impossible. As a safe harbor, the government now claims that the witnesses on which it heavily relied to support its trial arguments were immaterial. But even a cursory review of the record shows that this is incorrect. Zavaleta and Villarreal committed perjury concerning issues that were material to Garcia-Luna's conviction.

The Court should also reject the government's claims that Garcia-Luna failed to exercise due diligence in connection with the newly discovered evidence. Garcia-Luna did everything he could to assist in his defense and his defense team diligently worked to understand and defend against charges related to Garcia-Luna's alleged acts more than a decade earlier. Instead of explaining why it did

1

not conduct its own diligence when trying this case, the government instead tries to cast doubt on the authenticity of Garcia-Luna's new evidence but points to nothing specific about the pieces of evidence that calls their legitimacy in question.

Additionally, the government attacks on Garcia-Luna's claims related to the handling of classified information are baseless. It is uncontested that Garcia-Luna's counsel was not provided with any classified materials, even though the government reviewed classified materials connected to this case for more than two years, made several *ex parte* filings regarding the same, and submitted a proposed order requiring summaries be provided to the defense. The Court must scrutinize the classified material and the government's *ex parte* submissions and representations in conferences to determine if any of the classified materials would have been helpful to the defense, and whether the district court abused its discretion by failing to order the government to provide Garcia-Luna's counsel with access to classified materials.

The newly discovered evidence that Garcia-Luna was vetted by the United States government irrefutably established that Garcia-Luna and his special secret team of agents were vetted by U.S. officials. Despite being aware that Garcia-Luna was vetted to attend trainings and meetings at FBI and CIA headquarters, it makes a highly technical contract-based argument regarding the LOU. That technical argument has no basis in law and should be rejected by the Court. Its

2

failure to produce the LOU and other vetting-related materials violated its *Brady* obligations, therefore, the district court abused its discretion when it denied Garcia-Luna's Rule 33 motion.

Finally, the government's insinuations that Garcia-Luna had any unexplained wealth, despite the absence of any evidence tying any of Garcia-Luna's assets to criminal conduct, further undercuts the verdict. Garcia-Luna's conviction must be reversed.

## ARGUMENT

I.     **The Court Should Reject the Government's Attempts to Shift the Burden of Discovery to Garcia-Luna Because the Government Should Have Known That Villarreal's Testimony Was False**

The government attempts to place the entire burden on the defense to discover a government witness's false testimony when, with minimum diligence, it would have realized the impossibility of his claims. It is not in dispute that Villarreal testified falsely at trial. His testimony regarding his meeting with Garcia-Luna could not have been true. Villarreal tied his alleged meeting to the year in which he claimed to have created a false invoice that he provided to the government. But the location in which the meeting allegedly took place did not yet exist, and the software had not yet been invented. He was not mistaken – he committed perjury. The government knew or should have known that Villarreal's testimony was false.

3

The government attempts to shift the responsibility to the defense to explain why it did not catch Villarreal's false testimony in real-time instead of examining its own actions, as the standard requires. In doing so, it makes a fleeting note to the proper standard but fails to apply that standard. The government concedes that "[i]f the prosecution knew, or should have known, of the false testimony prior to the conclusion of trial the conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the jury's judgment". Government Brief at 29-30 (quoting *United States v. Aquart,* 912 F.3d 1, 20 (2d Cir. 2018)). It then fails to apply that standard and explain why it should not be deemed to have constructive knowledge of Villarrel's incredible and false testimony.

When the government should have known that material testimony was false, reversal is virtually automatic. *See United States v. Gallego*, 191 F.3d 156, 162 (2d Cir. 1999); *see also United States v. Wong*, 78 F.3d 73, 81 (2d. Cir. 1996) (quoting *United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir. 1975)). Instead of addressing the *Gallego* and *Wong* standards, citing no caselaw, the government argues that Garcia-Luna must have discovered the perjury during trial to prevail on this claim – a proposition that would incentivize prosecutors to present surprise false testimony so long as the defense does not discover it in real-time. That is not the standard for good reason.

4

The government completely fails to examine its own conduct and responsibility in connection with Villarreal's false claims. It fails to offer any explanation for its failure to discover (if in fact it failed to discover) that its own critical witness intended to testify to facts that could not be true. Even the slightest due diligence on its part, after years of investigation, would have shown that Villarreal was going to lie at trial. Instead of offering any explanation, it ignores the "should have known" standard, or even argue why that standard somehow does not apply here.

Notably, the government also ignores the standard articulated in *United States v. Cromiti*, 727 F.3d 194, 224 (2d Cir. 2013) (quoted in *Aquart*, 912 F.3d at 20), that goes a step farther and holds that even if the government had a good faith subjective belief that the witness's testimony was true, knowledge of the testimony's falsity can still be imputed to it when "no reasonable person could fail to recognize its falsity." No reasonable prosecutor preparing Villarreal to testify against Garcia Luna would have failed to recognize the falsity of Villarreal's claims.

Furthermore, this is not a case of ambiguous testimony that could be the result of a mistake. *United States v. Glover*, 588 F.2d 876, 879 (2d Cir. 1978), cited in the government's brief, involved a witness's mistaken testimony regarding the date on which the defendant was present for a narcotics sale. The court held

5

that a mistaken date can be attributed to the length of time between that date and the witness's testimony, if it was indeed an incorrect date at all. The *Glover* witness's "testimony concerned events that were four years distant, and it [was] clearly possible that the substance of his testimony was accurate though mistaken by a few months with regard to specific dates." *Id*. Villarreal's testimony cannot be attributed to a mistake.

The government and the district court below ignored or failed to even attempt to reconcile the numerous factual impossibilities embedded in Villarreal's testimony. In fact, on appeal, the government has now abandoned its argument made below that it was possible that Villarreal saw an "early prototype of Pegasus" (A4336) in "an early iteration of the bunker" (A4335), recognizing the ridiculousness of that impossibility. It has also abandoned its argument that "neither the date of the tour, nor the name of the spy software, were material details for which there would be any reason to intentionally lie." A4336. It now vaguely defends Villarreal's false statements, simply stating that "even if such evidence did establish falsity, such inaccuracies would fall well short of perjury. Misremembering the date of a meeting or the name of a technology used more than a decade prior—particularly where, as here, the date or name are immaterial—is

6

the kind of '[s]imple inaccurac[y] [that]…do[es] not rise to the level of perjury.'" Government Brief at 37.[1]

But even if the onus was on the defense to catch the government's witness's perjury, Garcia-Luna had no reason to anticipate Villarreal's perjury. He had no notice that Villarreal would be testifying to something patently impossible and he had no ability to gather decades-old materials from another country that was hostile to him, and to which travel and investigation was impossible for most of the pretrial process due to the COVID-19 pandemic. For example, the government argues that "Garcia Luna was a featured speaker at the inauguration of the bunker and, thus, clearly knew prior to trial when it first opened." Government Brief at 35. The Bunker opened more than ten years before trial began. Garcia-Luna could not be expected to remember the date of the inauguration more than ten years earlier when there was no reason to believe that it was going to be a subject of the trial. Garcia-Luna was the Secretary of Public Security for the entire nation, a member of the presidential cabinet, and tasked with an incredible number of responsibilities. Even the government, in its trial opening, stated "[i]t's a little hard for me to explain how powerful he really was because we do not have any law

---

[1] Ironically, the government attempts to excuse Villarreal's false testimony because of the amount of time that would have passed between his alleged meeting at the Bunker and Garcia-Luna's trial, but expects Garcia-Luna to have a clear memory of the same timeframe.

enforcement officers in the United States who have consolidated this much power under them". A1249.

Additionally, Villarreal's 3500 material did not mention that he claimed to have been given any demonstration of the Pegasus software at the Bunker, nor that it was related to any alleged meeting where bribe payments were discussed.[2] *See* GSA40-48. Instead, his 3500 material suggested that the meeting where he discussed bribing El Universal with Garcia-Luna was subsequent to another meeting in 2009 or 2010 (GSA42), and that a bribe payment was made in 2010 (GSA48). The 3500 material did not mention the existence of any invoice (GSA40-48) corroborating and allegedly memorializing the date of the alleged bribe and scheme. The defense was not on notice that Villarreal would testify to a factual impossibility. And the government, when it was preparing Villarreal to testify to information not contained within any notes of his numerous previous meetings with the government, should have known that his claims were false.

If the government intended to elicit this testimony at trial, it also should have known that Garcia-Luna was the inauguration speaker (as it says) and determined the year. If it had simply cross-checked its own witness's claims, it could have

---

[2] The government produced hundreds of pages of Villarreal's 3500 material from meetings with the United States Attorney's Office for the Western District of Texas, including many with AUSA Russell Leachman, who was given a report explaining Villarreal's alleged criminal activity while cooperating with the government – material that was not disclosed to the defense and is discussed *infra*.

prevented false testimony. This would be especially appropriate considering the invoice that Villarreal claimed was proof of a bribe was arguably the only corroborating evidence offered against Garcia-Luna.

In response to these devastating claims in Garcia-Luna's post-trial motion, the government did not even offer the district court Villarreal's explanation, even though it went to great lengths to interview its witnesses in connection with one of Garcia-Luna's other grounds for a new trial. Not doing so has left a trial record containing materially false testimony. Villarreal could not have had a meeting in a facility that did not yet exist, where he was shown software that had yet to have been created. This lie was compounded by the invoice that he claimed was a result of (and allegedly corroborated) this meeting at the Bunker.

The government knew or should have known that Villarreal was going to falsely testify multiple times at trial and as such, Garcia-Luna's conviction must be overturned.

## II. Garcia-Luna's Conviction was Tainted by False Testimony from Two of the Government's Most Material Witnesses

Newly discovered evidence established that two of the government's critical witnesses committed perjury during Garcia-Luna's trial. The government's opposition largely advances a materiality defense – that Zavaleta's and Villarreal's testimonies were immaterial and cumulative. This is in direct conflict with the trial record which establishes, often by the government's own arguments to the jury,

that the perjured testimony was material and crucial to obtaining Garcia-Luna's conviction.

### a. The Government's Trial Arguments Establish That Zavaleta's Testimony was Material

The government's conclusion that Zavaleta's entire testimony was immaterial and cumulative runs contrary to the very arguments it made during its summations. At trial the government elicited testimony from five witnesses concerning what they repeatedly referred to as Garcia-Luna's kidnapping. Four of those witnesses could only provide the jury with testimony based on their secondhand knowledge of the purported kidnapping. Only one witness, Zavaleta, testified with allegedly first-hand knowledge. His testimony was critical to the issue of whether Garcia-Luna was working for the cartels. It provided the jury with the only direct evidence linking Garcia-Luna to the cartel from a witness who was not cooperating with the government.

The import of Zavaleta's testimony was repeatedly emphasized by the government in its summations. For example, in its opening summation, it stated:

> You heard it from various perspectives, and you heard it from someone who actually saw it. Arturo had the defendant and his bodyguards detained on the side of the road. And you heard that from the police officer who was driving that day on that road, a police officer who knew what Arturo Beltrán and Barbie looked like, and who knew what Genaro Garcia Luna looked like because he worked

10

for him closely, and saw it and remembered it.  Officer Francisco Canedo Zavaleta.[3]

A3251-52.  That was only one of many quotes from the government's opening summation concerning the materiality of Zavaleta's testimony.  Indeed, at one point more than four full pages of the transcript from the opening summation was dedicated to this issue.  A3251-55.

Moreover, during the government's rebuttal summation, it underscored the materiality and veracity of Zavaleta's testimony, describing it as "devastating." A3368.  The government now, understandably given the falsity of the testimony, attempts to downplay the import of Zavaleta's testimony, now describing the kidnapping as a "meeting" between Garcia-Luna and senior cartel members, despite the trial being replete with references to the same event using the term "kidnapping."[4]  A517, A2068-69, A2211-12 (using the word grabbed instead of kidnapped), A2528, A3250, A3251-52, A3254, A3255, A3271, A3355, A3368.

The government emphasized to the jury in its opening and rebuttal summations that Zavaleta's testimony was detailed, precise, and had the "hallmark

---

[3] Additionally, the affidavits from Garcia-Luna's secretary and bodyguard, as well as Zavaleta's own public employment documents, show that he did not work for or with Garcia-Luna at all, let alone closely.  SA1819-29, A3950-77.

[4] Even in the government's response to Garcia-Luna's Rule 33 motion it continued to use the term "kidnapping".  A4094, A4138, A4140, A4142.  Only before this Court has it abandoned the term.

11

of truth telling." A3252, A3355, A3368. However, those details are exactly why his testimony was false. At the exact time that Zavaleta testified to having seen Garcia-Luna detained on the side of the road with Beltran-Leyva more than two hours away from Mexico City, Garcia-Luna was in Mexico City with his wife at Angeles Del Pedrigal Hospital signing her discharge paperwork.[5] His testimony cannot be accurate. Only when confronted with proof that his testimony was false did the government switch positions and attempt to argue that Zavaleta's testimony was immaterial. That argument is contrary to the arguments it made to the jury and should be rejected as a desperate attempt to give credence to a conviction obtained with perjured testimony.

      *b. Villarreal was the Government's Response to Garcia Luna's Primary Defense*

The central issue in this case, which the jury's verdict hinged upon, was whether Garcia-Luna accepted millions of dollars in bribes from the cartel and was, thus, a corrupt government official. Garcia-Luna's primary defense was that the government lacked any evidence of unexplained wealth attributable to him and,

---

[5] The government describes the hospital receipt as "unauthenticated" (Government Brief at 30) without citing any cases that require new evidence to be "authenticated". This is the reason that the district court (who permitted Garcia-Luna to admit evidence at trial of a bill of lading because it exhibited "guarantees of trustworthiness" A3104) should have at least held an evidentiary hearing. And the government has cited no investigation or explanation about why the receipt would not be authentic.

12

thus, could not corroborate any of its witnesses' claims. The government attempted to counter this defense by introducing testimony from Villarreal showing how corrupt politicians in Mexico, bribed by the cartels, used their bribe proceeds to purchase things like real estate and hide wealth. Villarreal testified that officials would buy property through third party "strawmen" and thus avoid a paper trail or any public disclosures.

The government also used Villarreal to give credence to Zavaleta's kidnapping story. Villarreal testified that Garcia-Luna worked with him to bribe a newspaper, El Universal, to obtain favorable press coverage and not write any stories about how Garcia-Luna had been kidnapped by the cartel in 2008. The government highlighted the importance of Villarreal's testimony during its summations. A3271-73, A3364.

As with Zavaleta, only after being confronted with uncontested proof of his perjurious testimony did the government try to claim that Villarreal's testimony was immaterial. The trial record speaks for itself. Villarreal's testimony was unique and important. He was the only non-cartel member that testified about public corruption in Mexico and Garcia-Luna's ties to the cartel. The government cannot now run away from the materiality it once ascribed to Villarreal. Villarreal's perjured testimony was critical to obtaining Garcia-Luna's conviction and was demonstrably false.

13

Zavaleta and Villarreal committed perjury concerning issues that were material to Garcia-Luna's conviction.  The government has not even attempted to explain why it did not, let alone should not, have known about the perjury.  In this case, the need for integrity in the criminal prosecution against Garcia-Luna tips the scales in favor of a retrial.  *See Aquart*, 912 F.3d at 20.

## III.    Garcia-Luna Exercised Due Diligence to Discover New Evidence

The Court should find that Garcia-Luna exercised due diligence when preparing his defense while incarcerated during a global pandemic where potential witnesses in Mexico were too afraid and did not come forward until after trial. Garcia-Luna did everything he could to assist in his defense and his defense team diligently worked to understand and defend against charges related to his alleged acts more than a decade (and in some cases two decades) earlier.

In its opposition, the government cites numerous inapposite cases, largely relating to the availability of local witnesses or international witnesses that would exercise their Fifth Amendment rights against self-incrimination.  *See United States v. Owen,* 500 F.3d 83, 87 (2d Cir. 2007) (where local witness exercised Fifth Amendment right against self-incrimination); *United States v. Bout*, 666 App'x 34, 38 (2d Cir. 2016) (where international arms dealer attested he would have exercised Fifth Amendment right at trial).  The government does not cite a single case where the witnesses were outside the United States and would have had to

14

have been located and interviewed in the middle of a global pandemic, regarding topics that were not contained in any charging documents or pretrial motion practice, and only became apparent and relevant shortly before trial (the alleged kidnapping) or during trial itself (Villarreal's alleged meeting with Garcia-Luna).

Furthermore, the incidents to which Zavaleta and Villarreal testified allegedly occurred over a decade prior to trial. The government's entire case was based on acts alleged to have been committed more than a decade previously, and in some cases close to two decades. The challenges to the defense were enormous. When Garcia-Luna was indicted, any witnesses that could have remembered anything were in Mexico and were under the threat of arrest if they assisted Garcia-Luna or his family that were and are still considered enemies of the state.

Garcia-Luna was arraigned on January 3, 2020, mere months before the start of the COVID-19 pandemic. *See* A7. Most of his pretrial preparation time was during the pandemic. After his arrest, Garcia-Luna's family was locked out of or lost any access to items in Mexico and its banking system. *See* A57. Additionally, Garcia-Luna's family was subject to arrest in Mexico, and anyone helping him was subject to arrest as well. And, as the majority of the new evidence was located in Mexico, even if defense counsel was aware of it, they had no ability to subpoena these potential witnesses.

15

In its response, the government cites *Owen* to support its argument that the evidence presented in Garcia-Luna's Rule 33 motion was not newly discovered. Government Brief at 32, 35, 44. But *Owen* dealt with a co-defendant exercising his Fifth Amendment rights, thereby refusing to testify for the defendant. *Owen* has no place in this analysis primarily because Garcia-Luna was not aware that much of this material, located in Mexico, even existed. 500 F.3d at 91 ("[Defendant] was at all times aware of [co-defendant's] 'ability' to exculpate him, but was unable to benefit from [co-defendant's] testimony because [co-defendant] did not make it available until after the trial was over. In these circumstances, [co-defendant's] testimony is not newly discovered evidence within the meaning of Rule 33."). Additionally, unlike in *Owen*, at least one of Garcia-Luna's unavailable witnesses were in Mexico and would not speak to the defense. Finally, in *Owen* the potential witness was exercising a legal right, specifically his Fifth Amendment right against self-incrimination. *Id.* ("When a codefendant invokes his privilege against self-incrimination and refuses to testify, the defendant is denied the benefit of any potentially exculpatory testimony the codefendant might have provided."). No new witness presented by Garcia-Luna claims that they did or would have exercised their Fifth Amendment rights. Rather, they did not come forward because of fear of reprisals from their own government.

16

Similarly, in *Bout*, also cited by the government, the defendant did not attempt to contact a witness who later declared that he "did not testify because he did not want to incriminate himself." 666 App'x at 38. As with *Owen*, that is not the case here. No witness declared that they did not testify because they were exercising a legal right to remain silent.

In her affidavit, Garcia-Luna's secretary explained that she was reluctant to come forward because she lived in Mexico and only provided information to Garcia-Luna's defense after what she termed Garcia-Luna's "unjust conviction". SA1825. With respect to the veracity of Villarreal, the defense could not have been and was not aware of the witnesses related to that information. After trial the defense was contacted by former DEA agents who came forward because they were shocked that the government would call Villarreal as a witness, considering their investigation of the crimes that Villarreal allegedly continued to commit while cooperating with the government. Only after meeting with them in person months after trial did they provide to the defense the evidence they had compiled of Villarreal's activities while a government cooperator – information they had previously given to two U.S. Attorney's Offices in Texas. One of the individuals that the agents gave this evidence to was AUSA Russell Leachman of the Western District of Texas, who conducted numerous proffers with Villarreal, and was presumably involved in providing the prosecution team with Villarreal's 3500

17

material. Similarly, a former high-level member of the Mexican government reached out to the defense in Spring 2023, to provide hundreds of thousands of pages of new material, largely Mexican government documents, not previously made available to the defense from any sources. SA1815.

Tellingly, in response to Garcia-Luna's Rule 33 motion, the government attacks the defense on due diligence grounds but did not supply any factual statements from Zavaleta refuting any of the defense's arguments. The government took no investigative steps to confirm or refute that Garcia-Luna was at a hospital in Mexico City at the exact time Zavaleta claims to have seen him being kidnapped, underscoring how difficult it is for even the United States government, which has investigators from the DEA, FBI, and State Department stationed in Mexico (A2601), to obtain information from Mexico. Instead, it expected defense counsel, who was under personal attack by the president of Mexico since the outset of the case, to travel to Mexico during a global pandemic when borders were closed.

These were not normal circumstances, and this was not a normal prosecution. Garcia-Luna was in the Metropolitan Detention Center during a pandemic, and he had left his post with the Mexican government eight years

18

earlier.[6]  Instead of explaining why it did not conduct its own diligence when trying this case, the government instead tries to cast doubt on the authenticity of Garcia-Luna's new evidence but points to nothing specific about the pieces of evidence that calls their legitimacy in to question.  Garcia-Luna was diligent in preparing for trial, and this evidence was not available until after he was convicted.

## IV. The Court Must Carefully Review Whether the District Court Denied the Defense Access to Classified Materials

Garcia-Luna's claim regarding his improper denial of access to classified materials is not "speculation", conjecture or theory.  It is uncontested that Garcia-Luna's counsel was not provided with any classified materials, even though the government reviewed classified materials connected to this case for more than two years, made several *ex parte* filings regarding the same, and submitted a proposed Classified Information Procedures Act ("CIPA") Section 4 order that proposed summaries be provided to the defense.  Because Garcia-Luna has had no access to any classified materials in connection with his defense, his claim must be a general one.  Based on the nature of CIPA litigation, he is forced to make a more general claim and request that this Court carefully examine the sealed *ex parte* proceedings

---

[6] Garcia-Luna, who could not subpoena foreign witnesses, was reliant on people in Mexico coming forward to provide documents in their possession.  Alternatively, the government could have simply called sister agencies to obtain documents that should have been readily available.  And for the Villarreal *Giglio* material, called Madrigal, its own witness.

related to classified materials. Like the defendant in *United States v. Abu Jihaad*, 630 F.3d 102, 139 (2d Cir. 2010), because neither Garcia-Luna nor his counsel has access to the government's CIPA submissions or the transcripts of *ex parte* conferences, Garcia-Luna is unable to present factual arguments regarding the propriety of those proceedings more than what he already has.

For example, the government submitted a proposed order to the district court identifying that it had prepared summary substitutions of classified materials that were sufficient to satisfy its discovery obligations, yet the defense is not aware of any classified materials or summary substitutions that were produced. *See* GA06. In *United States v. Sedhagaty*, 728 F.3d 885, 905 (9th Cir. 2013), the government, before the district court, acknowledged that it had classified information potentially helpful to the defense and prepared a proposed summary of the materials. Those summaries were made available to the defense for review. The defense asked the court to ensure that the summary was "even-handed, worded in a neutral fashion, and not tilted or shaded to the government's advantage." *Id.* at 906. Here, no procedures like this were followed and the defense was not made aware of any summaries.

Garcia-Luna only asks the Court to perform the review function it has conducted in countless cases. The Court must scrutinize the government's *ex parte* submissions and representations in conferences to determine if any of the classified

20

materials would have been helpful to the defense, and whether the district court abused its discretion by failing to order the government to provide Garcia-Luna's counsel with access to classified materials. Garcia-Luna was entitled to all materials that would have been helpful to establish that he was a trusted and vetted partner of the United States that had not been corrupted by any of the Mexican cartels.

## V. The Government Cannot Deny That Garcia-Luna Was Vetted by the United States

The government has always been aware that Garcia-Luna was vetted by the highest levels of the U.S. law enforcement and intelligence communities. It has never denied the same and only claimed, before trial, that it was not in possession of vetting materials *connected to Garcia-Luna's meetings with high level officials*. It ignored then, and it ignores now, that Garcia-Luna, early, requested *all* materials of Garcia-Luna's vetting by U.S. authorities, not just those connected to his meetings with high level officials. Such materials would have been essential to his defense.

The LOU obtained by the defense from Mexican sources after trial irrefutably established that Garcia-Luna and his special secret team of agents were vetted by U.S. officials. The government claims that because the document does not specifically state that Garcia-Luna would be subject to vetting, he was somehow exempted from that requirement. Despite being aware that Garcia-Luna

21

was vetted in order to attend trainings and meetings at FBI and CIA headquarters, it makes a highly technical contract-based argument regarding the LOU. That technical argument has no basis in law and should be rejected by the Court.

The language of the LOU is clear and unambiguous from its four-corners. The Sensitive Investigative Unit ("SIU"), of which Garcia-Luna was the head, was subjected to vetting – a full U.S. background investigation that included polygraph examinations. *See Global Reinsurance Corp. of Am. V. Century Indem. Co.*, 22 F.4th 83, 94 (2d Cir. 2021) (four corners of the document govern) (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009)). The government urges a different interpretation to try and minimize the clear importance of the LOU, but "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations." *Global Reinsurance Corp.*, 22 F.4th at 94 (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir. 1992)).

The affidavit of Garcia-Luna's secretary established that Garcia-Luna and members of his staff were subjected to background checks and polygraph examinations by U.S. law enforcement and intelligence agencies. SA1823-24. Furthermore, the government has *never denied* that he was vetted at the highest levels, and the evidence at trial and sentencing record establish as much.

22

In its brief, the government completely glosses over Ambassador Anthony Earl Wayne's testimony. Despite his testimony at trial that the Department of State never received any reliable reports that Garcia-Luna was involved with the cartels, the government states, incorrectly, that the Department of State "could not rely on Garcia Luna's Federal Police 'to work against…the Sinaloa Cartels.'" Government Brief at 20. On the contrary, Ambassador Wayne testified that "Mexico was a close partner of the United States in trying to curtail or stop the drug trafficking" (A2595) and in particular, that Garcia-Luna was a "strong partner." A2611. Ambassador Wayne further testified that the U.S. government was "briefed about significant events that occurred in law enforcement in Mexico" and "[i]f there were specific credible evidence that bribes had been received [by Garcia-Luna], yes, I and everybody would have alerted Washington." A2607.

Even though he was the head of the SIU, nothing in the record establishes that Garcia-Luna was not subject to the same or more vetting than the rest of the team, especially when his own secretary was vetted and polygraphed. Is the coach not also a part of the team; is the U.S. attorney not also a prosecutor; is the federal defender not also a defense lawyer; is the chief judge not also an acting judge? Unless he is excluded, why would the LOU not include him? And if it was as obvious as the government suggests, where was the statement from a law-enforcement official attesting to as much in its Rule 33 motion response or in

23

testimony at trial? All these basic questions and more were the reason for this issue to have been at least explored at a hearing.

The government also claims that the defense should have found the LOU with the exercise of minimal diligence because Garcia-Luna signed it. This issue has been discussed above. But specifically regarding the LOU, just because Garcia-Luna was a signatory to a contract creating a secret specialized U.S. trained unit, does not mean he would have a copy or recall signing that document approximately ten years earlier. Furthermore, the government does not explain where Garcia-Luna or the defense would have located the document. The LOU is an official U.S. and Mexican document that was sent to the defense by a Garcia-Luna sympathizer only after trial. The government's brief is silent as to where it asserts the defense would find this official U.S. document.

The government also ignores that the defense had to defend this matter during a global pandemic where international borders were closed for the majority of the time. That is precisely why Garcia-Luna made the general and specific discovery requests he did. The government was gathering documents from its law enforcement partners (including the DEA) and the intelligence community to produce Rule 16 materials and potential classified discovery. Through its representations, it was reviewing classified material for more than two years. The government's response did not deny that vetting materials existed but that it was

24

not in possession of background check materials in preparation for "meetings with U.S. government officials." It has never denied that it is aware of and there exists vetting materials connected to Garcia-Luna. In fact, as noted above, Ambassador Wayne testified that he was briefed by many federal agencies regarding whether Garcia-Luna and others were corrupt. A2607. The government largely ignores Ambassador Wayne's testimony in its brief, devoting only one sentence to his illuminating testimony. It simply ignores that its own witness testified that Garcia-Luna was investigated and vetted, and that according to his sources, the United States did not have any credible evidence that Garcia-Luna was corrupt. A2607.

Likewise, in its brief, the government ignores the claims, which echoed Ambassador Wayne's testimony, made by Jose A. Rodriguez, Jr., a former member of the Mexico City U.S. Embassy diplomatic staff, who indicated that he had vetted Garcia-Luna "with the DEA, FBI, and CIA." A4443. But according to the government, *Garcia-Luna* was supposed to find a U.S. government document that is not public and would be in DEA or other U.S. government agency files discussing a clandestine unit that would be polygraphed and vetted by U.S. intelligence. No defense investigation would have obtained this document but for a sympathizer sending the document to the defense after trial. *See* SA1813-18.

25

As a fallback, the government claims that the LOU or vetting materials were not in its possession.[7] It does so, ignoring *United States. v. Avellino,* 136 F.3d 249, 255-56 (2d Cir. 1998), which holds that prosecutors are "presumed to have knowledge of all information gathered in connection with his office's investigation of the case and has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." The government also ignores what it acknowledged in the past, that this investigation commenced at the U.S. Embassy in Mexico (A2622) and the government would have gathered information from the Embassy, DEA, FBI, and CIA that it knows all have substantial information related to Garcia-Luna's vetting. The LOU would have certainly been in the files of the embassy and/or the DEA.

The government is well-aware that Garcia-Luna had been vetted by the highest levels of U.S. intelligence that permitted him to attend trainings at Quantico, attend meetings and briefings at CIA headquarters, and engage with high level U.S. government officials in connection with U.S. law enforcement and broad government objectives and operations in Mexico. Accordingly, its failure to produce the LOU and other vetting-related materials violated its *Brady* obligations,

---

[7] The government claims that by citing to the Justice Manual Garcia-Luna is claiming that the manual gives some kind of rights to a defendant. That is not the argument. Rather, Garcia-Luna simply points out that the government's actions in this case ran contrary to its own best practices, promulgated by the DOJ in its Justice Manual.

therefore, the district court abused its discretion when it denied Garcia-Luna's Rule 33 motion. At a minimum, the Court should have conducted a hearing to explore the extent of the government's knowledge of Garcia-Luna's vetting in light of the defense's discovery of the LOU and witnesses willing to come forward to attest that they were aware of Garcia-Luna's vetting.

**VI.** **Garcia-Luna Possessed No Trappings of Wealth in Mexico and the Government's Implications Regarding Hidden Wealth Should Not Have Been Permitted at Trial**

The government never established, either before or at trial, that any of Garcia-Luna's assets were connected to narcotics trafficking or any illicit behavior. It acknowledged as much, which formed the basis of the district court's decision to exclude all evidence of Garcia-Luna's post-2012 alleged wealth.[8] As Garcia-Luna pointed out in his Rule 33 motion, a Mexican court examined his Mexican assets and ruled in an action known as an Amparo, that none of Garcia-Luna's assets could be traced to ill-gotten gains. A4205-56.

---

[8] The government mentions that it produced "more than one million pages of documents in discovery, including substantial financial records that the government did not intend to use in its case-in-chief and were not exculpatory." Government Brief at 5. In reality, those documents showed that there was no nexus between Garcia-Luna's wealth from his successful consulting career and any alleged bribes. This is why Judge Cogan granted Garcia-Luna's motion to preclude the government from introducing any evidence of Garcia-Luna's wealth after he left public office. See SA60-66.

The government was well-aware that Mexico conducted many investigations stemming from false claims made by opposing party senators. Public hearings were held in Mexico. Documents were produced in discovery regarding all his properties in the government's first production. Its claim that any of his wealth was unexplained is patently false and this myth has been debunked many times over. The government provided no evidence at trial that he acquired any assets in Mexico from any connection to the cartels. Furthermore, the government knew that his home in the Mexican suburbs, a vacation home, was inherited from his parents and shared amongst his siblings. It also knew, especially from the testimony of Ambassador Wayne, that his townhouse, his primary residence, was nothing extravagant or "ostentatious." A2573.

The government also knew that the home and yacht, which it alleged were purchased through "shell companies", were actually purchased by Garcia-Luna's employer in the United States and who let Garcia-Luna live in the home. The government could not tie any of his property in the United States or Mexico to narcotics proceeds.[9] The implication to the contrary should never have been permitted at trial.

---

[9] Similarly, the government argues that Garcia-Luna's wife testified at trial that Garcia-Luna failed to include her income on his patrimony statements. This argument would not only conflict with its argument that any "unexplained wealth" was illicit, but Garcia-Luna's wife testified that they corrected this omission in later patrimony statements. *See* A3123.

28

The government was aware that Garcia-Luna's assets in Mexico were purchased legitimately, not with drug proceeds. And the Miami home and boat the government mentions were bought by Garcia-Luna's prospective employers, who let him live there. There was no obfuscation. The baseless rumors to the contrary have been debunked many times over and should not have been presented at trial.

## CONCLUSION

For the foregoing reasons, this Court should reverse or vacate Garcia-Luna's conviction and sentence.

Dated: April 9, 2026

Respectfully submitted,

   /s/ *Cesar de Castro*
_____
Cesar de Castro
Shannon McManus
THE LAW FIRM OF
  CESAR DECASTRO, P.C.
The District
111 Fulton Street, Suite 602
New York, New York 10038
646-285-2077

*and*

Valerie A. Gotlib, AT
GOTLIB LAW, PLLC
20 Vesey Street, Suite 400
New York, New York 10007
917-536-8171

*Attorneys for Defendant-Appellant*

29

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Rule 32.1(4) because this brief contains 6,648 words, excluding the parts of the brief exempted by F.R.A.P. 32(f).

This brief complies with the typeface requirements of F.R.A.P. 32(a)(5) and the type style requirements of F.R.A.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Dated: April 9, 2026

Respectfully submitted,

_/s/ Cesar de Castro_
Cesar de Castro
Shannon McManus
THE LAW FIRM OF
   CESAR DECASTRO, P.C.
The District
111 Fulton Street, Suite 602
New York, New York 10038
646-285-2077

*and*

Valerie A. Gotlib, AT
GOTLIB LAW, PLLC
20 Vesey Street, Suite 400
New York, New York 10007
917-536-8171

*Attorneys for Defendant-Appellant*

30